UNITED STATES DISTRICT COURT - DISTRICT OF NEW HAMPSHIRE

ANDRE BISASOR, Plaintiff,

v.

CRAIG S. DONAIS;
RUSSELL F. HILLIARD;
DONAIS LAW OFFICES, PLLC;
UPTON & HATFIELD, LLP;
MARY K. DONAIS,
BEATRIZ VAN MEEK (as amended)
JOHN DOE COMPANY 1 (as amended)
JOHN DOE COMPANY 2 (as amended)
Defendants.

Case No.1:23-cv-00374-JL

## [CORRECTED[1]] SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1. I, the plaintiff in this case (hereinafter "plaintiff"), in the above captioned case, hereby submits this second amended[2] complaint against the above-named defendants Craig S. Donais (hereinafter "Mr. Donais" or "Donais"), Russell F. Hilliard (hereinafter "Mr. Hilliard" or "Hilliard"), Donais Law Offices PLLC (hereinafter "Donais Law Offices"), Upton & Hatfield LLP (hereinafter "Upton & Hatfield") and Mary K. Donais (hereinafter "Mary Donais" or "Ms. Donais" or "Donais' wife" or "Craig Donais' wife), (hereinafter together collectively referred to as the "original defendants"), and Beatriz Van Meek ("Ms. Van Meek" or "Van Meek"), John Doe Company 1 and John Doe Company 2 (hereinafter together collectively referred to as "the new defendants"), and which hereinafter together fully and altogether collectively are referred to as "the defendants", for defamation, aiding/abetting defamation, false light invasion of privacy, tortious interference with advantageous relations, violations of the Massachusetts civil rights act, violations of 93A consumer protection act, civil conspiracy, intentional infliction of emotional distress, section 176D violations, etc.

2. The plaintiff demands a jury trial.

3. NB: The plaintiff hereinafter is also, where applicable, referred to in the first person, as "I", "me", "my", in addition to original term in the third person as "plaintiff".

## I. PRELIMINARY STATEMENT

### A. Summary of Allegations

4. This case is about holding lawyers accountable for defamation, and about sophisticated race discrimination by exploiting racism against two African Americans (including falsely saying that I accused him of race discrimination because simply he declined to represent me in a case which is patently false), and then going to the police to make false reports and to try to use the police to intimidate and retaliate against said African Americans (when said African Americans tried to hold him legally accountable for these false accusations and attempts at intimidation), thereby putting their lives in danger from police by making a false police report and falsely suggesting that they are dangerous criminals and more. The plaintiff will prove these allegations. In light of the defendants' malicious attempt to involve law enforcement against African Americans, this is a

---

[1] This is a corrected version of the filing made last night and is made to correct errors discovered after filing including typos, grammatical, syntactical errors, missing words/sentences/references and other scrivener errors. It is made promptly the very next day. Please accept and use this corrected version.

[2] NB: The first amended complaint was filed in state court prior to service of process on the defendants and prior to removal of the case by the defendants to federal court. That state court complaint has not been amended since after service of process or since removal to federal court. Consequently, that state court amended complaint is referred to herein as the state court complaint or the complaint, for ease of reference. Thus, any reference to the proposed amended complaint is referred to as the second amended complaint or simply the amended complaint, again for ease and simplicity of reference.

critically important case in this day of racial justice reckoning and in the aftermath of the death of George Floyd.

### B. Primary Defamation Allegation: False Accusation of Race Discrimination Accusation

5.  Donais made false statements about me that are defamatory and damaging to the plaintiff's reputation, and injurious to the plaintiff's legal rights. The very purpose of him making these statements was to damage the plaintiff and harm the plaintiff's reputation and credibility.

6.  For example, Donais made written statements to others saying that the plaintiff accused him of race discrimination because he (Donais) declined to represent the plaintiff, in a case against a defendant hotel, that the plaintiff became upset and angry because he (Donais) declined representation and thus accused him (Donais) with no reason or basis of being a racist.

7.  This was based on nothing and no actual facts that occurred, but it was manufactured by Donais to attack the plaintiff with an inflammatory accusation that could stick because the plaintiff is black. This is dog whistle racism intended to hurt and harm the plaintiff's reputation.

8.  These statements by Donais were made with malicious intent and reckless disregard of the truth.

9.  In making these statements, Donais was motivated by racial animus and intended to exploit the plaintiff's race as a black man and to use it against him.

10. These false accusations (by Donais) of race discrimination accusation by the plaintiff is tantamount to him playing the "race card in reverse".

11. The statements by Donais were false, disparaging, and negative statements about the plaintiff. It is analogous to a man saying that a woman falsely and frivolously accused him of rape, based on no reason or facts that occurred. If the woman made no such accusation, then the statement is defamatory and harmful to her reputation and intended to create despise and contempt of her in the community, much less if presented to a court or to law enforcement or others. It would be intended to paint the woman as a crazy irrational woman seeking to falsely accuse a man of rape. The same is true in this case where Donais falsely stated that the plaintiff frivolously accused him of race discrimination as such a statement is likewise defamatory and harmful to the plaintiff's reputation and intended to create despise and contempt of the plaintiff in the community and the public.

12. Donais' false and defamatory statements were gratuitously and maliciously made in order to harm, annoy, embarrass, humiliate, and burden and oppress the plaintiff. It had no other purpose.

13. Donais completely fabricated a lie and perjured himself in the process to publicly malign the plaintiff. The plaintiff felt utterly violated and harmed that someone-an attorney nonetheless--would exploit the issue of racism, which is something so painful for so many people in this country, just so that he could help his former client and friend to win a court case or so that he could advance his law career/business.

14. Donais was trying to undermine the plaintiff's valid concerns and real experiences related to the discrimination and retaliation suffered at a defendant hotel (which matter was settled several years later), in order to make it seem as though the plaintiff was irrational and predisposed to groundlessly, frivolously, without any cause, falsely accuse him of being racist (which the plaintiff did not do, and which is completely false).

15. Donais fabricated and utilized his lie about racism to willfully intimidate me and to interfere with and injure the plaintiff because of the plaintiff's race, and it was done, initially, in connection with the plaintiff's federally protected right to patronize a public accommodation and later republished and perpetuated to others in order to exact revenge on the plaintiff and/or to intimidate, harass, burden and retaliate against the plaintiff.

16. Donais' acts were motivated by racial animus, and it was done to exploit the plaintiff's race to bring harm to him. He targeted the plaintiff exploiting the fact that the plaintiff is black and thus use race as a weapon against the plaintiff. Blacks are generally vulnerable to these kinds of attacks and stirred up sensibilities in light of today's racial polarization. He wanted to make a caricature of the plaintiff as despicable untrustworthy, irrational human being. It is a form of racialized character-assassination and a racialized attack against the plaintiff.

17. Donais only brought up, falsely, that the plaintiff accused him of racism because the plaintiff is Black. It was thus racially motivated. If the plaintiff were White, such a fabricated lie would not stick.

18. Moreover, Donais had ulterior motives in that he wanted to intimidate the plaintiff and to shut the plaintiff up and to silence the plaintiff (and his wife). He was also using this racial element to protect his colleagues and his friend and longtime client. He thus set out, initially, to damage the plaintiff (and his wife) in their pocketbook, in their housing, in their legal rights and in their case. He also essentially tried to interfere with their contracts and their housing by trying to wrongly and perjuriously influence another court against them. Thereafter, Donais republished these false statements in order to try to protect himself from an attorney discipline misconduct case and to intimidate the plaintiff to prevent him from pursuing a misconduct case against Donais and offering evidence or testimony against him.

19. These statements are untrue and harmed the plaintiff.

20. Subsequently and additionally, Donais has repeated and republished his false defamatory statements about the plaintiff on more than one occasion and has continued to publish these defamatory statements with impunity and abandon.

21. Defendants knew the statements made to the police were false and deliberately inflammatory when they were made.

22. Defendants' statements to the police are not protected by privilege, because they were not made during the course of a judicial or quasi-judicial proceeding.

23. Defendants' statements to the police are not protected by privilege, because they were made with a reckless disregard of the truth.

24. Defendants cannot raise any privilege defenses, because they do not protect false statements made to the police.

25. Upon information and belief, Defendant Donais made false allegations against the Plaintiff, because he saw an opportunity to further his law career/law business, and to sure up personal solidarity and advantage with his former client (regarding which he was disqualified for conflict) for personal gain/future business with his former client in the relevant hotel case, etc., by creating a false race card story against a black couple who was in the process of seeking to pursue a lawsuit against a hotel, the principal of which was a friend and business client of Donais.

26. Plaintiff's reputation has been damaged by Defendant's false allegations.

27. Defendants knew the statements made were false and deliberately inflammatory when he made them.

28. Defendants acted with actual malice, because he was highly aware his statements made about the Plaintiff to the police were a lie.

29. Defendant Hilliard acted with actual malice because he was highly aware that Defendant Donais' statements to the police about the plaintiff were false. Defendant Hilliard was involved in or aided/abetted or facilitated the false allegations about the plaintiff.

30. Defendant Hilliard is grossly irresponsible because he allowed Defendant Donais to publish false statements about the plaintiff in furtherance of his personal agenda.

31. Defendant Hilliard acted in a grossly irresponsible manner without due consideration for the standards of integrity for the legal profession.

32. Plaintiff has been damaged in an amount in excess of the jurisdictional amounts of the court and in amount to be determined by a jury at trial.

## C. Other False Accusations and False Statements

33. Donais also made statements to others that implied or suggested falsely and maliciously that the plaintiff was dangerous and suggesting falsely that the plaintiff was going to (or was) capable of hurting and harming his wife and young child, among other things. By the way, these unfounded accusations about dangerousness and harmful intent were also ascribed to the plaintiff's wife.

34. Donais made false statements/accusations about the plaintiff in June 2019, falsely accusing the plaintiff of manufacturing and fabricating his voice to make it look as though he made statements that he did not make (or otherwise that the plaintiff was capable of or prone to do such things).

35. Donais made false statements/accusations about the plaintiff in June 2019, falsely accusing the plaintiff of suffering from (or suggesting that the plaintiff suffers from) a mental disease.

36. Donais made false statements/accusations about the plaintiff in 2020 to the police, falsely accusing the plaintiff of violent criminality or being a dangerous criminal threat.

37. Donais made false statements about the plaintiff to Hilton attorney Shelagh Michaud and misrepresented that he wanted to engage in settlement negotiations with me/my spouse along with the Hilton defendants.

## D. Other Claims

38. As will be more fully elucidated below, the defendants committed other wrongs and tortious acts including but not limited to tortious interference with advantageous relations, violations of the Massachusetts civil rights act, violations of 93A consumer protection act, civil conspiracy, intentional infliction of emotional distress.

## E. The Nexus Between Donais and Hilliard Acts/Claims

39. First, it is important to understand at the heart of this is the fact that almost every wrongful act, dishonest statement, and misconduct of Donais outlined in this complaint stems from an attempt at a cover-up of other misconduct, lies and violations of law or ethics. This has resulted in a repeating, expansion and compounding of more and lies on top of lies. It has also resulted in Hilliard getting involved to help, assist, vouch for, and protect Donais.

40. It is hard to describe in words the nature of the relationship between Hilliard and Donais.

41. On information and belief, Hilliard is Donais' confidante, mentor, fixer, and is a personal and professional connection, ostensibly as part of a tight 'good ole boy' network.

42. On information and belief, Hilliard has also helped Donais with getting opportunities as a lawyer.

43. Hilliard has been Donais' counsel in at least 3 attorney discipline proceedings against Donais and at least 10 court proceedings (including both superior court actions as defendant or intervenor, and appellate court actions whether as appellant or appellee) as Donais' counsel, involving to one extent or the other, the plaintiff and/or his wife. Hilliard has vouched for Donais in most of these proceedings. Similarly, Hilliard has staked his reputation (and thus law license) on vouching for Donais. Hilliard and Donais have been and are tied at the hip. If Donais is exposed, Hilliard will be exposed. Their fates are now inextricably intertwined. Hilliard has become emotional and unhinged in his vouching for Donais. Hilliard will do anything to protect Donais because in doing so, Hilliard is protecting himself. NB: On information and belief, Hilliard may not even be charging Donais for much of legal work on his behalf, as Hilliard has become so invested in this matter that he is not only doing it for Donais, he is also doing it for himself.

44. Donais leans on and relies heavily on the help, assistance, and counsel of Hilliard. Hilliard, at 71 years old, is about 20 years old older than Donais at 52 years old. Donais and Hilliard have become even closer through the litigations involving the plaintiff and his wife.

45. In several instances, it has been discovered that Donais consults with Hilliard before doing some of the wrongful or tortious acts mentioned in this complaint. In some instances, Hilliard may have even recommended some of these acts. Therefore, Hilliard has been complicit in many of the acts of Donais including the defamatory emails sent to the police and including tortious interference with advantageous relations. Similarly, Hilliard knows or has enough evidence to show that Donais lied about the plaintiff accusing Donais of race discrimination (i.e., because Donais declined representing the plaintiff), but Hilliard turns a blind eye to it, and still vouches for Donais even though Hilliard knows that Donais lied and perjured himself.

46. When it is proven that Donais lied and perjured himself, Hilliard will be found to be complicit in the lies and perjury and dishonesty of Donais. Because Hilliard knows that, Hilliard has determined to pull out all the stops to try to attack, embarrass, discredit, burden, annoy, bully, and oppress the plaintiff in order to try to destroy the plaintiff's reputation and credibility.

47. In order to further understand the role and involvement of Hilliard, it is important to understand that Hilliard and Donais are essentially acting as one, they are complicit in each other's acts, and are conspiring in a common design to lie to others and to engage in a cover-up, in order to deny the allegations of dishonesty and to try to deflect and turn things around on the plaintiff.

48. This situation is effectively analogous to a mortal combat situation. Neither Donais nor Hilliard will admit to their lies, dishonesty, and wrong acts. They have gone so far down the road of committing to their dishonest acts, including lying and doubling down on their lies, that they have passed a point of no return, so that for them to admit their wrongs at this point would likely result in disbarment for both or either of them, but especially for Donais. Even if Hilliard himself is not disbarred or receives some lighter sanction or

reprimand, he will likely still be severely tarnished from Donais' disbarment or other discipline because he has gone on the record many times to forcefully vouch for Donais' false and dishonest statements, and to promulgate and perpetuate Donais' false and dishonest statements.

49. Donais is a well-known and well-connected lawyer. Hilliard is even more well-known and well-connected than Donais and Donais benefits from the connections and stature of Hilliard as a well-known and well-connected lawyer. Hilliard has strategically planted himself on several different law-related organizations and boards over the years, developing and solidifying relationships and stature in the legal community (and Donais tried to follow a similar model). Hilliard trades off this and uses it to his advantage including with other lawyers, with judges, with court staff and with bodies like the Attorney Discipline Office (ADO). Because of both Hilliard's and Donais' connections and stature in the legal community that they worked at crafting and molding for some time, they believe that no one will believe the plaintiff's allegations over their word. It is evident from their behavior, attitude, and modus operandi, that they believe that as white men, particularly as white male lawyers, they enjoy the utmost credibility, especially over against a black male who is not a lawyer. These are among the unspoken things that few people in our society like to acknowledge or say out loud.

50. So, the challenge is formidable for the plaintiff as he is like a David going up against Goliath. However, the plaintiff has the truth on his side. The plaintiff would not dare go up against these formidable and powerful lawyers, if he was not telling the truth. The plaintiff is a regular citizen with no power or privilege compared to Hilliard and Donais. The one thing that the plaintiff has is the truth. The plaintiff is hopeful that the truth will be enough. And it will be clear in this lawsuit as it unfolds that the truth is on the plaintiff's side as both Hilliard and Donais will run away from, dodge and deflect from being forthright and from answering straightforward questions about whether they told the truth or knew that what they said was not true, and they will deploy every underhanded dirty tactic in the book to deflect and try to turn things around on the plaintiff.  But there are several stories throughout history where the wealthy, powerful, connected thought they were untouchable, but it took one person who had the courage to take a stand, resulting in truth, justice and the exposure of wrongful conduct that otherwise would not be discovered.

51. The plaintiff in this case sees it as his duty to do what is right, to stand up for what is right and to be courageous and willing to advance truth and justice even in the face of overwhelming odds against him, not only for himself but for those who are to come after him, for those similarly situated, and for those who find themselves harmed by the likes of men like Donais and Hilliard.

52. The plaintiff is prepared to prove his allegations in this matter. He only asks for a fair chance to do so and an open mind when such proofs are presented.

---

## II. PARTIES

---

### A. Plaintiff

53. The plaintiff is an individual located in the state of Massachusetts. He is an African American male. He is a Massachusetts citizen and has a Massachusetts domicile. The plaintiff is a business consultant in negotiation, conflict resolution, leadership and strategy and organizational development. He is also a trainer, professional speaker, and a conference organizer and convening authority, in the field of negotiation theory and practice. He has organized training and events, in negotiation, conflict resolution, leadership and entrepreneurship, for under-privileged youth in the local community and has served as a youth mentor and youth business plan competition judge in the city of Boston. He also has consulted with, coached, and advised minorities in negotiation and conflict resolution matters, including resolving employment disputes, school disputes, as well as including resolving race-related conflicts. He has also served as a local leader for the NAACP and has worked with police in event planning pertaining to police-community dialogue and mediation in order to improve relationships between law enforcement and communities of color. He is also a Christian minister of the gospel and has spoken/taught at local churches, and has spoken at Christian-related events in other parts of the country. He has multiple advanced/graduate degrees and credentials in the field of business/management and a degree in theology with expertise in hermeneutics.

**B. Defendant Craig S. Donais**

54. Defendant Craig S. Donais ("Mr. Donais" or "Donais") is an attorney who is admitted to practice in the state of Massachusetts. He is a white male. On information and belief, he is of age 52. He is also a republican and ran for local political office as a republican candidate.

55. Donais attended University of Massachusetts at Amherst in Amherst, Massachusetts and then he attended law school at Suffolk University Law School in Massachusetts.

56. Donais lived in Massachusetts (MA) for many years including in Attleboro, Chelmsford, and Rehoboth MA before moving to NH, where his current address is 39 Buzzell Street, Manchester NH 03104 (which, according to land records, is a property he owns with his wife Mary Donais).

57. On information and belief, he has family members that live in Massachusetts and that own property in Massachusetts.

58. On information and belief, Donais also travels often to Massachusetts to visit family.

59. On information and belief, he owns multiple properties, including residential and business properties in NH. It is unclear if he currently owns property in Massachusetts.

60. Donais is admitted to practice in MA and has a current law license in MA and is currently a member of the bar of Massachusetts.

61. Donais was admitted to the Mass. Bar on December 18, 1996, and has continued to be admitted since then until the present day. His Board of Bar Overseers Number is 634112.

62. Donais frequently appears voluntarily in courts in Massachusetts. Donais thus conducts business in MA. Donais is admitted to practice in MA and NH.

63. Donais' frequent appearance in the courts of Massachusetts and representing/counseling clients in Massachusetts, indicates that he conducts substantial business in the State of Massachusetts and that he has sufficient minimum contacts with this State and sufficiently avails himself to the markets of this State to render the exercise of jurisdiction by this court reasonable.

64. On information and belief, Donais also frequently travels to Massachusetts to attend events, for recreation, to shop at retail stores, or to visit family and friends.

65. Massachusetts thus has both general and/or specific personal jurisdiction arising from Donais' decision to conduct business in Massachusetts as well as due to other acts by Donais in Massachusetts.

**C. Defendant Mary K. Donais**

66. Defendant Mary K. Donais ("Ms. Donais") is the wife of Craig Donais. She is a white female. On information and belief, he is of age 53.

67. Ms. Donais attended University of Massachusetts at Amherst in Amherst, Massachusetts and completed graduate school there, in Massachusetts.

68. Ms. Donais lived in Massachusetts (MA) for many years including in Amherst and Chelmsford MA,[3] where she lived before moving to NH where her current address is at 39 Buzzell Street, Manchester NH 03104 (which, according to land records, is a property she owns with her husband Craig Donais). On information and belief, she owns multiple properties, in NH. It is unclear if she currently owns property in Massachusetts.

69. On information and belief, Ms. Donais also assists Mr. Donais with his law practice/law business at Donais Law Offices.

70. Through involvement with Donais Law Offices, Ms. Donais has substantial contacts with the state of Massachusetts sufficient to render the exercise of jurisdiction by this court reasonable.

71. On information and belief, Ms. Donais also frequently travels often to Massachusetts for work-related matters, to attend events, for recreation, to shop at retail stores, or to visit family and friends. She thus regularly avails herself of the highways, amenities, benefits, and protections of this state. The plaintiff can furnish further proof of this if necessary.

---

[3] On information and belief, these addresses include: 13 Berkshire Ter, Amherst, MA 01002-1301, and 12 Hallock St Apt 4, Amherst, MA 01002-2052 as well as15 Warren Ave, Chelmsford, MA 01824-3008.

72. Massachusetts thus has both general and/or specific personal jurisdiction arising from Ms. Donais' decision to conduct business in Massachusetts as well as due to other acts by Ms. Donais in Massachusetts.

## D. Defendant Russell Hilliard

73. Defendant Russell Hilliard ("Mr. Hilliard" or "Hilliard") is an attorney who works with or represents Craig Donais. On information and belief, Hilliard is also a mentor as well as a personal and professional connection who helps Donais in a variety of personal and professional ways. Hilliard aids and abets the wrong acts of Donais and helps Donais to cover them up and help to perpetuate lies and dishonesty about these wrong acts.

74. Hilliard is a white male. On information and belief, he was born in 1951 and is of current age 71. He currently resides at 579 Sagamore Ave Unit 9, Portsmouth, NH 03801-5567 (which is a property that he owns according to land records).

75. Hilliard frequently appears in courts in Massachusetts as a lawyer representing clients (such as Donais and others) or as a witness or expert witness in various proceedings in Massachusetts. For example, as recently as in 2020, Hilliard appeared in the Middlesex Superior Court of Massachusetts at a hearing, while representing, or on behalf of, Donais in that Massachusetts court.

76. Hilliard thus conducts business in MA. His appearance in the courts of Massachusetts wherein he represents clients before Massachusetts courts indicates that he conducts substantial business in the State of Massachusetts and that he has sufficient minimum contacts with this State and sufficiently avails himself to the markets of Massachusetts.

77. Massachusetts thus has both general and/or specific personal jurisdiction arising from Hilliard's decision to conduct business in Massachusetts as well as due to other acts by Hilliard in Massachusetts.

## E. Defendant Donais Law Offices PLLC

78. Defendant Donais Law Offices PLLC ("Donais Law Offices" or "law office") is a law firm that is owned and managed by Donais. On information and belief, Defendant Donais Law Offices PLLC is the corporate "alter ego" of Craig Donais.

79. Donais is the sole member and manager of this corporate entity as well as the registered agent for this corporate entity.

80. Donais Law Offices has its location at 95 Market Street, Manchester NH, 03104, and which has another location that was the only address for this law office for many years, at 441 Willow Street, Manchester NH, 03103, which is a property that Craig Donais owns via a single member LLC.

81. Donais Law Offices conducts substantial business in the State of Massachusetts and has sufficient minimum contacts with this State and sufficiently avails itself to the markets of Massachusetts to render the exercise of the Massachusetts jurisdiction over him reasonable.

82. Massachusetts thus has both general and/or specific personal jurisdiction arising from its decision to conduct business in Massachusetts as well as due to other acts by it in Massachusetts, including as committed or done through or by Donais.

83. Donais Law Offices is responsible for the conduct of its attorney Craig Donais.

84. Donais operates through and using his law office. The acts perpetrated by Donais occur through the operation of his law office. Donais and his law office are, for all intents and purposes, the same.

85. On information and belief, Donais is employed by his law office.

86. Donais Law Offices is vicariously liable for the acts of Craig Donais under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

87. NB: The Massachusetts Bar has Donais listed as carrying malpractice insurance that covers him for his practice of law in Massachusetts. See screenshot below.



Look Up An Attorney

Click on each Attorney for more details.

| Name | Status | Malpractice Insurance ⓘ | Location | Public Discipline |
|------|--------|------------------------|----------|-------------------|
| Craig S. Donais (603) 669-4140 | Active | Yes | Manchester | None |

88. For insurance purposes, it is not clear if Defendant Donais and Defendant Donais Law Offices are covered by the same malpractice insurance coverage or other insurance coverage. Only discovery will address this point. It is not clear if Donais is a personal guaranty for the debts of his law office business, or vice versa.

89. Therefore, in light of all of the above, the plaintiff believes it is prudent that both Defendant Donais and Defendant Donais Law Offices are named as defendants in this lawsuit.

### F. Defendant Upton & Hatfield

90. Defendant Upton & Hatfield is a law firm that Russell Hilliard works for and is the law firm that Hilliard notes as the law firm that ultimately represents Craig Donais in the activities outlined in this complaint. This law firm has several offices including 159 Middle St, Portsmouth, NH, 03801, which, on information and belief, is the location that Russell Hilliard works at.

91. Defendant Upton & Hatfield, including using its lawyers like Russell Hilliard, represents clients in the state of Massachusetts and clients who conduct business in the state of Massachusetts.

92. Defendant Upton & Hatfield conducts substantial business in the state of Massachusetts and has sufficient minimum contacts with Massachusetts and sufficiently avails itself to the markets of Massachusetts to render the exercise of Massachusetts jurisdiction over it reasonable.

93. Defendant Upton & Hatfield is responsible for the conduct of its attorney Russell Hilliard.

94. Defendant Upton & Hatfield oversees and supervises the work of its attorney Russell Hilliard.

95. Defendant Upton & Hatfield is vicariously liable for the acts of Russell Hilliard under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment.

96. Massachusetts thus has both general and/or specific personal jurisdiction arising from its decision to conduct business in Massachusetts as well as due to other acts by it in Massachusetts, including as committed or done through or by Donais.

### G. Defendant Beatriz Van Meek

97. Defendant Beatriz Van Meek is a Massachusetts resident who, on information and belief, engaged in a civil conspiracy with Craig Donais to injure and harm the plaintiff, as will be further outlined in this complaint. On information and belief, Beatriz Van Meek's address is 1208 Sheffield Way, Saugus, MA 01906-4430.

### F. Defendant John Doe Company 1

98. Defendant John Doe Company 1 is an insurance company who provides Craig Donais' and Donais Law Offices PLLC's malpractice insurance coverage in Massachusetts, and who, on information and belief, does business in Massachusetts and whose true identify is presently unknown to Plaintiff.

99. NB: Plaintiff is ignorant of this defendant's true name at this time and thus has employed the usage of the "John Doe" defendant nomenclature. The First Circuit allows plaintiffs to file complaints against unnamed defendants who cannot be reasonably identified prior to discovery. See Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) ("a plaintiff may bring suit against a fictitious or unnamed party where a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information.") (citing Bivens v. Six Unknown Named Agents of

Fed. Bureau of Narcotics, 403 U.S. 388 (1971)); Wilson v. Town of Mendon, 294 F.3d 1, 7 n.16 (1st Cir. 2002) (noting "the right of a plaintiff to proceed against a "John Doe" defendant whose identity can only be established through discovery…[that is based on a] principle of fairness recogniz[ing] that a plaintiff…may not know or have the opportunity to learn the identity of the alleged wrongdoer").

100.    NB: Virtually every state in the country allows the pleading of fictitious defendants in a complaint for unknown parties. See CCP 474;  Austin v. Mass. Bonding & Ins. Co. (1961) 56 Cal.2d 596.

101.    Moreover, "no federal statute prohibits litigants from filing civil actions under fictitious names" Doe v. Mass. Inst. of Tech., 46 F.4th 61, 67 (1st Cir. 2022).

## G. Defendant John Doe Company 2

102.    Defendant John Doe Company 2 is an insurance company who provides Russell Hilliard's and/or Upton & Hatfield's malpractice insurance coverage, and who, on information and belief, does business in Massachusetts and whose true identify is presently unknown to Plaintiff.

103.    NB: Plaintiff is ignorant of this defendant's true name at this time and thus has employed the usage of the "John Doe" defendant nomenclature. The First Circuit allows plaintiffs to file complaints against unnamed defendants who cannot be reasonably identified prior to discovery. See Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) ("a plaintiff may bring suit against a fictitious or unnamed party where a good-faith investigation has failed to reveal the identity of the relevant defendant and there is a reasonable likelihood that discovery will provide that information.") (citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)); Wilson v. Town of Mendon, 294 F.3d 1, 7 n.16 (1st Cir. 2002) (noting "the right of a plaintiff to proceed against a "John Doe" defendant whose identity can only be established through discovery…[that is based on a] principle of fairness recogniz[ing] that a plaintiff…may not know or have the opportunity to learn the identity of the alleged wrongdoer").

104.    NB: Virtually every state in the country allows the pleading of fictitious defendants in a complaint for unknown parties. See CCP 474;  Austin v. Mass. Bonding & Ins. Co. (1961) 56 Cal.2d 596.

105.    Moreover, "no federal statute prohibits litigants from filing civil actions under fictitious names" Doe v. Mass. Inst. of Tech., 46 F.4th 61, 67 (1st Cir. 2022).

---

## IV. FACTUAL ALLEGATIONS AGAINST DEFENDANT CRAIG DONAIS

---

### A. SUMMARY OF FALSE & DEFAMATORY STATEMENTS

106.    Donais made false statements/accusations about the plaintiff that indicated/suggested that the plaintiff frivolously (i.e., groundlessly and irrationally without cause, reason or justification) accused him (Donais) of racism because simply he declined to represent the plaintiff as a client, and of which Donais has since caused multiple republications to occur to different audiences on different occasions[4].

   a.   These false statements/accusations were made against the plaintiff to the police in or around June 2019 including in written form using email to the police, as well as orally to the police but which was captured on video.

   b.   Donais has communicated these statements to several police officers including to friends and/or colleagues on non-profit boards that he serves with or together on, as well as to other colleagues, friends and/or family including his wife and his sons (including his adult son).

   c.   These statements are patently false. There is no truth to them whatsoever.

   d.   When Donais made these statements, he knew these were false. He made up these statements out of whole cloth. He had perfect knowledge that the opposite of what he said was true. He thus maliciously and wantonly made these false defamatory statements.

   e.   These statements are capable of a defamatory meaning. It is for the trier of fact to determine whether these are defamatory, and to look to the context and circumstances of these statements and the motive behind them to conclude whether there was defamation or defamatory intent. Donais made

---

[4] NB: These false statements/accusations were also made against the plaintiff via false statements to other citizens including his friends and/or colleagues such as Mr. Dave Akridge and Mr. Brian Snow in 2017. This is pertinent in that it serves as background showing a persistent pattern of dishonest and defamatory conduct by Donais. This will be revisited in further detail later in this complaint.

these statements with ulterior motives, to deflect from his misconduct and to intimidate, harass and retaliate against the plaintiff.

107.    Donais made false statements/accusations about the plaintiff in June 2019, falsely accusing the plaintiff of manufacturing and fabricating a recording with Donais' voice to make it look as though Donais made statements that he did not make (or otherwise that the plaintiff was capable of or prone to do such things).

    a.  *"I would also not put it past them that they actually fabricated a recording, and claims that it is part of a conversation that they had with me."*

    b.  *"Um, and candidly, I wouldn't put it past them to have a recording and to have altered or doctored, the recording, because their, their grasp on reality is very tenuous."*

108.    Donais made false statements/accusations about the plaintiff in June 2019, falsely accusing the plaintiff of suffering from (or suggesting that the plaintiff suffers from) a mental disease/sickness.

109.    Donais made false statements/accusations about the plaintiff in 2020, falsely accusing the plaintiff of violent criminality or being a dangerous criminal threat, to the police.

    a.  Donais, in August 2020, made further allegations to the police suggesting that the plaintiff and his wife are dangerous criminals and that Donais and his wife/family/sons were in danger from the plaintiff and his wife because the plaintiff and his wife were going to come to their home, particularly when Donais was not there, to physically harm his wife and his children including a young child.

    b.  Donais also pleaded for special protection from the police and to have them assign regular monitoring protection for him and especially his wife and young child because of the danger/threat that the plaintiff and his wife posed, because the plaintiff and his wife were going to come to their home, particularly when Donais was not there, to physically harm his wife and young child.

    c.  Donais requested special police protection or enhanced police observation of his home and neighborhood to be on the lookout for the plaintiff and his wife.

    d.  Donais also used the word "offenders" to describe the plaintiff and his wife and juxtaposed that word "offenders" with the allegation that Donais' wife and young child were in physical danger from the plaintiff and his wife. Combine that with the allegations, which he repeated with an attachment, to the police, that the plaintiff fabricated recordings or that the plaintiff and his wife are the type of people that do those kinds of things, and that the plaintiff and his wife were crazy or had a tenuous grasp on reality, etc., serves to bring Donais' defamatory "hit-job" to a crescendo, which caused the police to spring immediately into action with a department-wide alert, warning the entire police department to be on alert to look out for the plaintiff and his wife. The police credited these false statements by Donais as true, and expressed sympathy for Donais, his wife and his children believing that the allegations were true, and believing that Donais had knowledge of undisclosed facts as the basis for stating that the plaintiff and his were going to physically harm him, his wife, and his children.

    e.  When Donais made these statements, he knew these were false, that neither myself nor my wife posed any danger to him, his wife, or young children and that there was no basis in fact for alleging or asserting such allegations against the plaintiff and his wife. In fact, Donais had information showing that the opposite was true. He thus maliciously and wantonly made these false defamatory statements.

    f.  These statements are capable of a defamatory meaning. It is for the trier of fact to determine this and to look to the entire context and circumstances of these statements and the motive behind them to conclude whether there was defamation or defamatory intent. Donais made these statements with ulterior motives, to deflect from his misconduct and to intimidate, harass and retaliate against the plaintiff.

    g.  The defamatory nature of these statements made in August 2020 were reinforced by the previous defamatory statements made by Donais to the police in June 2019. When combined together, the total picture that Donais had communicated about the plaintiff to the police, was intended to diminish the esteem with which the plaintiff was held, to injure the plaintiff's reputation and credibility and bring contempt to the plaintiff's name and to potentially cause the plaintiff to be

harmed or, worse killed, in potential escalated encounters with the police brought to fruition by Donais' false, reckless, and defamatory statements to the police.

h.  Similarly, Donais invoked and introduced his wife as being involved in this defamatory scheme by citing her in the defamatory email to the police in August 2020.

## B. FALSE & DEFAMATORY STATEMENTS TO THE POLICE IN 2019

110.  Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

111.  In June of 2019, Donais went to the police wherein he made several statements, via email and video interview, that were false and defamatory. These statements were not made as part of or in furtherance of a court proceeding. These statements were made with malice, with knowledge of their falsity, and made recklessly with the intent to injure the plaintiff. These statements were not privileged.

112.  These false statements/accusations indicated/suggested that the plaintiff frivolously (i.e., groundlessly and irrationally without cause, reason or justification) accused Donais of racism because simply he declined to represent the plaintiff as a client.

113.  These false statements include accusations that the plaintiff manufactured and fabricated Donais' voice to make it look as though he made statements that he did not make.

114.  Also, these statements include accusations that the plaintiff suffered (or suggested that the plaintiff suffered) from a mental disease or sickness.

115.  Similarly, these statements were made in malice and reckless disregard of the truth and are not privileged.

116.  Donais' false written statements propagated to the police include but is not limited to the following:

> "*He challenged my declination, at which point I told him my practice does not include racial discrimination cases, and even if I did, I would need perform a check for conflicts before undertaking representation. Upon hearing this, Andre became upset and asserted that Attorney O'Brien had represented to him that I would take his case. This was very strange since I had made the exact opposite statement to Attorney O'Brien. I recall repeatedly telling Andre that I was not interested in the case, that the timeline was unworkable, and that representation in discrimination cases was not within my practice. He noted that I did real estate work, and questioned why I was declining to represent him such that he intimated I was discriminating against him which I immediately denied since it was not true. I then ended our telephone conversations.*"

117.  Donais accused the plaintiff essentially of ridiculously, baselessly, and frivolously calling Donais a racist. Donais thus used what is known or referred to as "the race card" (which is a pejorative reference to the illegitimate and groundless insertion of racism accusations into a situation), when in actuality Donais himself was the one trying to illegitimately and groundlessly exploit the sensitive issues related to race by using it as a preemptory strike with his bald lie against the plaintiff. Donais thus tried to manipulatively (or perhaps masterfully) "play the race card" on the plaintiff. Aside from this being outrageous behavior, it was truly troubling that a licensed attorney would go that far to try to damage and disparage someone through such blatant and scurrilous lies. This was particularly despicable because it appears that Donais was relying on racial bias to achieve his ends--he was hoping that those who heard his false statements would immediately take a hostile disposition towards the plaintiff. Yet Donais completely fabricated this story. The plaintiff felt utterly violated in that someone—an attorney nonetheless--would so exploit racism, which is something so painful for so many people in this country.

118.  Contrary to Donais' ridiculously false assertion, at no time did the plaintiff claim that Donais was discriminating against the plaintiff because Donais did not take the case. This is a nonsensical allegation. It just does not make sense in the context of such a discussion for the plaintiff to assume and allege that Donais was discriminating against the plaintiff. Moreover, what would the plaintiff hope to gain? To force him to represent the plaintiff? What kind of representation would that be? It is just not credible. Moreover, this is an unadulterated lie. This is for a jury to determine who is more credible and who is telling the truth.

119.  Donais blatantly made up out of "whole cloth" the idea that the plaintiff accused him of discrimination. This is not a matter of interpretation of words. The plaintiff did not utter any such words that could even be misinterpreted. No such words left the plaintiff's mouth. In fact, to the contrary, the conversation between the plaintiff and Donais ended amicably and on good terms. There was no abrupt ending. Donais has

blatantly and unscrupulously lied about the plaintiff accusing him of discrimination which is a blatant and dangerous lie. This demonstrates that Donais is the kind of person who would bear false witness against others and is capable of lying to put someone in jail/prison by false testimony. As such he is a disgrace to and a blithe on the legal profession. It is even worse that Donais has chosen to tell such a despicable lie on an African American man. If Donais has lied about the plaintiff making this statement (which Donais did), then this issue, though it began as a conflict of interest issue, it is about Donais falsely accusing the plaintiff of accusing him of discrimination, which becomes evidence of an attempt to use the plaintiff's race against the plaintiff (i.e. the "race card" in reverse).

120.     Donais was trying to use the plaintiff's race against the plaintiff, by accusing a black man of making ridiculous false accusations of discrimination with the intent to imply that because he is a black man, it should be believed that he made such ridiculous false accusations.

121.     Further support that Donais lied can be seen by certain witnesses who can establish from the circumstances that Donais did not tell anyone about these accusations at the time of these outrageous statements attributed to the plaintiff. NB: Because it is rare to garner direct evidence of an individual's state of mind, a plaintiff may rely on circumstantial evidence to prove that a defendant had actual knowledge that the statements were false, or had serious doubts about their accuracy. Levesque v. Doocey, 560 F.3d 82, 90 (1st Cir. 2009). See Bose Corp. v. Consumers Union of U.S., Inc., 692 F.2d 189, 196 (1st Cir. 1982), aff'd, 466 U.S. 485 (1984) (subjective determination whether defendant in fact entertained serious doubts about truth of statement may be established by inference "as it would be very rare for a defendant to admit such doubts"). See also Murphy, 449 Mass. at 57-58 (determination of defendant's subjective state of mind may be made based on circumstantial evidence).

122.     These circumstances includes statements, at the time, from Donais' friend, colleague and client Dave Akridge, Donais' co-counsel Karl Terrell, opposing counsel Elliott Berry, as well as his own statements made to a court (Judge Paul Moore) and in certain emails created by Donais himself, all at around the time that he first made these false statements, showing that he never said, claimed, alluded to or suggested that the plaintiff made those accusations of racism. These statements demonstrate that Donais is lying with respect to his accusation that the plaintiff accused him of race discrimination.

123.     These statements from several other persons show that:

   a.   At no time did Donais mention in a contemporaneous email chain with Dave Akridge and Karl Terrell, the accusation of discrimination against Donais by the plaintiff, at which time Donais was asked to describe what was said in that conversation between Donais and the plaintiff, and at which time Donais had a clear and compelling opportunity to tell others what the plaintiff said to him, but yet with all of that time and opportunity, and despite being asked or called upon to describe the conversation he had with the plaintiff, somehow Donais left out the accusations of racism, out of what he said the plaintiff had said to him.

   b.   At no time in his contemporaneous discussions with Attorney Elliott Berry did Donais mention the accusation of discrimination against Donais by the plaintiff, at which time Donais was asked to describe what was said in that conversation between Donais and the plaintiff, and at which time Donais had a clear and compelling opportunity to tell what the plaintiff said to him, but yet, again, with all of that time and opportunity, and despite being asked or called upon to describe the conversation he had with the plaintiff, somehow Donais again left out the accusations of racism, out of what Donais said the plaintiff had said to him.

   c.   At no time during the court statements with Judge Moore did Donais mention the accusation of discrimination against Donais by the plaintiff, at which time Donais was asked to describe what was said in that conversation between Donais and the plaintiff, and at which time Donais had a clear and compelling opportunity to tell what the plaintiff said to him, but yet, again, with all of that time and opportunity, and despite being asked or called upon to describe the conversation with the plaintiff, somehow Donais still again left out the accusations of racism, out of what he said the plaintiff had said to him.

   d.   At no time did Donais mention in contemporaneous conversations with co-counsel Karl Terrell that the plaintiff ever told him about an accusation of discrimination against Donais by the plaintiff, at

which time Donais was asked to describe what was said in that conversation between Donais and the plaintiff, and at which time Donais had a clear and compelling opportunity to tell what the plaintiff said to him, but yet, further again, with all of that time and opportunity, and despite being asked or called upon to describe the conversation with the plaintiff, somehow Donais, yet further again, still left out the accusations of racism, out of what he said the plaintiff had said to him.

e.   The fact that Donais did not tell anyone about this accusation at or around the time that the plaintiff allegedly made that accusation, is evidence that it is a complete fabrication made up much later after the fact.

f.   The key question here is why would Donais not bring this up earlier? Why not bring it up to the judge at the time, to Mr. Akridge, to Mr. Terrell, to Mr. Berry, or to anyone? Why did he neglect to bring it up then? And why would he suddenly first remember this titillating and sensational fact only 2 or 3 months later? All of this indicates that this was a bald unadulterated lie. There is nothing credible about it. It does not ring true. It does not fit the circumstances. It does not make logical sense that the plaintiff would say such a thing in the context of Donais declining to take case. It is unnatural, strained, and tortured. It is simply unbelievable. In the context of a 7-minute conversation, why would the plaintiff manage to shoot off an accusation of racism against Donais?

g.   NB: The plaintiff believes that if these circumstances are brought to a trier of fact or to a jury, it will be clear to them that Donais lied.

124.   This "race-card" accusation by Donais again the plaintiff is blatantly false, and it self-evidently smells very fishy that such a sensational fact was omitted from every version of Donais' recollection of the events at a time when the events were much closer in proximity and memories would be fresher, and certainly way prior to any such statements being published or republished by Donais to the police in June 2019.

125.   Donais fabricated and utilized his lie about racism to willfully intimidate me and to interfere with and injure the plaintiff because of his race.

126.   Donais has falsely styled himself as a victim of a false accusation of being called a racist by the plaintiff.

127.   This despicable lie by this white attorney of law perpetrated on the plaintiff was intended to target the plaintiff because of his race. It was intentional and it was motivated by racial animus/racial bias.

128.   It is also a tort of libel/defamation.

129.   Nothing angers people more than a person who falsely accuses a white person of racism. This is a major sore point in today's culture.

130.   Donais was trying to exploit racial tensions in our society to harm and discredit the plaintiff. He wanted to really damage the plaintiff. Donais was inciting fragile racial sensibilities and attitudes, and intended to exploit a culture of hostility towards those black people who are presumed to "cry wolf" about racism. Donais was seeking to fan the flames of racial tensions and used it as a form of a weapon against the plaintiff. Donais weaponized the race card issue and deployed it against the plaintiff.

131.   It is a form of racialized character-assassination and a racialized attack against the plaintiff.

132.   Donais only brought up that the plaintiff accused him of racism because the plaintiff is black. It was thus racially motivated. If the plaintiff were white, such a fabricated lie would not stick.

133.   Moreover, Donais wanted to intimidate the plaintiff (and his wife) and to shut the plaintiff up and to silence the plaintiff.

134.   In the above statement, Donais falsely implied and affirmatively intended to imply that the plaintiff had invented a racism accusation, essentially as a hoax, based on the groundless basis that he declined to represent the plaintiff. It was intended to make it seem that the plaintiff was irrational, crazy, in concocting a racism accusation based on nothing or based on a silly reason.

135.   The false statement was published with knowledge of its falsity and/or with reckless disregard for the truth.

136.   Donais knew it was false to state that the plaintiff accused him of racism because he declined to represent the plaintiff.

137.   Donais knew that the plaintiff did not accuse him of racism at all.

138.    Donais' defamatory claim that the plaintiff had accused him of racism for declining representation was false. Donais knew he was lying when he said that the plaintiff had accused him of racism for silly reasons, that he himself had invented out of whole cloth.

139.    He knew the plaintiff was telling the truth when the plaintiff denied making the statement after the plaintiff found out about his statement but yet he persisted in saying to several third parties that he was telling the truth and that the plaintiff was not telling the truth.

140.    Because these statements were first written and later put on a video recording and because they tend to injure the plaintiff in his profession or trade, they constitute defamation per se and libel per se.

141.    They tended to (and did) damage the plaintiff in his trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information. Because the statement affected the plaintiff or may have affected the plaintiff in his profession by "imputing to [me]…fraud, dishonesty, [and/or] misconduct…", the statement constitute libel per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

142.    The plaintiff has suffered harm as a direct result of Donais' false, defamatory statement, which caused injury to plaintiff's reputation, honor, and dignity.

143.    Plaintiff has suffered professional harm as a direct result of Donais' defamatory statement.

144.    Donais has injured the reputation upon which the plaintiff based his business and livelihood as a consultant.

145.    Donais made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on the plaintiff and his rights.

146.    Donais' false and defamatory statement caused the plaintiff to suffer reputational, emotional, and professional harm.

### C. FURTHER ON FALSE STATEMENTS AND LIES MADE BY DONAIS TO THE POLICE

147.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

148.    Donais made or provided numerous false statements to the police about the plaintiff as well as to others including his friends, colleagues and family members.

149.    Donais' false statements are contradicted by the following facts, as follows.

150.    Contrary to Donais' assertion, Donais had no difficulty understanding the plaintiff as the plaintiff spoke clearly. During the call, Donais signaled that he understood the plaintiff by saying "yes", or "ok", etc., throughout the conversation and at certain points made clear comments in response to the plaintiff statements or questions. This appears to be nothing but a veiled attempt to try to cast me as some foreigner who could not speak proper English. The only language the plaintiff speak is English. English is not a second language. So, Donais' insinuations should be treated as what it is, i.e., veiled attempt to negatively imply illiteracy or a language impediment on my part.

151.    Contrary to Donais' assertion, the plaintiff did not say or mention his last name on the call with Donais. In fact, it was Donais who called the plaintiff and when the plaintiff answered the phone, Donais asked to speak to "Andre", and the plaintiff simply stated, "this is he". At no time did the plaintiff mention his last name and at no time did Donais reference the plaintiff's last name and at no time did Donais ask the plaintiff about his last name. In fact, the only way for Donais to have known the plaintiff's last name, at that time, was for Donais to have received that information from Mr. Akridge or Mr. Terrell.  Given that Donais initiated the call and given that neither the plaintiff nor Donais mentioned or asked about or discussed the plaintiff's last name whatsoever, Donais' reference to hearing what sounded like "bedsore as a last name" on the call is completely fabricated and reflects an intention to play on the plaintiff's uncommon or unusual-sounding last name to imply that the plaintiff was some kind foreigner who spoke poor English. [NB: The plaintiff is well-educated with multiple advanced graduate degrees, as well as other graduate credentials, from select universities in the US].

152.    Contrary to Donais' assertion, Donais did not ask the plaintiff if he got Donais' name and number from his friend and colleague Robert Obrien ("Mr. Obrien").

153.    Contrary to Donais' assertion, the plaintiff did not indicate to Donais that the plaintiff received Donais' name and number from Mr. Obrien.

154.   Contrary to Donais' assertion, the plaintiff did not "challenge" Donais' declination of representation.

155.   Contrary to Donais' assertion, Donais did not tell plaintiff that he did not do race discrimination cases.

156.   Contrary to Donais' assertion, the plaintiff did not mention the words "race", "racism", "race discrimination", "discrimination", "discriminating" or "discriminate" (or any variation of those words) in the plaintiff's conversation with Donais. Neither did Donais mention nor say any of those words on the call.

157.   Contrary to Donais' assertion, Donais did not tell the plaintiff that he would need to perform a check for conflicts before undertaking representation.

158.   Contrary to Donais' assertion, the plaintiff was not upset and did not become upset at any point in time during the conversation with Donais. The call ended amicably and in polite fashion with no hint of anger, or of a disagreement or argument whatsoever.

159.   Contrary to Donais' assertion, the plaintiff did not tell Donais that Mr. Obrien told the plaintiff that Donais would take the plaintiff's case.

160.   Contrary to Donais' assertion, Donais did not repeatedly tell the plaintiff that he was not interested in the case and that representation in discrimination cases was not within his practice. Again, there was no mention whatsoever of the term "discrimination" or "race" by Donais.

161.   Contrary to Donais' assertion, the plaintiff did not "note" that Donais did real estate work, and the plaintiff did not "question" why Donais was declining to represent the plaintiff when there was a "real estate" element.

162.   Contrary to Donais' assertion, the plaintiff did not become even more upset that Donais was declining to represent him.

163.   Contrary to Donais' assertion, the plaintiff did not intimate, suggest, insinuate that Donais was discriminating against the plaintiff.

164.   Contrary to Donais' assertion, at no point in time did the plaintiff accuse Donais of race discrimination.

165.   In fact, the plaintiff did not at any point utter or use the words "discrimination", "discriminating" or "discriminate" in any form or context, at all, whatsoever on the call with Donais. Neither did the plaintiff utter or use the words "race" or "racism" on the call with Donais.

166.   Contrary to Donais' assertion, Donais did not "immediately deny that he was discriminating against me", because in fact the plaintiff never made any such accusation. There was nothing for Donais to deny. Donais completely made up, fabricated and manufactured this lie out of thin air.

167.   Contrary to Donais' assertion, Donais did not end the telephone call. The call was mutually ended in a respectful, amicable, polite and friendly manner.

168.   Contrary to Donais' assertion, Donais did provide the plaintiff with legal advice during the call.

169.   Contrary to Donais' assertion, Donais did receive private, confidential privileged communications from me on the call.

## D. DONAIS' INTIMIDATION/HARASSMENT INTENT VIA POLICE

170.   Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

171.   Donais has leveraged his relationships with police officers and brought undue influence to push for them to do him a favor, to target two African American citizens, which is unconscionable in this day and age when the misuse of police force and resources as well as wrongful arrest and wrongful prosecution against African Americans are under intense scrutiny, and when there have been urgent and intense calls for criminal justice reform involving the over-policing, over prosecution and over-incarceration of black people.

172.   Donais evidently believes that the police is at his disposal to threaten and harass black people for any and everything and that the police will do his bidding.

173.   This situation with Donais enlisting the police to investigate the plaintiff and harass the plaintiff, for an alleged crime that is time-barred and that at most would be only a minor possible alleged misdemeanor reflects a pattern.

174.   This also is in the context of a nationwide epidemic of white people using police to terrorize black people for baseless or frivolous issues, trumping up lies against them in order to harm, harass, injure, retaliate, oppress or burden black people.

175.   Donais said things to the police that riled them up, that he exaggerated, embellished and fabricated accusations in order to try to make his allegation "stick" and to try push it pass a certain threshold of actionability.

176.   These kinds of trumped-up sensational allegations can result in people being falsely arrested, especially when directed at black people.

177.   Donais was attempting to trump up a prosecution for an alleged time-barred possible misdemeanor involving a recording that purportedly would prove the attorney's dishonesty/perjury, against an African American grievant who filed an ADO complaint against that attorney for race-based felony perjury.

178.   NB: Donais had no knowledge of any recording or any facts about any recording, and he insinuated to police that if there is a recording, he thinks it could be of him relating to the call with the plaintiff and Donais, but this was rank speculation. Anyone taking a high school course in logic would know that this is rank speculation. Donais did not know what recording was referenced, whether it was video or audio or stenographic recording, whether it was of him (Donais) or someone else, what date or time it occurred (if it occurred at all), and he did not know who made the recording, what state/city the recording was made in, if it was recorded by someone else, if it was captured inadvertently, if it was of a voicemail, or a court proceeding, etc. He had no idea. And Donais knew this was not enough to make a police report. So, he used his relationships with the police to push a frivolous and baseless investigation and possible prosecution.

179.   He further made up this wild, crazy, and absurd allegation indicating or suggesting that the plaintiff hacked or bugged his telephone system at his office (thus recording/compromising all of his calls with his other clients). This is a nasty allegation to make based on no evidence and based on speculation. It is also patently false and defamatory. It is also far-fetched if not ridiculous.

180.   First, to bug his office is a crime. Also, it is implied that burglary was also involved. So with that statement, Donais was accusing the plaintiff of multiple crimes/felonies. This is patently false and defamatory.

181.   Furthermore, Donais' reckless speculative false statement was based on a vague non-specific sentence in a letter to the ADO from plaintiff's wife, that stated as follows: "(Note: There is also a recording that the plaintiff would like to share with the Discipline Office to prove the dishonesty of Mr. Donais.)". This is what Donais based his false speculation on and nothing else. This is what Donais expected the police to go on to open an investigation and to pursue possible police prosecution. Yet this statement is vague, non-specific, and could mean almost anything. It did not say the recording was of Donais. It just said there is evidence that could prove the dishonesty of Donais (note the syntax and grammatical construction of the sentence). It did not say how the recording was created or obtained. It did not say who created or obtained it. It does not say what format the recording was in or created in (i.e. video, audio, pictorial or stenographic). [NB: For example, a video recording is not illegal in any state. Neither are stenographic recordings that captures and translates words contemporaneously into writing. It did not say when it was recorded i.e. what date or time. It did not say if it was a recording of an open public event or not. It did not say what state the recording occurred i.e. if the recording occurred in a one-party consent state. Anything else is rank speculation. Anything to fill in the blanks is speculation. Anything done to make choices as to the meaning of the above when it is so vague is speculation.]

182.   But yet Donais had attended a court hearing where both the plaintiff and plaintiff's wife attended and where the court provided a copy of the recording of the hearing to the plaintiff and the plaintiff's wife, which Donais knew of, and which recording shows the dishonesty of Donais (wherein he in fact was disqualified by a judge for conflict of interest). Also, there was a voicemail left by the plaintiff on Donais answering machine prior to him calling the plaintiff back to have a phone conversation, a recording of which voicemail message of the plaintiff shows the dishonesty of Donais. Donais knew that these could have been the basis for showing his dishonesty but ignored that to focus only on a call that he had with the plaintiff about a prospective client relationship.

183.   It should be noted that Donais' actions and statements to the police indicate that Donais was worried that the reference to a 'recording' could be a recording of his call with the plaintiff (and, logically, this worry could only stem from the fact that he had a guilty conscience and knew that he lied). Two days after receiving a decision by the ADO dated on or about June 10, 2019, wherein he was informed that he would

be investigated by ADO for misconduct based on a complaint by the plaintiff's wife, Donais became worried and ran to the police to make this police report on June 11, 2019. He wanted to react quickly to stop evidence from coming out in that ADO investigation i.e., evidence that he thought, in his mind, could hurt him. But why not wait until the recording that claimed to show his dishonesty was shared in the ADO process? Why not wait for more information to come out in the ADO process to determine exactly the nature of this recording? Why the rush to go to the police after the docketing of the ADO complaint on June 10, 2019? What was Donais hoping to accomplish by making his police report on June 11, 2019?? On or about June 10, 2019, the ADO announced that it was now docketing the ADO complaint against Donais for investigation. The temporal proximity of the event of the ADO announcement of docketing on June 10, 2019 and the initial act of contacting the police on or about June 11, 2019 by itself establishes a basis for inferring that the two events were related and that Donais was motivated by retaliation, harassment and a desire to suppress evidence (that he thought in his mind could possibly be out there and could hurt him). [NB: This was over 2 years after the purported event/call occurred in 2017].

184.    After Donais contacted the police, the police then immediately (same day) called the plaintiff's phone number in Massachusetts and left an ominous message. The plaintiff was intimidated by the message. As an African American, such ominous contact from the police was intimidating. Donais accomplished his mission of intimidation, of sending a message to the plaintiff and the plaintiff's wife, to back off from pursuing any attorney misconduct complaint against Donais.

185.    It should be noted that when the plaintiff first called Donais' phone number back in 2017 to inquire about possible legal assistance, Donais did not answer. So, the plaintiff left a voicemail on Donais' voicemail. However, there was a recording of that voicemail, in the plaintiff's own voice only, that was left on Donais' voicemail system (it was not a conversation but only a voice message). Yet, with that contact from the police that came shortly after the filing and docketing of an ADO complaint, the plaintiff was made to feel as though the plaintiff should not participate in any ADO misconduct proceeding against Donais because Donais had police friends and connections that would harass the plaintiff if the plaintiff did so. This concern about unfair, baseless, trumped-up targeting or harassment by police of an African American because of the instigation of angry white men intent on intimidating black people, or worse, is not a light thing given the deeply problematic history in this country between law enforcement and African American population as a whole. Donais knew this and exploited this dynamic to achieve his ends of intimidation with threat of police force or police action behind it.

186.    Conversely, if the police had actually prosecuted or arrested the plaintiff or the plaintiff's wife based on the report by Donais they received from Donais at the time (back in June 2019), it would have had the effect of immediately stopping the ADO complaint against Donais in its tracks. That would have been the intent and effect of Donais actions in going to the police when he did and in the manner that he did. Such a baseless prosecution, grounded on a vague allegation, would eventually have had to be dismissed not only because it baseless and vague, but also because it was based on a time-barred allegation of a simple misdemeanor (i.e., an alleged illegal recording of a conversation by one of the parties to the conversation) that allegedly occurred at least two years prior in 2017. But Donais knew that. As an attorney himself, he knew that misdemeanors only have a 6 month to, at most, one year statute of limitation. Yet, regardless, all that Donais needed was for the police to contact the plaintiff, which would be to effectively send a message; and/or Donais wanted the police to try and arrest the plaintiff and any of those acts would have stopped any ADO complaint from moving forward either because of intimidation/witness tampering or because the plaintiff would not be available or able to participate in any ADO proceeding against Donais while fighting a police arrest charge/prosecution. Fortunately, there was no arrest and no prosecution because of lack of evidence, but Donais did not care that the prosecution would end up nowhere. Donais' intent was to harass, intimidate, retaliate against, punish, scare, oppress, and burden the plaintiff, and to suppress evidence that he thought the plaintiff had (not what the plaintiff's wife said we had but that he surmised we had). He was trying to stop the evidence that he thought we had, from coming out. His intent and state of mind is clear. He only went to the police shortly after he was informed on or about June 10, 2019, that the ADO had docketed an attorney misconduct complaint against him. Then about day or two later, evidently in a frantic state of mind, worried that he was caught red-handed by a recording that would show that he committed

perjury, he went to his police connections and tried to harass us and retaliate against us and to suppress this evidence, he thought in his mind that we had, by getting his police contacts to push to open a frivolous investigation and to immediately get the police to call us so that we would know there was a police investigation underway against us.

187.    NB: If Donais was telling the truth, why would there be anything that could prove his dishonesty? Moreover, why was he so concerned about this purported recording so much so that he assumed, or thought, it was of the call he had with the plaintiff in 2017? This shows that Donais knew he lied about what was said on that call and he was worried that a recording of such a call would expose him as a liar and this could expose him further to attorney discipline sanctions, including but not limited to attorney disbarment. The indication that Donais had a guilty conscience, and that this guilty conscience was driving his behavior above, is further indicated by one of his statements to the police via an email conversation that he initiated with his police friends/connections in June 2019, which states:

> **Craig Donais**: Nate: I wanted to check with you about a potential criminal issue. I have a potential client who I declined who has filed an action against me, but now claims that they have a recording of my conversation with them. If they have a recording of a conversation with me, it was done without my consent or knowledge, which would be in violation of the Wiretap statute, as NH is a 2-party state. I would also not put it past them that they actually fabricated a recording, and claims that it is part of a conversation that they had with me. You will note that they admit to this recording in the last sentence of the paragraph at the top of page 3 in this pdf. Can I file a police report on this, and start a process to determine whether this is worthy of prosecution? See you tomorrow at Crimeline! Craig

> **Officer Nate Linstad**: I can't open the attachment bc I'm in the woods in northern nh. Sgt brennan will be at the Crimeline meeting for me tomorrow and will be showing the new paperwork. But just reading the email I would have you talk to detectives and have them look into it for sure.

> **Craig Donais**: Thanks. Can you put me in touch with someone specifically to look into this?

> **Officer Nate Linstad**: I will forward it to Houghton.

> **Officer Nate Linstad (to Officer Patrick Houghton)**: This guy is from the crimeline. Can you help a brother out?"

188.    First, it should be noted that Donais' suggestion that we claimed to have a recording of his conversation with us or me, or that there was an admission was made that we had possession of recording of a conversation with him, was false. The letter to the ADO that he referred to, made no such claims and Donais knew that. The only thing stated in the letter to the ADO was one sentence that there was a recording that proved the dishonesty of Donais. But there were many actions and/or statements made by Donais that was being challenged by the ADO complaint filed by my wife including statements he made in a court hearing to a judge in January 2017. Donais did not know if that was what was being referred to. Moreover, that one sentence did not identify Donais as the person recorded. There were other conversations with other witnesses or statements by other people other than Donais that could have been recorded (which in fact there was a recording of my voicemail left for him, which voicemail proves his dishonesty as it contradicts, with hard proof, statements that Donais made about that voice message by me that he made in affidavit to the court in 2017). Also, that one sentence did not identify when the recording was made, who the parties to the conversation were, nor if the recording was in video, audio or stenographic form. Neither a video recording (i.e., video alone) nor a stenographic recording are unlawful[5].

---

[5] NB: There are a few states in this country that make it unlawful (a misdemeanor) to record a conversation (i.e., audio/voices) with another person, in which one is a party, without the knowledge of the other party to the conversation. However, the majority of states as well as federal law does not that make that unlawful at all. See United States v. White, 401 U.S. 745 (1971)(taped conversations between the defendant and another which were recorded without the defendant's knowledge or consent but with the consent of the other party are admissible and do not violate the defendant's Fourth and Fifth Amendment rights); see also United States v. Fanning, 477 F.2d 45 (5th Cir. 1973), cert. denied, 414 U.S. 1006 (1974)(The consent of one party to the conversation eliminates any claim of illegality as to the recording per se even when the government had participated in the recording.). So, if one party is located in say Rhode Island (which is a one party consent state) and the other party is located in New Hampshire (which is a two-party consent state), and the party in Rhode Island records a call with the other person in New Hampshire, it is not unlawful in either Rhode Island or New

189.    Either way, Donais did not know if there was a recording of his voice and if such a recording was of the call he had with me in 2017. Hence, it was false for him to tell the police that we "now claims that they have a recording of my conversation with them" and that we "admit to this recording." Neither I nor my wife claimed or admitted to having a recording of his conversation with me in 2017. Donais at best is engaged in rank reckless speculation or at worst is intentionally, with his clever lawyer skills, trying to mislead the police into thinking that I or my wife had made an admission that I or my wife illegally recorded him in a conversation that I had with him in 2017. Neither I nor my wife made any such admission whatsoever in the above. The point here is that this goes to Donais' intent and state of mind at the time he sent this email to the police in June 2019. Here, Donais was making false or misleading statements to the police to try to ratchet up the allegations in order to sway the police to begin a police investigation on something that was so vague and speculative, that no other regular civilian would have made this complaint to the police nor would any other police (other than Donais' police friends/connections) have entertained such a report from a regular civilian based on such rank vague non-specific reckless speculation.

190.    To add further insult to injury, Donais also then further ratchets up his allegations by telling the police that "I would also not put it past them that they actually fabricated a recording, and claims that it is part of a conversation that they had with me". Here, Donais, tries to "go in for the kill" (proverbially), by telling the police that we were the type of people that were so dishonest and so low in character that we would actually go to the trouble and lengths to fabricate a recording with Donais' voice in order to prove that Donais was dishonest and had committed perjury. Donais was communicating to the police that he had knowledge of undisclosed facts that indicated that we were not only despicably dishonest but also were criminal or capable of treacherous criminality since fabricating a recording and presenting it as evidence in a proceeding could or would constitute a crime of tampering with evidence or falsifying evidence. I cannot emphasize enough here how much of a nasty serious allegation is being made by Donais here. Donais has accused us of committing a crime or that we are criminals with a history of committing such crimes. This was clearly intended to discredit us and destroy our reputation and integrity with the police. But why did Donais do this? What was his motive here? It can be inferred that Donais knew that he was dishonest about what he had stated was said in the call between him and I, in early 2017, as presented by him in his 2017 affidavit. He was concerned that should there be a recording, he knew that such a recording would show that he had perjured himself and thus subject him to not only disbarment but perjury prosecution. The stakes were very high for Donais. So, he preemptively sought to discredit any such possible recording, in advance of the production of such a recording or in advance of any knowledge or confirmation that such a recording existed. This would be the only logical explanation for why Donais, without more, was so concerned about this purported recording and why he felt it necessary to preemptively strike at the credibility, authenticity or veracity of such a purported recording. This is evidence of a guilty mind or guilty conscience. If Donais was innocent and had not lied, then he would not have been so worried and he would not have needed to think ahead to discredit a purported recording that he did not even know if it existed, or what would be on it if it existed. An innocent person would welcome a recording of a disputed event because it would show he is innocent or telling the truth about the event. However, a guilty person who is guilty of lying would not welcome such a recording because he would know that he would be proved to be lying. The fact that Donais was trying to suppress any

---

Hampshire since the recording of the call would have taken place in Rhode Island (i.e., that is where the recording device would have been located if the person in Rhode Island recorded the call). Moreover, even with respect to New Hampshire, there are certain exceptions to the illegality of a party recording a conversation, in which they are party to, without the knowledge of the other party to the conversation, and those exceptions include that there has to be present, with respect to the conversation, a reasonable expectation of privacy (or otherwise an implied waiver of consent), and there has to be a knowing intentionality on the part of the party doing the recording, as well as a more obscure exception known as a public interest exception (where it involves a matter of high importance to the public and the greater good, or something to that effect). For example, if two people are in New Hampshire and a conversation is recorded by one party without the knowledge of the other party, but there was no reasonable expectation of privacy in that conversation (i.e., such as in a hotel lobby, public park, or otherwise where the conversation can be heard by others, etc.), then it is not unlawful. Similarly, if there is a recording that was inadvertently recorded without the specific intent to do so, such as can happen with modern technology like Alexa or Google voice, etc., then that recording is not unlawful. Several New Hampshire courts have ruled on these issues and the New Hampshire Attorney General has put out an advisory opinion on these matters from some time ago. Conversely, all states in this country and federal law make it unlawful, including bumping up to a felony, if a third party (one who is not party to a conversation), records two or more other parties without their knowledge.

recording from coming out in the ADO proceeding by preemptively and prematurely contacting the police to get involved with contacting me and my wife before any ADO investigation was under way and by preemptively assuming that if a recording of him existed, it would automatically show that he was lying, shows that Donais, in his own mind, knew that he was lying. These circumstances show that Donais entertained serious doubt about the truth of his statements.

191.     NB: Here, Donais used his connections to gain access to the inside track at the police station in order to push through, push up and fast track his complaint against us. Donais misled Officer Nate Linstad in making it sound like a current matter i.e. "I have a potential client."[6] This was done to hide the fact that the matter involved a two-year old allegation of a misdemeanor that would be time-barred from prosecution.

192.     Donais also lied saying that "but now they claims that they have a recording of my conversation with them". We did not say we have a recording of Donais or have a conversation with him. It was also egregiously untrue, false and defamatory for Donais to tell officer Linstad that he "would also not put it past them that they actually fabricated a recording, and claims that it is part of a conversation that they had with me." Donais has no basis to claim or allege that we would actually fabricate a recording and claim that it is part of a conversation with Donais. This is a preposterous and outrageous assertion. This was intended to sensationalize the allegations in order to incite the police to act and push through the complaint and start a prosecution.

193.     Donais also states: "Can I file a police report on this, and start a process to determine whether this is worthy of prosecution?" This is Donais pushing for, instigating a prosecution in order to harass us. Donais knows there is no chance that this prosecution is valid because the matter is over 2 years old and at most could be a misdemeanor which has a statute of limitations of only 1 year at most. Yet, Donais pushes here for a prosecution, lying to and misleading the police by saying it is a current matter (i.e., "I have a potential client") and by totally fabricating the sensational and inflammatory allegation that we fabricated a recording.

194.     Moreover, Donais' last comment "see you tomorrow at Crimeline", tops off his clear intent to leverage his relationship with the police to drum up a trumped-up baseless prosecution against us, as harassment and in retaliation for bringing the ADO complaint which had just been docketed a day or two before. In fact, when Officer Nate Linstad says that he was out of town, and would not be there for the crimeline meeting the next day, Donais was not satisfied to wait. Donais instead pushed and pressed Officer Linstad for immediate action as if the matter was urgent. Donais said "Can you put me in touch with someone specifically to look into this?" Donais wanted fact swift action. But why? There was nothing imminent in the ADO matter. Donais had just been notified by the ADO that the case had been docketed (as of or around June 7 and/or June 10, 2019) and Donais was informed that he had 30 days to respond to the ADO complaint by July 10, 2019. There was nothing pressing or so urgent that required immediate same day action by him or by the police, other than the fact that Donais was afraid that there was a recording proving his dishonesty that would be submitted to the ADO. Donais wanted to put a stop to that. By contacting the police, and having them initiate an investigation including contacting us, it would at least send a message to us that if there was a recording that showed his dishonesty, it better not be produced. By getting the police to investigate or prosecute us, it would serve as intimidation, harassment and retaliation for starting this ADO process in the first place.

195.     It should also be noted that Donais went further to also tell another police officer, Officer Dan Whelan, in a recorded interview on June 18, 2019, the following:

> "Um, and candidly, I wouldn't put it past them to have a recording and to have altered or doctored, the recording, because their, their grasp on reality is very tenuous."

196.     So, on at least two occasions, Donais communicated to a police officer that I fabricated or doctored a recording. But why would Donais make such a statement? Why does he evidently seek to get out in front of this issue of a recording showing his dishonesty, by prematurely pointing to a recording that I would have fabricated, altered or doctored to show his dishonesty? The only reason to say such a thing to the police at this juncture is because he had a guilty conscience and was trying to preemptively provide an explanation if in

---

[6] NB: It should be noted here that Donais admits that I am or was a client/potential client, which furthers goes to the breach of fiduciary claim/legal malpractice claim, which is further outlined in this complaint. Thus, Donais cannot deny that I was a client.

case there was a recording showing that he was lying. This is a critical point. It shows that Donais entertained serious doubts about the truth of his statements and that he knew that he lied about the accusations of racism, and that he was afraid that a recording would or could expose him to be a liar. He knew that this lie could expose him not only to disbarment but to a felony perjury prosecution. So, he evidently was thinking ahead, in case a recording showed him to be lying, in that he would have already presented a cover story to cast doubt on the veracity of such a recording should such a recording be produced. But why anticipate at all that anyone could produce such a recording, showing that he was lying? Why even go there? Why even imagine that as a probable outcome? Because he knew that he was lying. It speaks to his state of mind at the time he made these statements to the police. See St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323 (1968 ("[R]ecklessness amounting to actual malice may be found where the defendant deliberately ignores evidence that calls into question [his] published statements"); St. Amant, 390 U.S. at 732 ("recklessness may be found where there are obvious reasons to doubt" the truth of the published statements). The US Supreme Court has established that a finding of "reckless disregard" requires evidence…that the author "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 730-731 (1968). See also McAvoy v. Shufrin, 401 Mass. 593, 598-599 (1988). The above statements provide evidence that Donais had obvious reasons to "doubt" the truth of his published statements and also that Donais "in fact entertained serious doubts as to the truth of his publication."

197.    Further proof of Donais lying can be shown by a recording of a voicemail left by me in my voice for Donais prior to the call with him a couple of days later in 2019[7]. NB: These statements were later republished and embellished in statements by Donais to the police in June 2019.

   a.  **Donais statement regarding voicemail I left in my voice for Donais.**

       i.  Donais' statement made back in 2017 in an affidavit:

           "*On Friday, January 6", after I had left for the day and after business hours, an office telephone message was received requesting a return call from a Massachusetts phone number requesting assistance on a real estate matter. The caller's message was hard to understand*".

       ii. Here Donais states that I stated I was requesting assistance on a real estate matter and that it was hard to understand my message.

   b.  **Donais statement to the police on 6-18-19 via a recorded interview[8] states:**

       i.  At time marker 19:27 on the video recording of Donais' interview with the police, Donais stated the following:

           "Craig (19:27): ….he left kind of this mumbly rambling message. He was a little hard to understand.  He had a little bit of a, an accent with it. And I couldn't tell whether it was a, a Southern accent, a foreign accent. It was just not a, it was not a new England accent. We'll just say that…he was a bit mumbling. And I think I'm putting the affidavit in **his last name sounded like bedsore.**

           Detective:  Okay.

           Craig:  I later found out it's Bisasor. Uh, but I think just the, the way he pronounced it quick and **listening to the recording**.

           Detective:  Yeah.

           Craig:  Um, so it was just, uh, call me back. I've got a real estate matter. I want to discuss…"

---

[7] NB: To be clear, the point here is that there is evidence from witnesses of certain events and conversations that occurred in 2017 that can be used to show, and that will show, that Donais was being dishonest in his statements to the police in June 2019. This shows not only that Donais lied in his 2017 affidavit but that he lied to the police in his June 2019 police reports and recorded interviews. It therefore offers proof of false statements by Donais in support of my defamation claim, among other things.

[8] NB: A full transcript of this recorded video interview or the video recording itself and be produced in its entirety in further proceedings of this case.

     ii. Here, Donais clearly tells the police that my voice message was mumbly and rambling, and was hard to understand.

     iii. He clearly tells the police that I left my last name on the voicemail and that my last name "sounded like bedsore". Donais went to the trouble to come up with this detail.

     iv. Please note that at this point in time on 6-18-19, Donais had not received the facts about the voicemail recording. Donais did not know we had a recording of that voicemail, nor did he know what we would say about his version of it. Donais simply knew that it would be he said/she said regardless of whatever we said.

     v. The recording of the voicemail clearly shows that Donais is lying and that he lied to the police. This is 100% proof that Donais lied to the police.

c. A Tape Recording of the Voicemail in 2017 (of My Voice)[9] states the following:

> "*Hello, my name is Andre and I am calling about a tenant legal matter. I understand that you practice landlord-tenant law. I wanted to see if I could discuss a legal matter with you. Please give me a call back at 781-492-5675. The matter is somewhat urgent so if you can, please call be back as soon as it is practical.*"

d. The above shows that Donais made false statements about the message I left for him in 2017.

     i. I did not say my last name.

     ii. I did not say "real estate" matter.

     iii. I did not leave an unclear message that was hard to understand.

e. Moreover, Donais has had this voicemail on his own system since 2017. He would have known that his statements were not true or accurate.

f. Yet he still goes and says in an affidavit, and later to the police that I said "real estate matter", that the message was hard to understand and that I left my last name on the voicemail, which are all false.

g. Although these are not the most critical statements to show as false, in this case, it does show a carelessness with the truth by Donais and that the details of his affidavit and his subsequent statements to the police do not add up or comport with the facts. This undermines credibility for the rest of his statements. This is further supported by Attorney Elliott Berry below.

## 2. Attorney Elliot Berry's Notes[10] of His 1-17-17 Call with Donais:

a. Donais 2017 affidavit:

> "*On the morning of Monday, January 9, 2017, I returned the call and spoke with a person who identified himself as "Andre", and what sounded like "Bedsore" as a last name.*"

b. **Donais statement to the police on 6-18-19 via a recorded interview**. At time marker 19:27 on the video recording of Donais' interview with the police, Donais stated the following:

> "Craig (19:27): ….And I think I'm putting the affidavit that **his last name sounded like bedsore.**"

c. Attorney Elliott Berry's Notes of 2017 Call with Donais:

> "*In regard to the phone call with Andre on Jan 9, he says that he spoke to "some guy" he didn't get any specific facts from Andre--that he is not even sure that Mr. Anderson gave him his name or that of the defendant.*"

d. Here, Donais told Mr. Berry that he spoke to "some guy", and that Donais was not sure that he got my name (i.e., Donais referred to me as "some guy"). NB: Donais did not know that Mr. Berry kept meticulous contemporaneous notes of that call and that Mr. Berry would later be a witness that could provide written evidence to what Donais said at the time in early 2017.

e. Again, although these are not the most critical statements to show as false, in this case, it does show a carelessness with the truth by Donais and that the details of his affidavit and his subsequent statements to the police do not add up or comport with the facts. This undermines credibility for the rest of his statements. Again, because it is rare to garner direct evidence of an individual's state of

---

[9] This recording of my voice for this voicemail left for Donais in early 2017 can be produced to this court, in further proceedings at summary judgment or trial. Obviously, I cannot attach a recording to this complaint.

[10] NB: These notes were produced verbatim by Attorney Elliott Berry to the ADO in 2020 and be produced in its entirety in further proceedings of this case.

mind, a plaintiff may rely on circumstantial evidence to prove that a defendant had actual knowledge that the statements were false, or had serious doubts about their accuracy. Levesque v. Doocey, 560 F.3d 82, 90 (1st Cir. 2009). See Bose Corp. v. Consumers Union of U.S., Inc., 692 F.2d 189, 196 (1st Cir. 1982), aff'd, 466 U.S. 485 (1984) (subjective determination whether defendant in fact entertained serious doubts about truth of statement may be established by inference "as it would be very rare for a defendant to admit such doubts"). See also Murphy, 449 Mass. at 57-58 (determination of defendant's subjective state of mind may be made based on circumstantial evidence).

    f.   I could go on to show contradictions and impeachment of several details of Donais' 2017 affidavit and of several details of his subsequent statements to the police in 2019 but for sake of space will hold off on that until I am afforded an opportunity for discovery, summary judgment and/or trial.

198.    Donais then continued, after a year later, with sending baseless defamatory statements to the police to get them riled up and amped up against the plaintiff and his wife, with the goal of getting us arrested or in an escalated encounter with police. It is analogous to the crime of a "swatting" hoax. This was designed to get us to back off from pursuing misconduct complaints or lawsuits. After Donais failed at his attempts to get police to start a criminal prosecution against the plaintiff, though not for want of effort, the defendants pressed the police, fully expecting that the plaintiff would be arrested if the police saw them anywhere in the vicinity of Donais' neighborhood.

## E. FALSE & DEFAMATORY STATEMENTS TO THE POLICE IN 2020

199.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

200.    In 2020, Donais contacted the police and made several further statements to the police that were false and defamatory. These statements were not made as part of or in furtherance of a court proceeding.

201.    These statements were made with malice, with knowledge of their falsity, and made recklessly with the intent to injure the plaintiff. These statements were defamatory or capable of a defamatory meaning or intended to communicate undisclosed defamatory facts.

202.    These statements were not privileged. There was no court proceeding occurring in 2020. Even if there was, the statements had no relevance to any court proceeding. They were not made as part of a court proceeding or to be used in a court proceeding. These statements were not the subject of any lawsuit or legal action at the time (because these statements had not been made as yet previously or disclosed previously). These statements were not made to report a crime to the police.

203.    Donais, in August 2020, recklessly and wantonly made further allegations to the police implying that the plaintiff and the plaintiff's wife are dangerous criminals and that he and his wife were scared for their safety because of us, and even going as far as to plead for special protection from the police and to have them assign special protection or regular monitoring of his neighborhood/area, for him and especially his wife and young child. This is the heights of irresponsible defamatory baseless dishonest trumped-up fabricated allegations laced with unfounded racial stereotypes of black criminality and dangerousness. There is no basis or evidence whatsoever for Donais or his wife to say or suggest that the plaintiff or plaintiff's wife are a threat to him and his wife and his young child or for Donais or Donais' wife to insinuate such things to anyone including to the police. Donais is playing with dangerous fire here creating a tinderbox situation that could have been explosive because of these false allegations made to the police. These types of allegations can get innocent black people killed by police. Donais was trying to stir up the police to be on the lookout for the plaintiff and plaintiff's wife in the context of him insinuating that we are a danger to him and his family.

204.    What Donais did here was very dangerous for us as black people in terms of trying to create amped up escalated encounters between us and law enforcement. It is analogous to "swatting hoaxes" where a person calls police on someone reporting a false escalated situation in order to put them in danger when the police come to their home all amped up expecting criminals or criminal activity. What Donais did was similar to a swatting hoax and was intended or had the effect of putting our lives in danger. This is a very serious matter.

205.    This shows a pattern that Donais will tell extreme lies (or is willing to tell extreme egregious lies) on black people, trumping up false charges that could get them arrested or killed by police. Why else would Donais

say such a thing to the police? He is saying these things because we are black and because he wants to hurt us and retaliate against us.

206.     It should be noted that the plaintiff discovered these emails, after submitting a public records request to the police in 2020. These emails prove that Donais' intent was to induce his fellow police connections to trump up a prosecution on a case, that they would not normally investigate or prosecute. These emails reveal the tremendous pressure being brought to bear and the persistent personal pleas being made to push through this investigation in order to do a favor for and help out Donais.

207.     This implies that these pleas and personal connection pressures were being made to do this as a special favor to Donais. Donais exploited his position on the crime-line board and his relationships with police officers to get them to do favors for him in terms of marshaling the vast resources of the police to target black American citizens, because of an attorney misconduct complaint. This implies improper motive and purpose.

208.     In one email example, Donais pressures his policer officer friend/contact on the crime-line board to push for a favor with pressure to get other police officers involved to try to help a brother out. See below.

*"This guy is from the Crime-Line. Can you help a brother out?"*

209.     This statement by Police Officer Nate Linstad to Officer Patrick Houghton in June 2019, with respect to the pressure received from Donais for favors to investigate the plaintiff and plaintiff's wife on a baseless allegation that would be a time-barred misdemeanor in any event and thus invalid. Police rarely use resources to investigate civilian reports about simple non-violent misdemeanors (especially when there is no actual evidence) and they certainly do not investigate simple non-violent misdemeanors that are time barred occurring more than two years, before the civilian report was made.

210.     The above revelations are consistent with a troubling trend of certain white people in this country who use race as a weapon against blacks and who call police on innocent black people trying to get them harmed or even killed by police. Here, Donais told the police that he was essentially in fear for his life because of the plaintiff and plaintiff's wife. This is the dog whistle trend of racism that certain states and cities have passed laws to prevent, such as New York.

211.     Donais is not going to stop if he is not held accountable. This suggests that Donais is a sociopathic liar, whose lies could get someone falsely arrested, imprisoned, or killed.

212.     There is no basis for Donais to claim to the police that he/his family were in fear of safety from the plaintiff and plaintiff's wife. It is unconscionable for Donais to suggest or accuse the plaintiff and plaintiff's wife of being dangerous or violent criminals, capable of harming his wife and young child so much so that he and his wife were in fear for their safety and require a special police protection or observation to protect them from the plaintiff and plaintiff's wife. This is not only classic dog-whistle racism, exploiting stereotypes of black people as dangerous and violent without any basis other than race, but it is malicious and dishonest defamation and it put the plaintiff and plaintiff's wife in danger from the police who relied on the word of this attorney that he has good reason to be in fear of his life or safety (or that of his family).

213.     Donais made a written statement that labeled the plaintiff and his wife "offenders" which implied that there was a determination that we were offenders and had committed some offense and that we were guilty of criminal acts. The intent of the statement was to stigmatize the plaintiff as criminals to imply that we had been found to criminals which is false. Anyone reading that statement by Donais would be left the defamatory meaning that we were criminals and had been found or determined by the police to be criminals. Donais used this false implication to support his request for special protection by the police from the plaintiff and plaintiff's wife.

214.     Some people might not to be too concerned when white people tell lies on black people using race as a motivating factor. The plaintiff understands that it might be uncomfortable for some in our society today to hear and confront such matters or to put oneself in the shoes of a black person to understand what it is like to be subjected to such things. Yet, there is no room to look the other way with how certain white people exploit race and racism to hurt blacks like this. This country has allowed Donald Trump 4 years to desensitize much of the country to concerns about race and racism and have emboldened many to scoff at such concerns. People like Donais have evidently been empowered to feel as though they can do these things

with impunity and get away with it. Whenever a black person raises concerns about race, in many instances it is treated as though it is false or not valid. People like Hilliard and Donais then try to use it as evidence that you are not credible because if you point out racism more than once, you have used up your one quota to call out racism. Yet, Julian Jefferson, a well-known black public defender attorney in NH, recently gave testimony before the governor outlining his experiences with or observations of everyday racism in New Hampshire and Massachusetts from multiple people. Is he not credible because of such experiences? If Donais and Hilliard were to have their way, they would no doubt attack Julian Jefferson for stating that he experienced or observed more than one experience of racism in NH and MA.

215.   The bottom line is that Donais started out using race and racism against the plaintiff and plaintiff's wife in 2017. He continued to use race against us in 2019 and again 2020. This has to stop, and he must be held accountable.

216.   The false statement was published with knowledge of its falsity and/or with reckless disregard for the truth.

217.   These statements are not protected by privilege because statements to the police are only conditionally privileged. See Dear v. Devaney, 83 Mass. App. Ct. 285 (2013) (We further note that cases in other jurisdictions have mostly treated police reports under the rubric of a qualified privilege. See Annot., Immunity of Police or Other Law Enforcement Officer from Liability in Defamation Action, 100 A.L.R. 5th 341, 377-382 (2002).).   See also Dear v. Devaney, 83 Mass. App. Ct. 285 (2013) further stating:

"An absolute privilege has not, however, been extended to police officers' own investigatory reports. See Seelig v. Harvard Coop. Soc., 355 Mass. 532, 538 (1969) (statements by police officers in course of investigation conditionally privileged). Cf. Malley v. Briggs, 475 U.S. 335, 342-343 (1986) (describing police officers' activities as being "further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment" and therefore providing officers with only qualified immunity against 42 U.S.C. § 1983 claim); Kalina v. Fletcher, 522 U.S. 118, 126 (1997), quoting from Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) ("There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial . . . and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested")".
.....
"We conclude that the statements made here are not protected by an absolute privilege. They were made during the <u>investigation, not the prosecution,</u> of the license suspension proceedings. They were made by police officers, not lawyers or prosecutors. For the most part, the report does not contain witness statements but the officers' own speculation or recounting of unidentified hearsay. They are also directed not at a party to the proceeding but at someone who is not even present at the proceeding. As he was neither a party nor a witness at the proceeding, Dear had no opportunity to test the validity of the statements at the proceeding. Also, there is nothing in the record to suggest that the licensing board or MOCAL contemplated any such proceeding against Dear or Elite at the time the report was prepared, or even afterwards, as neither Dear nor Elite was a licensee. Nor did Devaney or McGill contemplate such proceedings against Dear; although McGill's deposition testimony indicates that he believed he could have sought criminal charges against Dear, he did not do so. Instead, McGill stated that he was merely providing information to the licensing board so that it could determine whether further investigation was appropriate. See Restatement (Second) of Torts § 588 comment e ("The bare possibility that [a] proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered"). Cf. Smith v. Suburban Restaurants, Inc., 374 Mass. 528, 531 (1978) (no absolute privilege where judicial proceeding was not being seriously considered, but was contingent on future developments)."

218.   The same principle regarding conditional privilege applied to statements to the police is seen in Butcher v. Univ. of Mass., 111 N.E.3d 294 (2018), as follows:

"Here, the police made no arrest, no formal charges were filed, there was no official police statement, and no search warrant was issued.8 In these circumstances, the Supreme Judicial Court has explained that " 'statements made ... by the complainant or other witnesses ... as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceedings or of the arrest itself and are not privileged ....' Restatement (Second) of Torts § 611 comment h (1977). Accordingly, '[t]here is also no privilege to report the unofficial talk of such officials as policemen, as distinct from their official utterances or acts, such as an arrest' .... W. Prosser & W. Keeton, [Torts § 112,] at 836 [ (5th ed. 1984) ]." Jones, 400 Mass. at 796, 512 N.E.2d 260. Thus, the fair report privilege "does not apply to witness statements to police, whether appearing in an official police report or not,

where no official police action is taken." Reilly, 59 Mass. App. Ct. at 776, 797 N.E.2d 1204. Such unconfirmed allegations have "neither the authority nor the importance to the public that other documents or statements shielded by the fair reporting privilege possess." Id. Extending the privilege to a witness's allegations merely because they appear in a police blotter does not further the doctrine's purpose of allowing the public to learn of official actions affecting the public interest. See id. at 777, 797 N.E.2d 1204. See also Phillips v. Evening Star Newspaper Co., 424 A.2d 78, 89 (D.C. 1980) (reporting on events documented in police activity log not privileged because, where there was no arrest, log did not "carry the dignity and authoritative weight as a record for which the common law sought to provide a reporting privilege"). Contrast Medico v. Time, Inc., 643 F.2d 134, 141-142 (3d Cir. 1981) (allegations in nonpublic, but official, Federal Bureau of Investigation investigatory reports submitted by Philadelphia field office qualified for privilege). In the circumstances of this case, the privilege does not apply."

219.   Such conditional privilege can be overcome by malice, reckless disregard for truth, knowledge of falsity, excessive publication.

220.   Because these statements were first written and later put on a video recording and because they tend to injure in plaintiff's profession or trade, they constitute defamation per se and libel per se.

221.   These statements tended to (and did) damage the plaintiff in his trade, occupation, and/or business, and these statements were defamatory on their face without reference to any extrinsic information. The statements affected the plaintiff or may have affected the plaintiff in his profession by "imputing to [me]…fraud, dishonesty, [and/or] misconduct…", the statement constitute libel per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

222.   The plaintiff has suffered harm as a direct result of Donais' false, defamatory statement, which caused injury to my reputation, honor, and dignity.

223.   The plaintiff has suffered professional harm as a direct result of Donais' defamatory statement.

224.   Donais has injured the reputation upon which the plaintiff base his profession and business.

225.   Donais made his false statement with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on me and my rights.

226.   These statements are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury.  These defamatory statement(s) requires no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Donais falsely accused the Plaintiff of committing a serious violation of moral conduct and because Defendants injured Plaintiff in his or her profession and/or occupation.

227.   Donais' false and defamatory statement caused the plaintiff to suffer reputational, emotional, and professional harm.

228.   Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

### H. EVIDENCE/DOCUMENTS SHOWING THAT DONAIS LIED ABOUT RACE DISCRIMINATION ACCUSATION (WHICH DONAIS REPUBLISHED IN 2019)

229.   Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

230.   Below provides some examples of evidence that corroborates the fact that Donais lied about race discrimination accusation in his 2017 affidavit (which Donais affirmed in 2019).

### i. 1-18-17 District Court hearing transcript and recording

231.   This proves that, in a January 2017 court hearing, Donais did not tell the judge or anyone else about me being upset or about the race discrimination allegation.

232.   This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later when he concocted and drafted his 2017 affidavit in March 2017 and which concoctions were subsequently repeated to others including to the police, his friends, colleagues and family members.

### ii. 2020 Interview of Attorney Elliot Berry by the ADO

233.    This proves that Donais did not tell Elliott Berry about my being upset or about the race discrimination allegation.

234.    This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later.

### iii. Notes/Email from Attorney Elliot Berry Contemporaneously Written/Documented in 2017 and Later Produced By Elliott Berry to the ADO

235.    This proves that Donais did not tell Karl Terrell about my being upset or about the race discrimination allegation.

236.    This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later.

### iv. 2020 Interview of Karl Terrell by the ADO

237.    This proves that Donais did not tell Karl Terrell about my being upset or about the race discrimination allegation.

238.    This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later.

### v. Dave Akridge 2017 affidavit

239.    This proves that Donais did not tell Dave Akridge about my being upset or about the race discrimination allegation.

240.    This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later.

### vi. Email chain on 1-11-17 with Donais, Akridge & Terrell

241.    This proves that Donais did not tell Akridge or Terrell about my being upset or about the race discrimination allegation, when he had the opportunity to do so.

242.    This circumstantially corroborates the fact that such events did not happen, and that Donais later made them up two months later.

### vii. Police Video Recording on 6-18-19

243.    This proves that Donais was told about a statement indicating an intent by us to file an ethics complaint against Donais and that he knew that we were planning to file an ethics complaint, just prior to him making up out of whole cloth the racism accusation in his March 2017 affidavit.

244.    This proves that Donais was motivated by retaliation to preemptively attack and lie in his subsequent 2017 affidavit.

245.    This further proves that Donais made false statements in 2019:

   a) by affirming and/or republishing to the police, the false statements Donais made in his 2017 affidavit,

   b) by repeating statements made in Donais' 2017 affidavit to the police,

   c) by also submitting his 2017 affidavit to the police,

   d) by stating that the allegations made by me/my wife are not true, accurate or justified,

   e) by stating that me/my wife have a tenuous grasp on reality in order to discredit us with the police and to plant seed/doubt in the mind of the police that we were crazy, and

   f) that we are the type of people to alter/doctor/fabricate recordings to make such recordings say what it did not say,

   g) by adding to his array of false statements a new set of false statements made for the first time in 2019.

### I. DONAIS' FALSE/DEFAMATORY STATEMENTS TO HIS FAMILY MEMBERS/WIFE

246.    To establish a claim for defamation, a plaintiff must prove four elements: (1) the defendant made a false statement to a third party, (2) of or concerning the plaintiff, (3) that was capable of damaging the plaintiff's reputation in the community and that caused the plaintiff economic loss or is actionable without proof of economic loss, and (4) the defendant was at fault. See Ravnikar, 438 Mass. at 629-630, 782 N.E.2d 508.

247.    The prima facie elements of a slander claim are: "the publication of a false and defamatory statement by spoken words of and concerning the plaintiff." Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630, 635 (1996),

citing Restatement (Second) of Torts §§558 and 568 (1977). "In order to be actionable, the statements must have been published, i.e., communicated to at least a single individual other than the person defamed." Ellis, 41 Mass.App.Ct. at 636.

248.    Donais made false defamatory statements to his wife and to his family members including his eldest adult son Garrett Donais.

249.    Donais made statements attributing to his wife the allegation that the plaintiff was going to physically harm her. Why did she think that? How would she have come into knowledge about certain alleged facts about the plaintiff that would lead her to conclude that the plaintiff was going to harm her?

250.    It is self-evident that Donais told his wife lies about the plaintiff that made her think that the plaintiff was going to physically harm her and her young child.

251.    The plaintiff had never said anything about Donais' wife to Donais or to anyone. The plaintiff did not know Donais' wife or know about Donais' wife or know anything about Donais' wife until Donais himself brought her up in his emails to the police in 2020.

252.    It can be inferred that the only way that Ms. Donais could think that the plaintiff was going to physically harm her is for Donais to have told her defamatory things about the plaintiff that were not true, things that led her to think that the plaintiff was dangerous, violent, and criminal and that the plaintiff was going to physically harm her and her young child.

253.    Publishing a statement to only one third party is enough to establish defamation. This includes false defamatory statements to family members including wife and sons, etc.

254.    A false statement by a husband to his wife is still defamation just as how a false statement by a son to his father or a daughter to her mother is still defamation. Family members do not have unfettered right to make false statements about other people to their family members. See Johnson v. Queenan, 12 Mass. L. Rptr. 461 (2000)(court holding that statements by daughter to her mother about her rape were only conditionally privileged and therefore subject to being overcome by proof of malice, recklessness, excessive publication, etc.).

255.    Without the false defamatory statements made to her by husband, Ms. Donais would likely not have had any reason to think that the plaintiff was dangerous, violent and criminal, and that the plaintiff was going to physically harm her and her young child.

256.    The plaintiff was also harmed by this defamation in that it evidently caused Ms. Donais to get involved in the scheme to report the false allegation to the police. Similarly, Donais inserted his wife's name into the email and into the allegation to the police against the plaintiff.

257.    This suggests that Donais lied to his wife and that stirred up his wife and then his wife him up to act against the plaintiff. On information and belief, they fed off each other building these lies and false allegations where they encouraged each other with making a police report and request special police protection. Because Donais invoke the involvement of his wife in the making of the false police report, this is part of the reason why the plaintiff has added her as a defendant in this case. Ms. Donais' involvement includes not only aiding/abetting defamation but also tortious interference with advantageous relations and civil conspiracy. Based on Donais' own words, Ms. Donais evidently provided encouragement and assistance in making the defamatory report to the police.

258.    NB: In the dark history of this country, defamatory lies have been told countless times to stir up crowds to lynch black men by riling them up with falsehoods about how they intended to hurt or harm the wives of white men. This should not be countenanced in any way, shape or form in the 21st century America. I believe a jury would find this abhorrent disgusting lie to be wholly unacceptable, wholly damaging and punishable to the fullest extent of the law.

## V. FACTUAL ALLEGATIONS AGAINST DEFENDANT RUSSELL HILLIARD

### A. Factual Allegations Against Defendant Russell Hilliard

259.    Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs of this as if fully stated herein.

260.    It should also be noted that Russell Hilliard was made a defendant in this case, as a necessary party.

261. Hilliard has aided and abetted Donais in his tortious and wrongful acts.

262. Donais and Hilliard have jointly and separately defamed me with others.

263. Hilliard has engaged in such acts including in counselling and assisting Donais in matters that do not involve litigation or a judicial proceeding and also in business matters generally.

264. They have together used their influence to intimidate and harass me (and my wife), including misuse of their connections with the police, in order to prevent us from pursuing an attorney misconduct complaint against Donais, among other things.

265. Donais lied to the police falsely indicating/suggesting that I suffer from a mental disease. Hilliard aided and abetted in this lie and defamation of me.

266. Donais lied to the police falsely suggesting that I manufactured a false recording of Donais in order to show that he committed perjury (i.e., that I had fabricated a tape of his voice to make it sound as though Donais was speaking when it was not Donais speaking.). Hilliard aided and abetted Hilliard in this lie and defamation of me.

267. Donais' statement to police (aided/abetted/encouraged by Hilliard) that I am a danger to his young child and wife and that I was going to physically harm him, his wife and young child, indicating violent criminality and threat of physical harm to them, on my part, and requiring regular police protection/observation. Hilliard aided and abetted in this lie and defamation of me.

268. Donais, with support, encouragement and participation of Hilliard, lied to the police telling them I am a danger to his wife and young child, falsely suggesting/implying that I am a dangerous or violent criminal threat to his family, and using that lie to request special police protection and neighborhood watch to protect his family from the plaintiff, which is a disgusting bald lie. This blatant egregious lie implies that I am violent, or that Donais knows, via undisclosed facts, that I am violent, or capable of violence, to physically harm him, his wife and his family, thus necessitating police protection and monitoring. Hilliard aided and abetted Donais in this ugly contemptuous sinister lie and malicious defamation of the plaintiff.

269. Donais was perpetuating and tapping into a pernicious racial stereotype of blacks as "brutes" with violent criminal tendencies or characteristics. Such stereotypes or myths have been used to instill fear in blacks to silence them and to control them, with the goal of subduing them into accepting wrongs done to them or putting them in their place and preventing them from complaining or organizing, among other things. These caricatures, particularly of black men, were used to justify the killing or lynching of blacks. This is further the case when white men invoked the protection of white women from these brutish dangerous beasts i.e., black men.  In this case, Donais, in his defamatory communications with the police, invoked the issue of my possibly harming his wife and young child to stir up deep sensibilities around the allegation that he had knowledge that I was intent on coming to their home, to break in (especially during the day when he is not home), to do violent physical harm to his wife and young child. Donais was invoking the disgusting imagery of me as a black man coming to his home to commit crimes against his wife and young child (which further implies that I would commit some kind of physical assault against them or worse). These statements were made with an intentional disregard for the truth and/or with reckless disregard for the truth, with the intent and effect of defaming me and damaging my reputation.

270. Hilliard, who knew of or encouraged the above false statements, ignored clear notice from me and other witnesses as well as other evidence, that these statements were false and defamatory but yet Hilliard persisted in making, repeating or affirming these false statements with or on behalf of Donais to third parties. Hilliard was also put on notice that his assertions were false, but ignored such notice, which also bears on the issue of malice.

271. Hilliard has thus aided, abetted or facilitated the defamation of the plaintiff.

272. Hilliard has himself participated in and propagated the defamation of the plaintiff.

273. On information and belief, Hilliard is also a witness to and enabler/aider/abettor of Donais' communications or conversations with the police, which include defamation of the plaintiff by Donais.

274. These defamation claims include Donais' false non-judicial assertions that the plaintiff accused him of racism because Donais declined representation of him.

275. In addition to non-judicial statements, plaintiff also seeks to hold defendants liable for the defamatory/invasive statements that do not plausibly relate to the litigation claims. Such statements do not

fall within privilege because they are "palpably irrelevant" to the case claims. "Republication" in this context means the dissemination of protected litigation statements in an unprotected non-litigation context. And publication need not be in print to qualify as tortious. Any form of publication, including oral publication in statements to others, is sufficient. See Karch v. Baybank FSB, 147 N.H. 525, 535 (2002) ("publication involves any communication by the defendant to a third person") (quotations and citation omitted); McGranahan, 119 N.H. at 766 ("The question whether an absolute privilege exists . . . turns on whether the pleaded allegations were pertinent or relevant to the civil action in which they were filed").

276.   Hilliard cannot simply plead ignorance of certain facts or circumstances, even if his client lied to him or misled him, because there are clear facts laid out in writing (including in the email record) that contradict Hilliard's assertions. Moreover, Hilliard has the burden of being an officer of the court and he swore an oath to "delay no man for malice or lucre". He has the responsibility to ensure that he undertakes a diligent investigation of the facts that he purports to rely on for his response on behalf of his client. Furthermore, I should not have to spend time to catch him in his lies and to work to ferret out his dishonesty. What Hilliard did here was not by accident, but it was evidently intentional. It was not only one lie, but it was a pattern of how Hilliard approached this entire letter. Hilliard cannot be allowed to operate with impunity and to be unleashed on the public to wreak havoc in people's lives through lies and deceitful practices.

277.   Hilliard has been careless with the truth and has pushed the envelope in not abiding by, or otherwise has purposefully violated, the rules of professional conduct for lawyers.  Some examples of the violative conduct, by way of background, include, but are not limited to, the following:

   a.   Making misleading statements in writing in a willfully malicious and vexatious manner. Some of these false statements were intended to cast aspersions on me or to make me seem as though I did or said things that I did not do or say. I should not be subjected to such acts from lawyers.
   b.   Telling outright lies in written statements regarding the record (emails or documents) in this matter.
   c.   Exhibiting lack of candor and attempting to mislead by omitting key facts or records in written statements.
   d.   Engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation.
   e.   Knowingly making false statements of material fact or law and failing to disclose material facts or otherwise concealing facts having potential evidentiary value.
   f.   Using means/methods that have no substantial purpose other than to create unnecessary delay or to burden, scandalize, embarrass or oppress.

278.   This case is about holding lawyers accountable for defamation, among other wrongs, and about sophisticated race discrimination by exploiting racism against two African Americans, and then using police to make false reports to try to intimidate and retaliate against said African Americans putting their lives in danger from police by making a false police report and falsely suggesting that they are dangerous criminals and more. The plaintiff will prove these allegations. This is a critically important case in this day of racial justice reckoning and in the aftermath of the death of George Floyd. This is high stakes litigation.

279.   If Donais is proven in this case to have previously lied and/or if he lies again in this case, he will likely be subject to discipline from the bar including up to suspension or even disbarment. So, it is anticipated that Donais will try to deny these facts rather than come clean and tell truth. He is already all in and beyond a point of no return. But Donais knows that he has lied already in making the false statements alleged in this complaint. I anticipate that Donais' behavior in this case will reveal the behavior of someone who is guilt of lying. He will not behave forthcoming or transparent. He will try to deflect. If this court observes carefully how Hilliard or Donais respond to the specific charges of making false statements, it will be consistent with the conduct of persons who are lying. When they are exposed for making false statements, they will then try to minimize it or incredulously explain it away or otherwise revert to saying that those are "discrepancies", which is a euphemism for lies.

280.   It should be noted that the defamatory email sent to the police was effectively sent by both Donais and Hilliard, as they both assented to the assertions made in that email.

# VI. FACTUAL ALLEGATIONS AGAINST THE REMAINING DEFENDANTS

## A. Factual Allegations Against Defendant Upton & Hatfield

281.    Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs of this as if fully stated herein.

282.    Defendant Upton & Hatfield is a law firm that Russell Hilliard works for and is the law firm that Hilliard notes as the law firm that ultimately represents Craig Donais in the activities outlined below. Defendant Upton & Hatfield represents clients in the state of Massachusetts and clients who conduct business in the state of Massachusetts.

283.    Defendant Upton & Hatfield is responsible for the conduct of its attorney Russell Hilliard.

284.    Defendant Upton & Hatfield oversees and supervises the work of its attorney Russell Hilliard.

285.    Defendant Upton & Hatfield is vicariously liable for the acts of Russell Hilliard under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment. See Ellis v. Safety Insurance, 41 Mass. App. Ct. 630 (1996)(As the defamatory statement can reasonably be found to have been uttered in the course of Donahue's employment, Safety is subject to liability under the doctrine of respondeat superior).

286.    On information and belief, Defendant Upton & Hatfield knows of and is aware of the acts and statements made by Russell Hilliard as an attorney employed by Upton & Hatfield, on behalf of Craig Donais and as it relates to the matters and claims outlined in this complaint.

## B. Factual Allegations Against Defendant Donais Law Offices PLLC

287.    Plaintiff hereby realleges and incorporate by reference each of the preceding paragraphs of this as if fully stated herein.

288.    Defendant Donais Law Offices PLLC is the corporate alter ego of Craig Donais.  Donais is the sole member and manager of this corporate entity as well as the registered agent for this corporate entity.

289.    Defendant Donais Law Offices PLLC is responsible for the conduct of its attorney Craig Donais.

290.    Donais Law Offices PLLC is vicariously liable for the acts of Craig Donais under a theory of respondeat superior where an employer will be responsible for the actions of its employee taken within the scope of employment. See Ellis v. Safety Insurance, 41 Mass. App. Ct. 630 (1996)(As the defamatory statement can reasonably be found to have been uttered in the course of Donahue's employment, Safety is subject to liability under the doctrine of respondeat superior).

## C. Some Important Additional Allegations For This Second Amended Complaint

291.    I thus hereby allege the following either on personal knowledge or on information and belief.

292.    I allege that Mary Donais actively assists Craig Donais with his law business and law practice including activities in MA. Therefore, it is alleged that Mary Donais fully aids, abets, and conspires with Craig Donais in his acts and conduct at issue in the complaint. Hence, the acts of Craig Donais are imputed to Mary Donais, and vice versa, unless otherwise indicated.

293.    Similarly, I allege that Donais Law Office PLLC is the alter ego of Craig Donais. Hence, the acts of Craig Donais are imputed to Donais Law Office PLLC and vice versa. Also, the tortious statements made by Craig Donais are imputed to Donais Law Office PLLC and Donais Law Office PLLC acts and speaks through Craig Donais, its alter ego, and vice versa.

294.    I also allege that Craig Donais and Mary Donais has engaged in defaming me to their family members including to their sons, and to each other and to other family in MA as well. Discovery will reveal the extent of the defamation and how widespread it is.

295.    NB: I allege that Mary Donais has made defamatory statements to her family members including her sons about me, including suggesting that I am a criminal and I was intending/planning to break into her home and on physically harming her and her sons, and she has conspired with Donais to defame and injure me not only with the police but with her family members including her sons.

296.     None of the above is directed at any public body or government. All defamatory acts are directed at private persons, as part of the defamatory scheme and campaign of Craig Donais and Mary Donais.

297.   Also, the acts of Craig Donais are imputed to Mary Donais and Donais Law PLLC, unless otherwise indicated under the counts/causes of action section of this complaint.

298.   Similarly, I also allege that both Donais and Hilliard engaged in fraudulent misrepresentations to me as it pertains to inducing me to agree to allow them to be involved in a global settlement negotiation with Hilton defendants, for which their intent was only to sabotage the settlement for the other defendants, and that they lied to me and deceived me into fake negotiation offers, which were reneged on and withdrawn at the last minute for no reason, right as the settlement paperwork was about to be finalized and signed by 20 other defendants. Again, this has nothing to do with any petitioning activity as the conduct was directed towards me.

299.   I hereby allege that the Donais defendants are represented by insurance counsel for Donais' malpractice insurance and that the Hilliard defendants are represented by insurance counsel in this case. I also allege that the insurance carriers know that the liability of the defendants is clear but yet they have refused to offer prompt settlement as required under Section 176D. This fact is supported by the fact that the defendants did not challenge the complaint on the basis of failure to state a claim in their original response to the complaint. This is a tacit admission of the factual validity of my claims. I have asked counsel for the defendants for the name of the insurance carrier several times and they refuse to tell me. I told them I intend to add insurance carriers as a defendants to this case, but they still refuse and obstruct. I offered to engage in settlement with insurance carrier and insurance counsel but they have refused to engage in any such discussion and they have even refused to tell me the name of the insurance companies. I asked defense counsel to confirm that they are insurance counsel but they refused to answer. The conduct above is a violation of Section 176D. On information and belief, the insurance carriers are citizens of MA and thus addition of them to the case would destroy diversity. Without a name, I have been obstructed in adding them as a defendant with a proper name. Thus, I hereby seek permission from the court to add them as John Doe Company 1 and 2, in the meantime until discovery or a court order can be had.

300.   I also allege that the defamation claims, the MCRA claims, aiding/abetting and conspiracy claims, 93A claims, breach of contract and breach of fiduciary duty claims are one continuous string of events designed together to injure, retaliate, undermine, intimidate me. The defamation claims flows out of the breach of contract and fiduciary duty/legal malpractice claim which is the genesis of this whole story, which is at core a story about a lawyer who turned against his vulnerable client and embarked on a campaign to damage and teach him a lesson using his legal skills and connection to try to crush him. Thus, the breach of contract claim and breach of fiduciary duty/legal malpractice claims stand on their own since these claims stem from acts that occurred prior to any defamation acts that occurred.

301.   I also allege that the statute of limitations do not apply to the claims in this case because this case was filed in Bristol Superior Court of Massachusetts in June 2022, within one year, after a similar case was dismissed without prejudice in the Middlesex Superior Court in August 2021, ostensibly due to an issue with service of process created by an agent of the United States Post Office, and thus the Massachusetts savings statute is triggered, allowing the entire Middlesex Superior Court case, as filed in Bristol Superior Court, to relate back to the original date it was filed in January 2020. Thus, all claims from the Middlesex Superior Court case were transferred through into the Bristol Superior Court case, and thus survive any statute of limitations analysis from start to finish, as further explained in this proposed amended complaint. Thus, the case has no statute of limitations issues. The Massachusetts renewal statute/savings statute allows for re-filing of a case dismissed within one year after dismissal while preserving the original date of filing of the dismissed case, and thus preserving against any statute of limitations issue. In this instance, if the Massachusetts renewal statute/savings statute applies, which I believe it does, then there are no statute of limitations issues in this case.

### D. Additional Points

302.   Mary Donais was working for and working with Craig Donais in a business or work assistance capacity, and working for Donais Law Office, as an employee or agent of Donais Law Office. There are statements Mary Donais made to other people such as her family members and adult son that are at issue in this case. These include statements defaming the plaintiff suggesting that he is a criminal, and is going to do physical harm to their family members. Defamatory statements to family members are not privileged. Allegations of

criminality, violent criminal intent to do physical harm to family members, of having mental illness/disease, of felony bugging of an office, are all defamatory per se and are not protected by privilege of any kind. The plaintiff alleges that both Craig and Mary Donais have engaged in this conduct via telling their family members such defamatory statements, and are thus both liable for such conduct.

303.    To the extent that I alleged that Mary Donais conspired with her husband to defame me, that conspiratorial act is not necessarily based on statements but based on the planning and orchestration of events that entailed the conspiracy and the carrying out of the conspiracy. Both Mary Donais and Craig Donais plotted together to harm me. The plaintiff alleges that Donais and Hilliard interfered with contractual or advantageous relations by sabotaging or trying to create conflicts with attorneys who the plaintiff had relations with, by initiating conduct towards these attorneys in order to artificially create conflicts so that the plaintiff would have no representation or legal assistance.  The plaintiff alleges that Mary Donais aided and abetted these acts by planning, coordinating, conspiring to do these acts with Donais and Hilliard. The plaintiff alleges that Mary Donais assisted Donais/ Donais law office with the breach of contract and breach of loyalty/fiduciary duty when Donais engaged in a conflict of interest. So, Mary Donais assisted in the act of the breach of contract/breach of fiduciary duty or aided and abetted the breach of contract/breach of fiduciary duty, where Mary Donais knew about the contract/duty and assisted Donais in the breach, causing injury to the plaintiff. Mary Donais made statements to her family members including but not limited to her husband Craig Donais but also includes statements to her children including adult children. The defendants have largely worked together in conjunction or in cahoots against plaintiff in virtually all of most of the claims alleged. Just as how it is evident that the defendants are working together and defending each other and coordinating with each other in its defense against this action, howbeit in a surreptitious manner where they think it is not obvious that they are working very closely together. Therefore, because of the incestuous relationship and behind the scenes coordination that defendants have engaged in, the claims should be seen as involving a joint effort between the defendants.

304.    I had an economic, advantageous and contract relationship with the Manchester NH police. The Donais defendants knew of this relationship. The Donais intentionally and improperly interfered with this relationship. I was damaged by such interference. Although having advantageous relationships is not the same as having a contractual relationship, I hereby allege that I had both. The party with whom I had advantageous, economic, and contractual relations with is the Manchester NH police. The third party who interfered with such advantageous, economic, and contractual relations with is the Donais defendants. I allege that the Donais defendants knew of this relationship. I allege that the Donais defendants intentionally and improperly interfere with this relationship. I allege that I have been damaged by such interference. Donais knew of the relationship because he scoured my Linked-in page which had that information on it since 2017. Donais has been searching every publicly available document about me and has been investigating my every document, my every move, my every step I make in my life, he and Hilliard have been fastidiously tracking my every move in order to try to use information against me since 2017. Dave Akridge in 2017 confirmed that Donais, his lawyer at the time, was tracking and investigating everything about me. Donais contacted the defendants in another case and provided detailed information that he found about me and my wife including regarding my movements, address, and business information from online or other sources. Donais also directly asked the Manchester NH police to confirm the information he found about me on Linked-in, specifically asking whether it was true that I had contractual relations with them regarding a certain event. This is damning proof that Donais read my Linked-in page including the information about my NH police relations.  Donais intentionally interfered with that relations upon knowing that I had such relations that he obtained from my Linked-in page. Donais also has numerous connections in the Manchester NH police department and evidently also knew of that through those connections. Donais has improperly used his police connections to do favors for him. He uses his position on the crime-line board of the Manchester police, to get information and to ask for favors, which is also evidence of cronyism with respect to the Manchester NH police. The contract was not performed, the conference that I was contracted for did not and has not occurred, and I did not receive the compensation that I was slated to receive for such contract. These are sufficient to show damages.

305.    Mary Donais joined in, aided, encouraged, instigated, influenced, conspired on the act of tortious interference knowing that I had a relationship with the police and knowingly seeking to lend her self to interfere with that relationship. Hilliard also actively joined in, aided, abetted, facilitated, encouraged, influenced, conspired on the act of tortious interference knowing that I had a relationship with the police and knowingly seeking to lend herself to interfere with that relationship. Defendant Donais knew of my involvement with the NAACP and about the initiative with the police department. Defendant Donais issued communications to the police indicating/implying that my wife and I were dangerous and a violent criminal threat to his wife and young child and requesting special police security detail to protect them from my wife and myself. That suggestion by Donais to the police that my wife and I were dangerous and posed a violent criminal threat to his wife and young child, accords with a racially stigmatizing stereotype of black people as inherently dangerous and violently criminal. Those damaging and stigmatizing communications to the police stem from an improper motive on the part of Donais. Donais had no rational or reasonable basis to issue those statements about me and my wife. Donais knowingly or recklessly made false statements to the police about me. Donais evidently was motivated by personal and racial animus towards me as evidenced by the racial stereotype/dog whistle employed by Donais as well as by the false allegation by Donais that I had accused him of racism in declining representation, which allegations were repeated and embellished on by Donais to the police.  Donais' personal and racial animus also can be seen from a retaliatory animus designed to get back at plaintiff and his wife for raising ethical concerns to the Attorney Discipline Office. See Draghetti v. Chmielewski, 416 Mass. 808, 817 (1994) (improper motive established if police chief acted "based on retaliation or ill will toward [plaintiff]…"). See also Dear v. Devaney, 83 Mass. App. Ct. 285 (2013). Those damaging and stigmatizing communications to the police by Donais were disseminated across the entire police department. These harmful communications by Donais were circulated widely to a large number of people. Those damaging and stigmatizing communications to the police by Donais harmed me and resulted in interference with my relations with the police and the police chief as well as interfered with/affected the plaintiff's police-community event and the planning thereof.

306.    Defendant Hilliard was also responsible for those communications as he aided/abetted, signed off on and sanctioned those communications to the police. On information and belief, Defendant Donais and Defendant Hilliard collaborated, conspired and agreed to send those communications to the police. Defendant Hilliard was also copied on those communications to the police, giving them further air of credence, credibility, validation, corroboration and urgency. These communications were taken seriously by the police and the police urgently acted on them to provide security detail attention and protection for Donais, targeting me and my wife for police monitoring and watch. [NB: These false and harmful statements to the police, amping them up to encounter black couple stereotypes/stigmatized and labeled as a dangerous violent criminal threat, could have resulted in escalated tension with me and my wife, for reasons unbeknownst to plaintiff and his wife, and in the worst case, as shown by other examples in this day and age, could have led to the loss of life of myself and my wife.]

307.    Subsequent to these statements by Donais/Hilliard to the police, and on account of them, my relations with the police have suffered harm and have been damaged. Also, the planned community event with the police was canceled/never took place and subsequent further attempts to make the event happen went unanswered by the police. I incurred not only damage to my reputation but also financial damages including loss of pay. Similarly, Donais' communications to the police to the effect that I was mentally ill/crazy/had a tenuous grasp on reality, that plaintiff manufactured a recording and fabricated his voice on the recording or that plaintiff was capable of doing such a thing, and that I had bugged the telecommunications systems of Donais, were likewise harmful and damaging to me in my trade and professional reputation.  Furthermore, Donais' attempt to falsely accuse me and my wife of being criminal offenders was further harmful and damaging to my personal and professional reputation.

308.    The above establishes a claim of interference with advantageous relations by improper means and improper motives. [NB: None of the above statements were made in a judicial proceeding or in a quasi-judicial proceeding. These statements were not made in a prosecution proceeding or in a lawsuit proceeding. This was simply a statement made to a police officer which was initiated by Donais for the purpose of harming, damaging, harassing, injuring, and retaliating against me.] I anticipated further advantageous

relations with the police in the future but this was not realized on account of the interference by the defendants.

309.    Similarly, the defendant Hilliard, specifically himself, has engaged in other acts of interference with advantageous relations. Hilliard contacted the spouse of an attorney (which spouse is also an attorney) as well as the law firm (Primmer, Piper, Eggleston & Cramer PC) of that attorney in New Hampshire (who will be called "Attorney Jane Doe", as an alias in this complaint, to protect the privacy and of this attorney), that, on information and belief, Hilliard knew I was working with in regards to matters that were before the ADO pertaining to Donais in 2019 and 2020 and for which I had retained Attorney Jane Doe on a limited basis for legal assistance, and sought to establish a working relationship with the spouse of Attorney Jane Doe or Attorney Jane Doe's firm. As a result, Attorney Jane Doe terminated the relationship with me citing that Hilliard's contact with her spouse and/or her firm, and/or the ensuing working relationship situation with Hilliard related thereto, had created a conflict situation or an appearance of a conflict situation with me. Attorney Jane Doe did not provide a lot of detail about this situation, citing confidentiality/privacy reasons. This contact by Hilliard, on information and belief, was done with an ulterior purpose, under a pretextual guise, in effect to create a conflict that would block, prevent, or undermine my ability to obtain legal assistance or support. Hilliard thus sought to intentionally interfere with that relationship in order to block, prevent or undermine my ability to obtain legal assistance, and he evidently succeeded. I was harmed as a result. Similarly, after I began to pursue relief in court against Donais, Hilliard specifically and knowingly contacted yet another attorney in New Hampshire and/or the organization that this attorney worked for (who will be called "Attorney John Doe", as an alias in this complaint, to protect the privacy and of this attorney), and sought to establish a working relationship with that attorney or the attorney's organization. I had a relationship with Attorney John Doe whereupon I sought legal help or advice. This contact by Hilliard, on information and belief, was again done with an ulterior purpose, under a pretextual guise, in effect to create a conflict that would block, prevent, or undermine my ability to obtain legal assistance or support. Hilliard thus sought to intentionally interfere with that relationship in order to block, prevent or undermine the ability of myself to further obtain legal assistance, and he evidently succeeded. I was harmed as a result. NB: I have not disclosed the names of these attorneys at this stage because of privacy reasons that may impact the reputation of these attorneys. Given the delicate nature of this situation, however, I will disclose these names under impoundment or in camera, or in discovery. If I am required to disclose the names before that, I request that the court so instruct me. On information and belief, Hilliard has done this on other occasions with other attorneys, in order to block, prevent or undermine the ability of the plaintiff to obtain other legal assistance.

310.    By the above-described conduct, inter alia, the defendants knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortuously interfered with my actual and potential advantageous relations.

311.    Also, I was injured in that I could not return to NH because of Donais' defamatory statements about me to the police resulting in a department-wide police watch implemented by the police to be on the lookout for me because of Donais' lie that I was going to physically harm him, his wife and children, and thus he damaged my ability to work in NH with the police or with the NAACP in NH, or engage in any social or community relations in NH through or with them or otherwise. I was put in fear of my life because of a false police report by Donais intended to get me caught up in a heightened encounter with NH police. Furthermore, the reputational effects harmed me in NH and MA. For example, the NAACP is regional organization which includes the new England region. The harm in NH was also in MA.

## VIII. COUNTS/CAUSES OF ACTION

### A. Summary of Applicable Defamation Law in Massachusetts

312.    Defamation can be in the form of libel or slander. While libel refers to written words that are defamatory, slander refers to spoken words that are defamatory. Draghetti v. Chmielewski, 416 Mass. 808, 812 n.4 (1994). To prevail on the libel claim, a plaintiff must prove that "the defendant was at fault for the publication of a

false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66 (2004).

313.    A claim for libel is actionable without proof of economic loss. See Ravnikar v. Bocojavlensky, 438 Mass. 627, 630 (2003). See Visnick v. Marriott International, Inc., 22 Mass. L. Rptr. 727 (2007). See also Valley Electronics AG, et al., v. Polis, No. 20-cv-2133ARRLB, 2021 WL 3919244, at *6 (E.D.N.Y. Aug. 6, 2021) ("'An action for defamation that is expressed in writing or print,' including on the Internet, 'constitutes the common law cause of action for libel.'") (quoting Murawski v. Pataki, 514 F. Supp. 2d 577, 589 (S.D.N.Y. 2007); citing Buskirk v. N.Y. Times Co., 325 F.3d 87, 88 (2d Cir. 2003).

314.    A written statement is libelous per se if it "tends to disparage a person in the way of his [or her] office profession or trade." See Davis v. Ross, 754 F.2d 80, 82 (2d Cir. 1985) (quoting Nichols v. Item Publishers, 309 N.Y. 596, 601 (1956))."A writing also is libelous per se if it "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him [or her] in the minds of a substantial number of the community, even though it may impute no moral turpitude to him [or her]." See further Nichols, 309 N.Y. at 600–01.

315.    It is sufficient to plead a claim of libel per se by alleging that a false written statement affected or may have affected one's profession by "imputing to [them] . . . fraud, dishonesty, [and/or] misconduct . . . ." Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

316.    To establish a claim for defamation, a plaintiff must prove four elements: (1) the defendant made a false statement to a third party, (2) of or concerning the plaintiff, (3) that was capable of damaging the plaintiff's reputation in the community and that caused the plaintiff economic loss or is actionable without proof of economic loss, and (4) the defendant was at fault. See Ravnikar, 438 Mass. at 629-630, 782 N.E.2d 508.

317.    Defamation is the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." Draghetti v. Chmielewski, 416 Mass. 808, 812 (1994), quoting from Correl-las v. Viveiros, 410 Mass. 314, 319 (1991). Defamation is essentially spoken or written words or expressions that injure reputation.6 See Stone v. Essex County Newspapers, Inc., 361 Mass. 849, 853 (1975).

318.    While jurisdictions differ as to the extent to which a statement must be capable of injuring the plaintiff's reputation for it to be defamatory, in Massachusetts the false statement must be one that "discredits the plaintiff 'in the minds of any considerable and respectable segment in the community.' " Draghetti v. Chmielewski, supra at 811, quoting from Tropeano v. Atlantic Monthly Co., 319 Mass. 745, 751 (1980).

319.    Although defamation is explicitly enumerated in § 10(c), it is unique among the listed intentional torts in that it does not require any intentional misconduct. Assuming the other elements of defamation are present, the publication of a false statement about a private party is equally tortious whether it is made intentionally, recklessly, or negligently. See, e.g., Ezekiel v. Jones Motor Co., 374 Mass. 382, 390 (1978) (defamation verdict reinstated where jury could have determined that defendant during public hearing "knowingly accus[ed] the plaintiff of theft"); New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 395 Mass. 471, 476-477 (1985), quoting from Stone v. Essex County Newspapers, Inc., supra at 855 ("private persons . . . may recover compensation on proof of negligent publication of a defamatory falsehood").

320.    The nature of the wrong in a defamation of a private party is unrelated to the defendant's intentions or his degree of malice: "[I]t is said that neither the intention with which a tortfeasor acted, nor the state of his feelings toward the person injured . . . , can make him less responsible for the injury actually caused by his wrongful act. To carelessly utter defamatory statements entails the same responsibility for the injurious consequences as negligently to cast about firebrands, or shoot off a gun: since the defendant has in fact done the wrongful act he must be taken to have intended the consequences which naturally resulted." Note, Libel Without Intent, 23 Harv. L. Rev. 218-219 (1910), citing Curtis v. Mussey, 6 Gray 261 (1856); Hill v. Winsor, 118 Mass. 251 (1875); Hanson v. Globe Newspaper Co., 159 Mass. 293 (1893); Ellis v. Brockton Publishing Co., 198 Mass. 538 (1908).

321.    For private persons, intent is not essential to the tort of defamation. Intent is presumed, or, at a minimum, responsibility and liability is imputed as if intent was manifest, even when publication is negligently or carelessly effectuated. See In re Pereira, 44 B.R. 248, 252 (Bankr. D. Mass. 1984). The Legislature appears to have acknowledged and perpetuated this unique characteristic of the tort of

defamation, by specifically including it in § 10(c). A statement about a private party that is negligently published, with intentional or reckless disregard for its truth, can be just as defamatory as a statement that is intentionally published, with negligent disregard for its truth. See New England Tractor-Trailer Training of Conn., Inc., supra; Ravnikar v. Bogojavlensky, 438 Mass. 627, 630 (2003). Ultimately, and appropriately, the Legislature has determined that both species of defamation, libel and slander, are intentional torts for the purposes of § 10(c).

322.   Massachusetts, by statute, allows a plaintiff to recover for a truthful defamatory statement if it was published in writing (or its equivalent) and with actual malice. See G. L. c. 231, § 92.

323.   Malice does not mean personal ill, but it may also mean such a wanton and reckless disregard of the rights of another as is ill-will's equivalent.

324.   Actual malice can be found where there is knowledge that the statements were false or made with reckless disregard for whether they were false. New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

325.   Mere reckless statements, or statements based on nothing in the way of information, are not protected. Nor are statements made "with knowledge that they were untrue, or without caring whether they are true or false; or if one states as true what he did not know to be true, recklessly, not taking the trouble to ascertain whether it was true or not.

326.   A plaintiff may prove actual malice either by extrinsic evidence of personal ill-feeling, or by intrinsic evidence, such as the exaggerated language of the libel, the mode and extent of publication, and other matters in excess of the privilege. (Odgers on Libel & Slander [5th ed.], 685.) The rule is properly applied to reckless statements based on nothing in the way of information. See Pecue v. West, 233 N.Y. 316 (1922).

327.   Reckless disregard requires that the individual making the alleged defamatory statement "entertained serious doubts as to the truth" of the statement. Murphy, 449 Mass. at 48, quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

328.   A qualified or conditional privilege can be abused and lost in a number of different ways. Bratt v. International Bus. Machs. Corp., 392 Mass. 508, 514 (1984). "One manner of such abuse is publication with knowledge of falsity or with reckless disregard of the truth." Tosti v. Ayik, 386 Mass. 721, 726 (1982). Case law and the Restatement (Second) of Torts agree that recklessness is the minimum degree of misconduct required to forfeit a conditional privilege. Bratt v. International Bus. Machs. Corp., supra.

329.   The abuse and loss of the defendant's conditional privilege in a defamation action can also be based on "unnecessary, unreasonable or excessive publication," provided the plaintiff proves that the defendant acted "recklessly." Id. at 515-516. Therefore, the privilege is abused when the communication is made in such a way as to unnecessarily, unreasonably, or excessively "publish it to others, as to whom the occasion is not privileged." Galvin v. New York, N.H. & H.R.R., 341 Mass. 293, 297 (1960).

330.   Finally, a conditional privilege is abused and lost when it is determined that the defendant has acted with actual malice. See ibid.; Tosti v. Ayik, supra. A conditional privilege may thus be recklessly abused and lost whether the fault lies in the misconduct of determining the truth of the material published or in the misconduct of unnecessarily, unreasonably, or excessively publishing the material. See also Barrows v. Wareham Fire District, 82 Mass. App. Ct. 623 (2012).

331.   Carelessly to utter defamatory statements entails the same responsibility for the injurious consequences as negligently to cast about firebrands, or shoot off a gun: since the defendant has in fact done the wrongful act, he must be taken to have intended the consequences which naturally resulted. Note, Libel Without Intent, 23 Harv. L. Rev. 218-219 (1910), citing Curtis v. Mussey, 6 Gray 261 (1856); Hill v. Winsor, 118 Mass. 251 (1875); Hanson v. Globe Newspaper Co., 159 Mass. 293 (1893); Ellis v. Brockton Publishing Co., 198 Mass. 538 (1908).

332.   A defamation which charges a plaintiff with criminal conduct is actionable per se. Finger v. Pollack, 188 Mass. 208 (1905); Sousa v. Davenport, 3 Mass. App. Ct. 715 (1975). Criminal accusations are generally regarded as defamatory, see Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 853 (1975).

333.   There are many cases which hold that the report of a crime is only conditionally privileged. In most of those cases, the defendants went to the police, or communicated with others, on their own initiative and published an accusation which might otherwise never have been known. See, e.g., Seelig v. Harvard Coop.

Soc'y, 355 Mass. 532, 537-538 (1969) (store initiated investigation which led to criminal complaint against plaintiff); Pihl v. Morris, 319 Mass. 577, 581 (1946) (defendant told police that plaintiff had stolen a dishwashing machine and made a formal complaint for larceny); Robinson v. Van Auken, 190 Mass. 161, 166 (1906) (defendant called a police officer to his store and made an accusation of larceny against the plaintiff in officer's presence); Brow v. Hathaway, 13 Allen 239, 242-243 (1867) (defendant went to police and initiated an investigation). The key to understanding these cases lies in the fact that, when the defendants made the allegedly defamatory statements, no criminal action or judicial proceeding was then being contemplated or proposed. As a consequence, the defendants could not reasonably argue that they were entitled to the protection of absolute privilege.

334.    A master is liable for the wrongful acts of his servant committed within the scope of his authority. Mills v. W. T. Grant, 233 Mass. 140 (1919). Pesce v. First National Stores, Inc., 1983 Mass. App. Div. 64 (1982).

335.    The plaintiff is entitled to recover for the 'distress and anxiety which may have been the natural result of the legal wrong.' " Shafir v. Steele, 431 Mass. 365, 373, 727 N.E.2d 1140 (2000), quoting Markham v. Russell, 12 Allen 573, 575, 94 Mass. 573 (1866).

336.    Generally, a publication may convey a defamatory meaning if it "tends to lower [the] plaintiff in the estimation of a substantial, respectable group, though they are a minority of the total community or plaintiff's associates." Afro-American Publishing Co. v. Jaffe, 366 F.2d 649, 654 n. 10 (D.C. Cir. 1966).

337.    Where the statements at issue "could have been understood by the average reader in either sense, [however,] the issue must be left to the jury's determination." Lyons v. New Mass Media, Inc., 390 Mass. 51, 59 (1983).

338.    Defamation by implication is also a valid claim, stemming not from what is literally stated, but from what is implied. See Tavoulareas v. Piro, 817 F.2d 762, 780 (D.C. Cir. 1987) (en banc); cert. denied, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) (use of the term "set up" in a familial context implied that one family member provided an opportunity to another family member on the basis of kinship, not merit); see generally R. Smolla, Law of Defamation, § 4.05 (1990). This court has recognized, however, that "District of Columbia law ... clearly contemplates the possibility that a defamatory inference may be derived from a factually accurate news report." Southern Air Transport, 877 F.2d at 1014; see also McBride v. Merrell Dow and Pharmaceuticals, Inc., 717 F.2d 1460, 1465 (D.C. Cir. 1983) (true statement that an expert witness received $5,000 a day might support an implied defamatory meaning that the plaintiff's testimony was "for sale").

339.    The usual test applied to determine the meaning of a defamatory utterance is whether it was reasonably understood by the recipient of the communication to have been intended in the defamatory sense.... When one uses language, one is held to the construction placed on it by those who hear or read, if that construction is a reasonable one. F. Harper, et al., The Law of Torts § 5.4 (1986) (emphasis added). Under this standard, in order to prevail on a defamation claim, the language used must, as a matter of law, be reasonably capable of a defamatory interpretation and a jury must find that the language was actually understood by the recipient in that sense. It is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one. At bottom, "[t]he meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." Restatement (Second) of Torts § 563 (1977); see also id. comment c. In McBride, the court held that the true statement that Dr. McBride received $5,000 a day for his expert testimony might support the implied defamatory meaning that "the plaintiff's case was so weak they had to pay that much to get any expert to testify, and hence that Dr. McBride's testimony was for sale." 717 F.2d at 1465. That implied defamatory meaning arose not out of mere reporting of the $5,000 payment, but from the juxtaposition of that figure with the fees which the defendant normally paid such experts. The McBride court noted this direct comparison.

340.    If the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference, the communication will be deemed capable of bearing that meaning.

341.    Defamation can thus be found with the use of certain juxtapositions, turns of phrase, or incendiary headlines. See, e.g., Cianci v. New Times Publishing Co., 639 F.2d 54, 60 (2d Cir. 1980) (article with the headline "Buddy We Hardly Knew Ya" allowed readers to conclude that Mayor Cianci was accused of being

a rapist and obstructor rather than the man of character he claimed he was). See *White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990)

342.   Similarly, the omission of material facts might in some circumstances supply the missing ingredient that would place a literally true communication in the field of implied defamation.

343.   For private persons, intent is not essential to the tort of defamation. Intent is presumed, or, at a minimum, responsibility and liability is imputed as if intent was manifest, even when publication is negligently or carelessly effectuated. See *In re Pereira*, 44 B.R. 248, 252 (Bankr. D. Mass. 1984).

344.   Most people only have to show that the defendant was negligent (i.e., careless) in making the defamatory statement. Public officials and public figures, on the other hand, have to show "actual malice," which the US Supreme Court has defined as knowledge of falsity or reckless disregard for the truth (which does <u>not</u> mean that the defendant necessarily acted with deliberate ill will).

345.   A defamatory imputation is an imputation which is likely to lower a person in the estimation of right-thinking people; an imputation which injures a person's reputation by exposing him to hatred, contempt or ridicule; or an imputation which tends to make a person be shunned or avoided.

## <u>COUNT 1 – DEFAMATION PER SE/LIBEL PER SE</u>
### (as to Defendants Craig Donais and Donais Law Office PLLC)

346.   Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

347.   To constitute defamation per se in Massachusetts, the alleged defamatory statement must fit within one of the four classes.
   a.   Statements constituting libel.
   b.   Statements charging the plaintiff with a crime.
   c.   Statements alleging that the plaintiff has certain diseases.
   d.   Statements prejudicing the plaintiff's business or profession.

348.   Defendants' actions fall within all four classes. Defendants' actions constitute defamation per se entitling Plaintiff to monetary damages in an amount to be determined at trial.

349.   Criminal accusations are generally regarded as defamatory. See *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975).

350.   Defendants accused the plaintiff of criminal conduct which included that I "bugged" his office and fabricating his voice in a recording. Defendants' published statements are defamatory per se and intended to damage the plaintiff. These statements were made orally as well as also were written when published to a third party, and thus also constitute libel per se.

351.   Defendants also accused the plaintiff of posing a dangerous criminal threat to him, his wife and young child. Defendants' published statements are defamatory per se and intended to damage the plaintiff. These statements were also written when published to a third party and thus also constitute libel per se.

352.   Defendants' published statements suggesting that the plaintiff was a criminal, or committed crimes or was a dangerous criminal threat to him, his wife and young child, are false and untrue and have defamed or was intended to defame the plaintiff. Defendants' published statements are defamatory per se and intended to damage the plaintiff. These statements were also written when published to a third party and thus also constitute libel per se.

353.   Defendants' published statements suggesting that the plaintiff had a mental disease, or a tenuous grasp on reality are false and untrue and have defamed or was intended to defame the plaintiff. Defendants' published statements are defamatory per se and intended to damage the plaintiff.

354.   Defendants accused the plaintiff of conduct which would injure plaintiff in his trade and profession.

355.   These statements were made to Craig Donais family members including his adult son Garrett and to the police, among others. Discovery will reveal to full extent of these statements and how widespread they were or became.

356.   NB: Defendants went to the police, or communicated with others, on their own initiative and published accusations which might otherwise never have been known. According to case law, this conduct is not protected. See, e.g., *Seelig v. Harvard Coop. Soc'y*, 355 Mass. 532, 537-538 (1969). *Brow v. Hathaway*, 13 Allen 239, 242-243 (1867) (defendant went to police and initiated an investigation).

357.     When Defendants made the defamatory statements, no criminal action or judicial proceeding was then being contemplated or proposed.

358.     The defendants' statements were false and reckless in disregard of the truth and made without proper investigation of the allegations.

359.     That the statements are defamatory is clear. The statements can reasonably be read as discrediting the plaintiff in the minds of any considerable and respectable class of the community. Moreover, these words have the effect of heaping disparagement upon plaintiff when viewed contextually, i.e. in the light of attendant circumstances.

360.     Defendants communicated the defamatory statements about plaintiff to several third parties. In publishing these statements, Defendants published defamatory statements to a wide range of persons.

361.     Therefore, Defendants' published statements that are false and untrue have defamed plaintiff.

362.     These statements made by the Defendants are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury.  These defamatory statement(s) require no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Defendants falsely accused the Plaintiff of committing crime(or) or violations of moral conduct and because Defendants injured Plaintiff in his profession and/or occupation.

363.     These statements are untrue and are harming the plaintiff, so long as they remain public.

364.     Because these statements are in the public record, Plaintiff does not have another means of seeking removal of such statements, representing an ongoing harm to Plaintiff.

365.     Defendant's false, disparaging, defamatory, and materially misleading statements are not privileged.

366.     Although not a necessary element to this cause of action, it is be noted nonetheless that Defendants' actions were malicious and showed intentional disregard for plaintiff's rights. Defendants have exhibited particularly egregious conduct and acted with malice or fraud. Defendants maliciously and willfully calculated their actions to harm the Plaintiff.

367.     These statements are false, were made with malice, were not honestly held opinion, were not made accidentally or disseminated accidentally and were intended to be made public.

368.     Defendants' actions betray a malevolent intent and ill-will towards the Plaintiff.

369.     Defendants published or allowed to be published the false and defamatory statements with malevolent intent, ill-will and/or with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

370.     Defendants' false, disparaging, defamatory, and materially misleading statements have subjected and continue to subject the plaintiff to contempt and tended to diminish the esteem, respect, goodwill and/or confidence in which he is held.

371.     Defendants published, of and concerning the plaintiff, several defamatory claims both orally and in writing (as well on video recording) to the police, to his friends, colleagues, family, to Craig Donais' wife, to Craig Donais' adult son Garrett Donais, in non-judicial contexts. These statements contained numerous falsehoods about plaintiff whether on its face and/or by virtue of a clear implication affirmatively intended by Defendants, and which were defamatory per se.

372.     Defendants published, of and concerning the plaintiff, several defamatory claims to court employees and to judges, with malice and knowledge of falsity as a non-party, and therefore are not privileged. These statements contained several falsehoods about plaintiff whether on its face and/or by virtue of a clear implication affirmatively intended by Defendants, and which were defamatory per se.

373.     By their above-described conduct, inter alia, Defendants have published or allowed to be published false, disparaging, defamatory, and materially misleading statements about the plaintiff.

374.     As described herein above, inter alia, Defendants have intentionally and with malice published false, disparaging, defamatory, and materially misleading statements about the plaintiff with the intent to damage his professional and personal reputation.

375.     As described above, inter alia, Defendants have negligently published or allowed to be published malicious, false, disparaging, defamatory, and materially misleading statements about the plaintiff.

376.     These statements are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury.  These defamatory statement(s) requires no proof

of its injurious character because it was obviously hurtful to the Plaintiff, because Donais falsely accused the Plaintiff of committing a serious violation of moral conduct and because Defendants injured Plaintiff in his or her profession and/or occupation.

377.    Donais made these false defamatory statements to his wife Mary Donais, to his sons including his eldest adult son Garrett Donais, to other members of his family, his malpractice insurance representatives, to his friend and colleague Robert Obrien, to Beatriz Van Meek, to his friend Nate Linstad, to friend and colleague Brian Snow, to his friend Dave Akridge and to his police cronies.

378.    Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

379.    As a result of the malicious defamatory conduct on the part of the Defendants, Plaintiff has suffered economic and consequential damages.

380.    As a direct and foreseeable consequence of Defendants' defamation, the plaintiff has suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation.

381.    As a result thereof, the plaintiff has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress.

382.    These damages include not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

## COUNT 2 – DEFAMATION/LIBEL OF PRIVATE CITIZEN
### (as to Defendants Craig Donais and Donais Law Office PLLC)

383.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

384.    Under the Massachusetts law, defamation is committed when: (1) the defendant published a statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss.

385.    Defendants' published statements suggesting that the plaintiff unjustifiably accused Donais of racism for declining prospective attorney-client relationship, is false/untrue. This is harmful to the plaintiff as it presents plaintiff as one who frivolously and groundlessly accused Donais of racism without any rational basis or justification.

386.    That the statements are defamatory is clear. The statements can reasonably be read as discrediting the plaintiff in the minds of any considerable and respectable class of the community. Moreover, these words have the effect of heaping disparagement upon plaintiff when viewed contextually, i.e., in the light of attendant circumstances.

387.    Defendants communicated the defamatory statements about plaintiff to several third parties. In publishing these statements, Defendants published defamatory statements to a wide range of persons.

388.    Therefore, Defendants' published statements that are false and untrue have defamed plaintiff.

389.    These statements made by the Defendants are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury.  These defamatory statement(s) require no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Defendants falsely accused the Plaintiff of committing crime(or) or violations of moral conduct and because Defendants injured Plaintiff in his profession and/or occupation.

390.    These statements are untrue and are harming the plaintiff, so long as they remain public.

391.    Because these statements are in the public record, Plaintiff does not have another means of seeking removal of such statements, representing an ongoing harm to Plaintiff.

392.    Defendant's false, disparaging, defamatory, and materially misleading statements are not privileged.

393.    Although not a necessary element to this cause of action, it be noted nonetheless that Defendants' actions were malicious and showed intentional disregard for plaintiff's rights. Defendants have exhibited particularly egregious conduct and acted with malice or fraud. Defendants maliciously and willfully calculated their actions to harm the Plaintiff.

394.    These statements are false, were made with malice, were not honestly held opinion, were not made accidentally or disseminated accidentally and were intended to be made public.

395.    Defendants' actions betray a malevolent intent and ill-will towards the Plaintiff.

396.    Defendants published or allowed to be published the false and defamatory statements with malevolent intent, ill-will and/or with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

397.    Defendants' false, disparaging, defamatory, and materially misleading statements have subjected and continue to subject the plaintiff to contempt and tended to diminish the esteem, respect, goodwill and/or confidence in which he is held.

398.    The false statements were published with knowledge of their falsity and/or with reckless disregard for the truth.

399.    Because these statements were first written and because they tend to injure in my profession or trade, they constitute defamation per se and libel per se.

400.    They tended to (and did) damage me in my trade, occupation, and/or business, and they were defamatory on their face without reference to any extrinsic information. Because the statement affected me or may have affected me in my profession by "imputing to [me]…fraud, dishonesty, [and/or] misconduct…", the statement constitute libel per se. See Grimaldi v. Schillaci, 106 A.D.2d 728, 729–30 (3d Dept. 1984).

401.    I have suffered harm as a direct result of Donais' false, defamatory statements, which caused injury to my reputation, honor, and dignity.

402.    I have suffered professional harm as a direct result of Donais' defamatory statements.

403.    Donais has injured the reputation upon which I base my business and livelihood as a business consultant.

404.    Plaintiff was also a professional conference planner and event organizer, particularly in the field of conflict resolution, negotiation and mediation.

405.    Plaintiff had an affiliation with the NAACP and was recruited to work on developing, planning and executing a large conference/event that centered on and facilitated dialogue and conflict resolution between the police and the local community, particularly communities of color, in order to improve relationships between local community leaders/members and law enforcement.

406.    Plaintiff had an agreement from the police to collaborate on a community event involving the police and the NAACP and was sponsored by other organizations such as two local colleges and universities.

407.    Part of this agreement was the recruitment of police officers to attend the event.

408.    Plaintiff had in person meetings with and further telephone and email conversations with the chief of police.

409.    The plaintiff had developed a good working relationship and reputation with the chief of police who was enthusiastic about working with the plaintiff on this joint police-community event.

410.    Defendant Donais knew of plaintiff's involvement with the NAACP and about the initiative with the police department.

411.    Defendant Donais issued communications to the police indicating/implying that my wife and I were dangerous and a violent criminal threat to his wife and young child and requesting special police security detail to protect them from my wife and myself.

412.    That suggestion by Donais to the police that my wife and I were dangerous and posed a violent criminal threat to his wife and young child, accords with a racially stigmatizing stereotype of black people as inherently dangerous and violently criminal.

413.    Those damaging and stigmatizing communications to the police stem from an improper motive on the part of Donais. Donais had no rational or reasonable basis to issue those statements about plaintiff and his wife.

414.    Donais knowingly or recklessly made false statements to the police about the plaintiff.

415.    Donais made his false statements with ill will and spite, and with wanton, reckless, or willful disregard for its injurious effects on me and my rights.

416.    Donais' false and defamatory statements caused me to suffer reputational, emotional, and professional harm.

417.     Defendants published, of and concerning the plaintiff, several defamatory claims both orally and in writing (as well on video recording) to the police, to his friends, colleagues, family, Craig Donais' wife, Craig Donais' adult son Garrett Donais, in non-judicial contexts. These statements contained numerous falsehoods about plaintiff whether on its face and/or by virtue of a clear implication affirmatively intended by Defendants, and which were defamatory.

418.     Defendants published, of and concerning the plaintiff, several defamatory claims to court employees and to judges, with malice and knowledge of falsity as a non-party, and therefore are not privileged. These statements contained several falsehoods about plaintiff whether on its face and/or by virtue of a clear implication affirmatively intended by Defendants, and which were defamatory.

419.     By their above-described conduct, inter alia, Defendants have published or allowed to be published false, disparaging, defamatory, and materially misleading statements about the plaintiff.

420.     As described herein above, inter alia, Defendants have intentionally and with malice published false, disparaging, defamatory, and materially misleading statements about the plaintiff with the intent to damage his professional and personal reputation.

421.     As described above, inter alia, Defendants have negligently published or allowed to be published malicious, false, disparaging, defamatory, and materially misleading statements about the plaintiff.

422.     Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

423.     As a result of the malicious defamatory conduct on the part of the Defendants, Plaintiff has suffered economic and consequential damages.

424.     As a direct and foreseeable consequence of Defendants' defamation, the plaintiff has suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation.

425.     As a result thereof, the plaintiff has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress.

426.     These damages include not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

427.     Defendants' actions constitute defamation of a private citizen entitling Plaintiff to monetary damages in an amount to be determined at trial.

## COUNT 3 – FALSE LIGHT INVASION OF PRIVACY
### (As to defendant Craig Donais and Donais Law Office PLLC)

428.     Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

429.     As more fully stated elsewhere and below, Craig Donais (and Donais Law Office acting through Craig Donais) engaged in the public disclosure of private facts to the police/police department and to others, and also engaged in publicity placing the plaintiff in a false light in the public, including but not limited to the police and police department, and publishing such disclosures to the public record of the police department, for access to the public, and which also, upon the further actions of Craig Donais, resulted in the widespread publication and publicity of false light disclosures, throughout the entire police department and ostensibly to other police departments in the region, and evidently also causing a state wide watch/lookout by the police for the plaintiff based on the false light and false defamatory allegations of Donais.

430.     Craig Donais broke confidentiality of the ADO process, which was in effect at the time, to present private confidential information to the police regarding the contents of a letter wherein it was stated that there was a recording that proved the dishonesty of Donais.

431.     Donais invaded my privacy by publishing to the police, certain private information provided to the ADO that was protected by confidentiality of the ADO process. By publishing this confidential information, without all of the relevant facts, it presented a false light about me and/or my wife, and Donais then used that letter to accuse me to the police that I or my wife committed a crime. Neither I nor my wife committed a crime. If Donais had waited until the ADO matter was completed, he would not have been able to make any such report of the matter to the police.

432.   The statement by Donais conveyed a defamatory meaning and constituted false invasion of privacy.

433.   The statement by Donais contained material capable of defamatory meaning.

434.   A jury ultimately is responsible for determining whether the statements actually conveyed a defamatory meaning and whether the other elements of defamation and "false light" invasion of privacy can be established.

435.   Donais' statements placed me in a "false light." The false light invasion of privacy action differs from an action for defamation because a defamation tort redresses damage to reputation while a false light privacy tort redresses mental distress from having private information presented publicly in a false light or twisted to imply a false conclusion.

436.   Donais accused me of making a recording and that the recording was illegal. Donais based this on a letter that was sent to the ADO that only stated that there was a recording that proved the dishonesty of Donais. But the letter did not say what form the recording was in, what the recording was of, when the recording occurred if it occurred, whether the recording was an electronic recording or a written recording, who the recording was made by, if it was a sound, video or stenographic recording, whether it was a court proceeding in which Donais spoke on the record or it was of a conversation with me. Donais later admitted that he did not know if it was accurately stated or was an untrue statement. Given the above, Donais had no grounds to file such a police report.

437.   Donais' statements falsely implied that I committed a crime.

438.   Donais' statement goes beyond reporting the facts of what was stated in the letter to the ADO.

439.   Donais' statement goes beyond merely stating what was on the incident report. The juxtaposition of the reference to word "offenders" and the statement of Donais' need for protection, renders a colorable inference that: a) I and my wife committed an offense and b) that I and my wife were criminals and c) were capable of harming him, his wife and his young child. By raising the specter of criminal violations, Donais provided a clear signal from which a reader could conclude, rightly or wrongly, that the defamatory inference was intended or endorsed by the police.

440.   Material omissions can give rise to a cause of action for defamation,

441.   Donais invaded privacy by exposing me and my wife to false light publicity. The Restatement (Second) of Torts § 652E (1977) defines this tort as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his [or her] privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

442.   Donais' assertions placed me in a false light. It would be highly offensive to a reasonable person to be placed in this light. As with the defamation count, a jury must be allowed to determine whether this impression is false. The emails, viewed in their entirety, are thus capable of bearing implied defamatory meanings and of placing me and my wife in a false light.

443.   Donais made assertions that can reasonably be understood as implying provable facts; the defamatory meanings are derived by implication. It was intended to get the police to take action concerning me and treat me as a criminal.

444.   The publications defamed plaintiff by implying falsely, inter alia, that he was a criminal or had committed a criminal offense. This was a clever attempt to try to play word games to create a false implication based on his own initial false or unfounded police report.

445.   And It should also be noted that Mr. Donais' false light disclosures and defamatory statements have garnered attention in the news and thus there was broad publication/publicity of matters that include his false statements and disclosures in public settings.

446.   Furthermore, Mr. Donais has also made statements to several other people including friends, colleagues and family members. He also went to the police and provided these false light and false defamatory statements to them because he was trying to use police connections to intimidate and harass the plaintiff.

447.   These false reports to the police are also public documents now.

448.    This has also damaged me in that it damaged my professional reputation. It damaged my credibility. It damaged me in the community.

449.    This includes false statements that I am a crazy person suffering from mental disease, that I was a

450.    dangerous criminal and he needs protection from me, his wife and his children are in danger, which is absolutely false and it's beyond the pale. And this tarnished my credibility. It tarnished my character. It's in public documents. These

451.    Anybody who tries to look up any kind of information under my name would show that Donais has written these false accusations against me. And it damages me in the community. It damages me with my work with the Police, with the work that I was supposed to be doing with the police and thus harmed me in my profession and in my business. There are multiple people, multiple entities, multiple organizations that Mr. Donais has provided or published this information to. In fact, when I was at one point seeking to obtain legal representation, this information published by Donais interfered with my ability to obtain legal representation.

452.    Plaintiff has thus been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

453.    As a direct and foreseeable consequence of Defendants' statements, the plaintiff has suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation.

454.    As a result thereof, the plaintiff has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress.

455.    These damages include not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

456.    NB: In this matter, Donais also committed false light invasion of privacy by violating his duty to the plaintiff in several ways. Donais discussed a client conversation he had with the plaintiff, with several people. These include his wife, Mary Donais, his friend Dave Akridge, and his police officer friends and connections. These communications with his friends violated the rights of the plaintiff. Donais also voluntarily engaged in discussion with the police about the conversation Donais had with plaintiff as a prospective client. The police interview recording of this conversation shows that Donais out of his way to violate any ounce of duty he had to the plaintiff as a former prospective client. Furthermore, much of what Donais stated in that interview with the police was untrue, misleading or twisted or embellished adding or stating things that did not occur or were not true. The fact that much of the conversation entailed untrue or misleading statements by Donais still does not avoid the conclusion that Donais violated his duty by having that conversation in the first place. There could be no untrue or misleading statements if Donais did not initiate the conversation. But even in initiating the conversation, Donais did not need to go above and beyond what was necessary. For example, this principle is also shown when a lawyer withdraws from a case and is required to state only the minimum necessary to obtain withdrawal.

457.    By publishing this confidential information, without all of the relevant facts, it presented a false light about me and/or my wife, and Donais then used that to accuse me to the police that I or my wife committed a crime. This also constitutes false light invasion of privacy.

## COUNT 4 - AIDING AND ABETTING DEFAMATION
### (As to defendants Russell Hilliard, Upton & Hatfield and Mary Donais)

458.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

459.    Under Massachusetts law, aiding-and-abetting liability requires that the defendant "possess an 'unlawful intent,'" which "comprises two distinct mental states: knowledge that the other's conduct is tortious, and an intent to substantially assist or encourage that conduct." Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009) (collecting Massachusetts cases). More specifically, "Massachusetts aiding and abetting liability generally requires that a defendant share the mental state of the principal violator." Id. at 35 n.21; see e.g., Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 481 (1994) ("Any violator of the prohibition against aiding or abetting . . . must share the mental state of the principal violator."); Stock v.

Fife, 13 Mass. App. Ct. 75, 82 n.10 (1982) (aiding-and-abetting liability "reserved for application to facts which manifest a common plan to commit a tortious act").

460.     Specifically, a cause of action for aiding and abetting defamation has been recognized by courts.  Under this cause of action, there is no requirement that the offender actually publish the defamatory statement to be liable (see, Long v Marubeni America Corp., 406 F Supp 2d 285 [SDNY 2005]).

461.     All that is required for this cause of action is that there be knowledge and assistance provided by the aider/abettor of the defamation.

462.     Hilliard had an active role in the publication of false statements to the police in August 2020. He acted with malice; and he knew that the statements were false. On information and belief, Hilliard drafted, reviewed, offered revisions or edits to the email which contained the false statements. Hilliard was copied on the email to the police, bearing the imprimatur of legitimacy and validity as essentially coming from two lawyers; and, in so doing, Hilliard aided and abetted the publication of the statements. Hilliard knew that the statements were false and defamatory and that there was no basis for the defamatory implications asserted therein; and, in aiding and abetting the publication of the false statements, Hilliard was acting with malice and reckless disregard of the truth. See Kosmdes v. Sine, Index No. 151683/2018, 7-8 (N.Y. Sup. Ct. 2020).

463.     Aiding-and-abetting liability further requires "assistance or encouragement" in causing the resulting tort". Taylor v. Am. Chemistry Council, 576 F.3d 16, 35 (1st Cir. 2009) (quoting Restatement (Second) of Torts § 876 cmt. d.). The Restatement sets forth five factors for assessing whether a defendant's conduct constitutes substantial assistance: (1) the amount of assistance given; (2) the nature of the act encouraged; (3) the defendant's presence or absence at the time of the tort; (4) the defendant's relation to the other; and (5) the defendant's state of mind.

464.     These factors are satisfied in the instance case.

    a.  Encouragement or assistance. Hilliard can be said to have encouraged specific acts of defamation and other violations.

    b.  Presence or absence at the time of the tort. Hilliard was present at the time of the defamation as he was copied on the defamatory email sent to the police. Hilliard was Donais' attorney so it can be inferred that Donais discussed the email with Hilliard before sending or drafting it and that Hilliard reviewed, agreed, offered edits or feedback on the defamatory email before sending it.

    c.  Relation to the other. Hilliard has a special relationship with or authority with Donais. Hilliard is a 71-year-old lawyer who gave counsel, advice and direction to the much younger 52-year-old Donais.

    d.  State of mind. Given the above, it can be inferred that Hilliard and Donais shared the same state of mind. Hilliard not only allowed the defamatory email, but he evidently agreed to participate in its dissemination.

465.     NB: The other defendants are vicariously liable for the acts of its employees.

466.     Similarly, Ms. Donais encouraged, knew of, and assisted Donais with his defamatory emails to the police about the plaintiff. Ms. Donais therefore has aided and abetted libel/defamation of the plaintiff.

467.     Ms. Donais actively assists Craig Donais with his law business and law practice including activities in MA. Therefore, it is alleged that Mary Donais fully aids, abets, and conspires with Craig Donais in his acts and conduct at issue in the complaint. Hence, the acts of Craig Donais are imputed to Mary Donais, and vice versa.

468.     Craig Donais and Mary Donais has engaged in defaming me to their family members including to their sons such as Garrett Donais (their eldest adult son), and to each other and to other family in MA as well. Discovery will reveal the extent of the defamation and how widespread it is.

469.     None of the above was directed at any public body or government. All defamatory acts are directed at private persons, as part of the defamatory scheme and campaign of Craig Donais and Mary Donais.

470.     Hilliard has also engaged in such acts including in counselling and assisting Donais in matters that do not involve litigation or a judicial proceeding and also in business matters generally.

471.     The plaintiff seeks general damages and special damages therefor.

472.     Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of

life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

473.    As a direct and foreseeable consequence of Defendants' tortious actions, the plaintiff has suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation.

474.    As a result thereof, the plaintiff has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress.

475.    These damages include not only out-of-pocket expenses, but also harm inflicted by impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

## COUNT 5 - TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS
### (as to Defendants Craig Donais, Russell Hilliard, Donais Law Offices PLLC, Upton & Hatfield LP, Mary Donais )

476.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

477.    "To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly interfered with or induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Blackstone v. Cashman, 448 Mass. 255, 260 (2007). See Weber v. Community Teamwork, Inc., 434 Mass. 761, 781-782 (2001).

478.    Whether the actor's motives or means are improper "depends on the attending circumstances, and must be evaluated on a case-by-case basis." G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 273 (1991). (improper motive established if police chief acted "based on retaliation or ill will toward [plaintiff], rather than the good of the police department").

479.    Plaintiff had an advantageous relationship with the state police/police department including with the state police chief.

480.    Plaintiff also had a contractual relationship with the state police/police department including with the state police chief.

481.    Plaintiff was a professional conference planner and event organizer, particularly in the field of conflict resolution, negotiation and mediation.

482.    Plaintiff had a contractual relationship and affiliation with the NAACP and was recruited to work on developing, planning and executing a large conference/event that centered on and facilitated dialogue and conflict resolution between the police and the local community, particularly communities of color, in order to improve relationships between local community leaders/members and law enforcement.

483.    Plaintiff had a contractual agreement from the police to collaborate on a community event involving the police and the NAACP and was sponsored by other organizations such as two local colleges and universities.

484.    Part of this contractual agreement was the recruitment of police officers to attend the event.

485.    Plaintiff had in-person meetings with and further telephone and email conversations with the chief of police.

486.    Plaintiff had developed a good working relationship and reputation with the chief of police who was enthusiastic about working with the plaintiff on this joint police-community event.

487.    Defendant Donais knew of plaintiff's involvement with the NAACP and about the initiative with the police department. In fact, Donais sent communications to the police to find out about the events that plaintiff was planning with the police, which I discovered later through a Right to Know request. Donais thus knew about the contractual relationship with the police. On information and belief, Donais also knew of this contractual relationship with the police by investigating my Linked-in profile where that information was published.

488.    Defendant Donais issued communications to the police indicating/implying that my wife and I were dangerous and a violent criminal threat to his wife and young child and requesting special police security detail to protect them from my wife and myself.

489.    That suggestion by Donais to the police that my wife and I were dangerous and posed a violent criminal threat to his wife and young child, accords with a racially stigmatizing stereotype of black people as inherently dangerous and violently criminal.

490.    Those damaging and stigmatizing communications to the police stem from an improper motive on the part of Donais. Donais had no rational or reasonable basis to issue those statements about plaintiff and his wife.

491.    Donais knowingly or recklessly made false statements to the police about the plaintiff. Donais evidently was motivated by personal and racial animus towards the plaintiff as evidenced by the racial stereotype/dog whistle employed by Donais as well as by the false allegation by Donais that plaintiff had accused him of racism in declining representation, which allegations were repeated and embellished on by Donais to the police.  Donais' personal and racial animus also can be seen from a retaliatory animus designed to get back at plaintiff and his wife for raising ethical concerns to the Attorney Discipline Office. See Draghetti v. Chmielewski, 416 Mass. 808, 817 (1994) (improper motive established if police chief acted "based on retaliation or ill will toward [plaintiff]…"). See also Dear v. Devaney, 83 Mass. App. Ct. 285 (2013).

492.    Those damaging and stigmatizing communications to the police by Donais were disseminated across the entire police department. These harmful communications by Donais were circulated widely to a large number of people.

493.    Those damaging and stigmatizing communications to the police by Donais harmed the plaintiff and resulted in interference with the plaintiff's relations with the police and the police chief as well as interfered with/affected the plaintiff's police-community event and the planning thereof.

494.    Defendant Hilliard was also responsible for those communications as he aided/abetted, signed off on and sanctioned those communications to the police. On information and belief, Defendant Donais and Defendant Hilliard collaborated, conspired and agreed to send those communications to the police. Defendant Hilliard was also copied on those communications to the police, giving them further air of credence, credibility, validation, corroboration and urgency.

495.    These communications were taken seriously by the police and the police urgently acted on them to provide security detail attention and protection for Donais, targeting the plaintiff and his wife for police monitoring and watch. NB: These false and harmful statements to the police, amping them up to encounter black couple stereotypes/stigmatized and labeled as a dangerous violent criminal threat, could have resulted in escalated tension with the plaintiff and his wife, for reasons unbeknownst to plaintiff and his wife, and in the worst case, as shown by other examples in this day and age, could have led to the loss of life of the plaintiff and his wife.

496.    Subsequent to these statements by Donais/Hilliard to the police, which were made in or around August 2020, and on account of them, the plaintiff's relations with the police have suffered harm and have been damaged. Also, the planned community event with the police was canceled/never took place and subsequent further attempts to make the event happen went unanswered by the police. The plaintiff incurred not only damage to his reputation but also financial damages including loss of pay.

497.    Similarly, Donais' communications to the police to the effect that plaintiff was mentally ill/crazy/had a tenuous grasp on reality, that plaintiff manufactured a recording and fabricated his voice on the recording or that plaintiff was capable of doing such a thing, and that plaintiff had bugged the telecommunications systems of Donais, were likewise harmful and damaging to the plaintiff in his trade and professional reputation.  Furthermore, Donais' attempt to falsely accuse plaintiff and his wife of being criminal offenders was further harmful and damaging to the plaintiff's personal and professional reputation.

498.    The above establishes a claim of interference with advantageous relations by improper means and improper motives. See Draghetti v. Chmielewski, 416 Mass. 808, 817 (1994) ("Even if [police chief] could have accomplished the same result by proper means, he may not use the improper means of misrepresentation").

499.    NB: None of the above statements were made in a judicial proceeding or in a quasi-judicial proceeding. These statements were not made in a prosecution proceeding or in a lawsuit proceeding. This was simply a statement made to a police officer which was initiated by Donais for the purpose of harming, damaging, harassing, injuring and retaliating against the plaintiff.

500.    Plaintiff anticipated further advantageous relations with the police in the future.

501.    Similarly, the defendant Hilliard, specifically himself, has engaged in other acts of interference with advantageous relations.

502.    Hilliard contacted the spouse of an attorney (which spouse is also an attorney) as well as the law firm (Primmer, Piper, Eggleston & Cramer PC) of that attorney in New Hampshire (who will be called "Attorney Jane Doe", as an alias in this complaint, to protect the privacy and of this attorney), that, on information and belief, Hilliard knew plaintiff was working with in regards to matters that were before the ADO pertaining to Donais in 2019 and 2020 and for which plaintiff had retained Attorney Jane Doe on a limited basis for legal assistance, and sought to establish a working relationship with the spouse of Attorney Jane Doe or Attorney Jane Doe's firm. As a result, Attorney Jane Doe terminated the relationship with the plaintiff citing that Hilliard's contact with her spouse and/or her firm, and/or the ensuing working relationship situation with Hilliard related thereto, had created a conflict situation or an appearance of a conflict situation with the plaintiff. Attorney Jane Doe did not provide a lot of detail about this situation, citing confidentiality/privacy reasons. This contact by Hilliard, on information and belief, was done with an ulterior purpose, under a pretextual guise, in effect to create a conflict that would block, prevent, or undermine the ability of the plaintiff to obtain legal assistance or support. Hilliard thus sought to intentionally interfere with that relationship in order to block, prevent or undermine the ability of the plaintiff to obtain legal assistance, and he evidently succeeded. Plaintiff was harmed as a result.

503.    NB: On information and belief, Hilliard made defamatory comments about me to the employees of law firm of Primmer, Piper, Eggleston & Cramer PC, including signaling that they should not do business with me.

504.    Similarly, after the plaintiff began to pursue relief in court against Donais, Hilliard specifically and knowingly contacted yet another attorney in New Hampshire and/or the organization that this attorney worked for (who will be called "Attorney John Doe", as an alias in this complaint, to protect the privacy and of this attorney), and sought to establish a working relationship with that attorney or the attorney's organization. The plaintiff had a relationship with Attorney John Doe whereupon plaintiff sought legal help or advice. This contact by Hilliard, on information and belief, was again done with an ulterior purpose, under a pretextual guise, in effect to create a conflict that would block, prevent, or undermine the ability of the plaintiff to obtain legal assistance or support. Hilliard thus sought to intentionally interfere with that relationship in order to block, prevent or undermine the ability of the plaintiff to further obtain legal assistance, and he evidently succeeded. Plaintiff was harmed as a result.

505.    NB: The plaintiff has not disclosed the names of these attorneys at this stage because of privacy reasons that may impact the reputation of these attorneys. Given the delicate nature of this situation, however, the plaintiff will disclose these names under impoundment or in camera, or in discovery. If the plaintiff is required to disclose the names before that, the plaintiff requests that the court so instructs the plaintiff.

506.    On information and belief, Hilliard has done this on other occasions with other attorneys, in order to block, prevent or undermine the ability of the plaintiff to obtain other legal assistance.

507.    By the above-described conduct, inter alia, the defendants knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortuously interfered with plaintiff's actual and potential advantageous relations.

508.    As a result of this intentional interference, plaintiff suffered damages.

509.    As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

510.    Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

## COUNT 6 - MASS CIVIL RIGHTS ACT VIOLATIONS
### (as to defendant Craig Donais and defendant Donais Law Offices PLLC)

511.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

## A. Summary of MCRA Law

512.   A claim is proper under the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H, 11I,  when the plaintiff proves that "(1) [his] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 395 (1996), quoting G. L. c. 12, § 11I.

513.   "To establish a claim under the [MCRA], the plaintiffs must prove that (1) their exercise or enjoyment of rights secured by. the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.' " Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 395 (1996) (citation omitted).

514.   Under the MCRA, threats are "intentional exertion[s] of pressure to make another fearful or apprehensive of injury or harm." Haufler v. Zotos, 446 Mass. 489, 505 (2006), quoting from Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994). See Commonwealth v. Maiden, 61 Mass. App. Ct. 433, 436 (2004) (a threat exists when "its content in the circumstances ... would cause the target of the threat to fear that the threatened crime or injury might be inflicted"). See Johnson v. Frei, 103 N.E.3d 1239, 93 Mass. App. Ct. 1111 (2018).

515.   Under the MCRA, a " '[threat' . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . [Coercion . . . [is] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.' " Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (citations omitted), cert, denied, 513 U.S. 868 (1994).

516.   There must also be evidence of "actual or potential physical confrontations involving a threat of harm," id. at 473 n.8, though the confrontation may involve third persons and the threat of harm need not be directed at the plaintiff. See Redgrave v. Boston Symphony Orchestra, 399 Mass, at 100-101 (potential physical harm to audience and orchestra members by third persons protesting plaintiff's political views is a confrontation within the MCRA).

517.   A plaintiff is not required to prove a specific intent to threaten, intimidate, or coerce for the purpose of interfering with a secured right. Id. at 99-100. See also Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86 (1999)

518.   Evidence of "threats, intimidation, or coercion" is to be measured by an objective standard, not the state of mind of the person threatened. Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass, at 474-475.

519.   A plaintiff may state a cause of action under the Massachusetts Civil Rights Act ("MCRA") against a private employer based on respondeat superior. Pheasant Ridge Assoc. Ltd. Partnership v. Burlington Town, 399 Mass. 771 (1987). An employer will be found to be vicariously liable under the MCRA for civil rights violations committed by its employee acting within the scope of his employment. Sarvis v. Boston Safe Dep. & Trust Co., 47 Mass.App.Ct. 86, 97 (1999). See also Wilkerson v. Star Market Co., 20 Mass. L. Rptr. 244 (2005).

520.   To state a civil rights claim under the MCRA, a plaintiff must demonstrate that a person or persons interfered with his state or federal rights by threats, intimidation, or coercion. See G.L.c. 12, §§11H, 111; Haufler v. Zotos, 446 Mass. 489, 505 (2006) (defining threat as "intentional exertion of pressure to make another fearful or apprehensive of injury or harm[;]" intimidation as "putting in fear for the purpose of compelling or deterring conduct!;]" and coercion as "application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done" (citations omitted)). The above alleges "threats, intimidation and coercion" sufficient to raise a right to relief above the speculative level for violation of the Civil Rights Act.

## B. MCRA Claims

521.   Donais attempted to interfere with the plaintiff's right secured by the Massachusetts declaration of rights and the US constitution to exercise his first amendment right to provide witness testimony or evidence to the

ADO and to bring suit against Donais and the attempted interference was by intimidation or coercion. Donais attempted to intimidate the plaintiff and coerce him not to provide evidence to the ADO.

522.    The police, at the behest of Donais and through Donais' crony connections with the police, called the plaintiff's phone number in Massachusetts and left a message. Plaintiff was intimidated by the message. As an African American, such ominous contact from the police is intimidating. Donais accomplished his mission.

523.    It should be noted separately, that when plaintiff first called Donais phone number back on January 6, 2017, Donais did not answer. Plaintiff left a voicemail on Donais' voicemail. Plaintiff had a recording of plaintiff's own voice that was left on Donais' voicemail system. Based on the police intimidation enacted at the behest of Donais, Plaintiff was made to feel as though he should not participate in the ADO proceeding against Donais. Donais knew that this would be effect of his conduct in using his police crony connections to contact me at my Massachusetts phone number.

524.    Donais then continued with sending baseless defamatory statements to the police to get them riled up and amped up against the plaintiff and his wife, with the goal of getting us arrested or in an escalated encounter with police. It is analogous to the crime of a "swatting" hoax. This was designed to get us to back off from pursuing misconduct complaints or lawsuits.

525.    After Donais failed at his attempts to get police to start a criminal prosecution against the plaintiff, though not for want of effort, the defendants pressed the police, fully expecting that the plaintiff would be arrested if the police saw them anywhere in the vicinity of Donais' neighborhood. The potential arrests or detention of the plaintiff by police was intrinsically coercive and, thus, sufficient to meet the plaintiff's burden of showing attempted intimidation or coercion. See Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985) (private security guard's order to a candidate for public office to stop distributing his political handbills at the common area of a private shopping center, which he was doing in a reasonable and unobtrusive manner, was intimidation and coercion within the meaning of the MCRA); Reproductive Rights Network v. President of the Univ. of Mass., 45 Mass. App. Ct. 495, 508 (1998) (university's use of campus police officers to prohibit, under threat of arrest for trespass, student access to a campus building for the purpose of engaging in protected political activity, was "threats, intimidation, or coercion" under the MCRA).

526.    Although the defendants themselves would not have been the ones to potentially arrest, detain or engage in a physical encounter with the plaintiff, any potential arrest or detention or physical encounter would have been made at Donais' instigation or direction, without which there likely would have been no such arrests, detentions or physical encounters. In these circumstances, liability attaches under the principle of joint venture. See Bell v. Mazza, 394 Mass. 176, 184 (1985). See also Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86 (1999).

527.    NB: This is similar to the claim of false imprisonment where a person does not need to participate in an arrest or detention of another person, nor engage in a conspiracy to do so, in order to be liable. A person may be liable for false imprisonment not only when the person's own acts directly impose a restraint upon the liberty of another but also when that person, by providing false information, causes such restraint to be imposed. Karjavainen v. Buswell, 289 Mass. 419, 427 (1935) (questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 [1954]). Restatement (Second) of Torts § 37 (1965) ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement"). Compare McDermott v. W. T. Grant Co., 313 Mass. 736, 738 (1943).

528.    The defendants, by requesting police watch for the plaintiff, and thus seeking to have the plaintiff arrested or detained if seen in or near Donais' neighborhood or area, knowing there was no lawful basis for the request, were liable for their consequent confinement. See Kruvelitz v. Eastern R.R. Co., 143 Mass. 228, 232 (1887).

529.    The defendants were intentionally interfering with the plaintiff's rights. The defendants have employed a variety of methods to harass, threaten, and dissuade the plaintiff from continuing with their misconduct complaint including contacting the police, threatening prosecution, refusing to speak with the plaintiff as required by rules of conduct in certain procedures, false statements to the police, conducting surveillance on the plaintiff, which collectively support an MCRA claim. Some of the activities targeted the plaintiff directly.

530.    Plaintiff was working with the Manchester NAACP which meeting place was located in the same area as Donais' home address in less than 2 miles apart. Donais knew of the plaintiff's association with the Manchester NAACP.  His acts were also designed to interfere with plaintiff's work and association with the NAACP.

531.    These constitute a pattern of antagonistic conduct designed to interfere with plaintiff's rights. See, e.g., Haufler v. Zotos, 446 Mass. 489, 506-508, 845 N.E.2d 322 (2006) (pattern of "persistent and antagonistic" conduct satisfied MCRA).

532.    The MCRA does not require state action. See Bell v. Mazza, 394 Mass. 176 (1985) (plaintiff alleging violations of Massachusetts Declaration of Rights need not allege state action); but see Redgrave v. Boston Symphony Orch, Inc., 855 F.2d 888, 904 (1st Cir. 1988) ("The right [to free speech] is to be free of state regulation . . .").

533.    Donais went to the police, with the intent of threatening and intimidating the plaintiff to stop him from exercising his right of pursuing, providing evidence or being a witness for attorney discipline complaints about Donais. Donais made statements to the police about plaintiff that he knew was not true, and made allegations of crime that he knew were not true or that the plaintiff did not commit, and which Donais knew was not supported by probable cause.

534.    The defendants' behavior (considered in its totality) constituted threats, intimidation, or coercion, based on multiple or repeated acts that if taken individually would be insufficient to make out the claim but if taken collectively are sufficient to constitute threats, intimidation, or coercion. See Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 753, 780 N.E.2d 926 (2002) ( "While no single point is determinative, the aggregate facts of this case are sufficient to create a jury question whether the defendants' conduct as a whole violated G. L. c. 12, § 11I"); See also Bell v. Mazza, 394 Mass. 176, 180, 183, 474 N.E.2d 1111 (1985) (course of conduct consisting of threats, "intemperate epithets," and physical obstruction satisfied MCRA); Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 835-836, 22 N.E.3d 960 2015) (series of activities, including threats and physical inconveniences, aimed at forcing plaintiffs from condominium satisfied MCRA).

535.    The pattern of abuses by the defendants collectively amounted to threats, intimidation, or coercion under the MCRA. The claim is based on the fact pattern as a whole, not on isolated incidents, any one or more of which might be considered insufficient to support civil rights claim when separated from the rest.

536.    Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

537.    As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

538.    As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

## COUNT 7 - 93A CONSUMER PROTECTION ACT VIOLATIONS
### (as to defendant Craig Donais and defendant Donais Law Offices PLLC)

539.    Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

540.    G. L. c. 93A, Section 11. General Laws c. 93A, Section 11, allows recovery for "the use or employment . . . of an unfair method of competition or an unfair or deceptive act or practice." See G. L. c. 93A, Section 2 (1994 ed.).

541.    Chapter 93A is a broadly construed remedial statute.

542.    Defamatory statements are actionable under G. L. c. 93A. A.F.M. Corp. v. Corporate Aircraft Management, 626 F. Supp. 1533, 1551 (D. Mass. 1985). See also Dulgarian v Stone, 420 Mass. 843 (1995).

543.    Because clients are "consumers" of the lawyer's trade or professional work, the 93A law applies to lawyers.

544.    The Supreme Judicial Court has held that attorneys can be held accountable under Massachusetts General Laws, Chapter 93A, and that can include negligent as well as intentional misrepresentations.

545.    The SJC has been held that Chapter 93A, Section 2 includes the practice of law as "trade or commerce" which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

546.     A lawyer's liability for multiple damages and attorney fees may generally be found under Chapter 93A, section 9.

547.     The court looks at the egregiousness of the case in deciding about multiple damages and come down strongly on attorneys who lie and do not do what they agreed to do.  This goes beyond negligence, or simply making a mistake that causes damages.

548.     The defendants' broadcast of erroneous assertions couched as facts.

549.     Defendant Donais and Defendant Donais Law Offices PLLC is engaged in trade/commerce as defined by 93A.

550.     Defendant Donais and Defendant Donais Law Offices PLLC engaged in unfair and deceptive acts against the plaintiff.

551.     These unfair and deceptive acts by Donais/Donais Law Offices PLLC stem from lies told by Donais about communications he had with the plaintiff while plaintiff was a client or prospective client.

552.     Racial stereotyping, whether as retaliation or discrimination, perpetrated by falsely characterizing a prospective client interview to injure the prospective client may well constitute an unfair business practice giving rise to a violation of G. L. c. 93A. See Ellis v. Safety Insurance, 41 Mass. App. Ct. 630 (1996)(Racial harassment perpetrated during the course of an insurance claim investigation may well constitute an unfair business practice giving rise to a violation of G. L. c. 93A.).

553.     Other unfair and deceptive acts by Donais and Hilliard include:

    a.   By his own words, Donas took steps to avoid service of process in order to unfairly prejudice the plaintiff.

    b.   Donais took steps to avoid or dodge receiving service of a subpoena by a sheriff.

    c.   Donais used or endeavored to use his police connections to try to trump up a police investigation of the plaintiff in order to intimidate, scare, harass, oppress, scandalize and retaliate against the plaintiff.

    d.   Donais breached his duty to the plaintiff as a prospective client and former prospective client.

    e.   Donais divulged confidential information about the plaintiff to his friends, family members including his adult son Garrett Donais, and his colleagues.

    f.   Donais acted to enter into the representation of an opposing party adverse to the plaintiff.

    g.   Donais falsely accused the plaintiff (to plaintiff's attorney) of communicating with Donais in order to conflict out Donais from representing certain hotel defendants, which Donais knew not to be true and could not be true, in order to cover up or deflect from Donais' own intentional conflict of interest and breach of fiduciary duty to the plaintiff.

    h.   Donais also breached the covenant of good faith and fair dealing with the plaintiff.

    i.   There was also interference with service documents by Donais and Hilliard

    j.   There was evasion of mail and service by Hilliard

    k.   There has been surveillance of plaintiff by Donais and Hilliard.

    l.   There has been evasion of a subpoena by Donais, among other things.

554.     Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

555.     As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

556.     As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

## COUNT 8 – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (as to Defendants Craig Donais, Russell Hilliard, Donais Law Offices PLLC, Upton & Hatfield LP, Mary Donais)

557.     Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

558.     To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show "(1) that the defendants] intended to cause, or should have known that [their] conduct would cause, emotional distress;

(2) that the defendants'] conduct was extreme and outrageous; (3) that the defendants'] conduct caused [her] distress; and (4) that [he] suffered severe distress.

559.   To be considered extreme and outrageous, the defendants'] conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community." Howcroftv. City of Peabody, 51 Mass.App.Ct. 573, 596 (2001).

560.   Intentional infliction of emotional distress requires "extreme and outrageous conduct intentionally or recklessly cause[d] severe distress to another."

561.   Defendants knew that making false accusations that plaintiff frivolously accused Donais of racism, would damage the plaintiff's reputation and subject him to contempt or ridicule.

562.   Defendants knew that by intimidating, retaliating, harassing the plaintiff, by deploying their police connections against the plaintiff and by making false police reports against the plaintiff (as African American), it would cause emotional distress for the plaintiff. This is intolerable in a civil society and is beyond outrageous and extreme conduct to subject an African American male (in this day and age where several police killings, police brutality and/or use of excessive force events against unarmed African Americans have been widely publicized in recent national news) to false police reports, to ominous calls/message from the police resulting from the false or unwarranted police reports, and the attendant possibility of false arrest, false prosecution and unnecessary escalated encounters with police resulting therefrom.

563.   Defendants have caused harm to plaintiff, including stress, loss of sleep, emotional upset, anxiety, etc.

564.   Defendants caused or created emotional distress for Plaintiff.

565.   It should be noted that this claim is distinct from the emotional distress caused by the defendants' defamatory statements. This claim is not based solely on the facts, acts and statements that give rise to the defamation claims.

566.   Defendants intentionally inflicted emotional distress on plaintiff, as a direct and proximate result of Defendants actions and inactions.

567.   Plaintiff was caused to suffer severe emotional distress as the result of which a reasonable person in plaintiff's position would have suffered similar emotional distress under like circumstances.

568.   Plaintiff sustained damages as a result of Defendants' intentional infliction of emotional distress on them.

569.   Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

570.   Alternatively, plaintiff plead a negligent infliction of distress claim, relying upon the same facts and elements of an intentional infliction of emotional distress claim.

571.   As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

572.   As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

## COUNT 9 – CIVIL CONSPIRACY
### (as to Defendants Craig Donais, Russell Hilliard, Mary Donais and Beatriz Van Meek)

573.   Plaintiff, repeats and reiterates each and every allegation of the complaint, in the above paragraphs with the same force and effect as if herein set forth at length.

574.   Civil conspiracy is a very limited cause of action in Massachusetts. Jurgens v. Abraham, 616 F. Supp. 1381, 1386 (D.Mass.1985).

575.   To state a claim for this tort, a plaintiff must allege that "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if acting independently." Id.

576.   Moreover, Massachusetts law recognizes the tort theory of "common design" in which a defendant may be liable for the tortious acts of another.

577.   To prove such a claim, two elements must be shown: first, that the defendant and others have agreed explicitly or implicitly to perform the act or achieve the particular result; second, that the defendant's "own conduct must be tortious." Payton v. Abbott Labs, 512 F. Supp. 1031, 1035 (D.Mass.1981).

578.     To prove their claims for civil conspiracy, the plaintiffs must show an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement. Kurker, 44 Mass. App. Ct. at 188-189.

579.     Donais, in concert with Hilliard and the other defendants, held a "power of coercion" they would not have had they acted independently. By including Hilliard in the scheme to defame the plaintiff, Hilliard was consulted on, and sanctioned the defamatory email to the police. Donais augmented his power to coerce the police into taking action against the plaintiff using Hilliard's presence as a coercive factor to move the police to action. Hilliard evidently agreed or assented to this scheme to harm the plaintiff.

580.     Similarly, both Donais and Hilliard conspired together to engage in fraudulent misrepresentations to me as it pertains to inducing me to agree to allow them to be involved in a global settlement negotiation with Hilton defendants, for which their intent was only to sabotage the settlement for the other defendants, and that they lied to me and deceived me into fake negotiation offers, which were reneged on and withdrawn at the last minute for no reason, right as the settlement paperwork was about to be finalized and signed by 20 other defendants. Again, this has nothing to do with any petitioning activity as the conduct was directed towards me.

581.     Similarly, Ms. Donais encouraged, knew of, and assisted Donais with his defamatory emails to the police about the plaintiff. Ms. Donais therefore engaged in conspiring to defame the plaintiff. By adding his wife's name to his police report and appealing to the sympathy of his police connections regarding his wife, Donais augmented his power to coerce the police into taking action against the plaintiff. Based on Donais' own words in the email to the police, Ms. Donais evidently agreed or assented to this scheme to harm the plaintiff.

582.     There is implication from the emails and other communications that they agreed to perform or achieve tortious ends with respect to the plaintiff, including tortious misrepresentation. The false and injurious statements also form the basis of a conspiracy claim. See Massachusetts School of Law at Andover, Inc. v. American Bar Association, 952 F. Supp. 884 (D. Mass. 1997).

583.     Both Ms. Donais and Hilliard provided Donais with substantial assistance and encouragement, with the knowledge that such assistance is contributing to a common tortious plan. Hilliard knew of the unlawful intent to commit tortious acts to injure and damage the plaintiff. See Grant v. John Hancock Mut. Life Ins. Co., 183 F. Supp. 2d 344, 363 (D. Mass. 2002) (quoting Kurker v. Hill, 44 Mass. App. Ct. 184, 189, 689 N.E.2d 833, 837 (1998)).

584.     Defendant Beatriz Van Meek engaged in a civil conspiracy with Craig Donais to injure and harm the plaintiff. Ms. Van Meek is a necessary party who is also a non-diverse party as she is a Massachusetts citizen. Ms. Van Meek is alleged to have been involved in planning and perpetrating or aiding the acts of Craig Donais to injure the plaintiff and to harm his rights. On information and belief, Ms. Van Meek acted to injure the plaintiffs' rights, and when this was discovered by others at her job, Ms. Van Meek was either fired from her job or reassigned to another position and location, because it was discovered that she used, among other things, her position at her job to act in concert with Donais, to injure and harm the plaintiff and to aid Donais' attempt to injure plaintiff's rights. On information and belief, Ms. Van meek conspired with Donais, both in and outside of her job, and the acts occurred because Ms. Van Meek was doing Donais a favor. On information and belief, when the matter was discovered by others, attempts were made to cover it up, so as to try to hide the full extent of the wrongdoing. Discovery will reveal the extent of this coverup and further details of this coordinated attempt between Donais and Ms. Van Meek to injure the plaintiff. These events did not occur in a judicial proceeding but outside of it. On information and belief, Donais evidently again leveraged his personal relationships to cause injury to the plaintiff which included loss of rights, emotional distress and pecuniary loss.

585.     Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community.

586.     As a direct and foreseeable consequence of Defendants' actions, the plaintiff has suffered damages.

587.     As a result thereof, the plaintiff has been and continued to be injured and suffer damages.

## COUNT 10 - BREACH OF FIDUCIARY DUTY, BREACH OF PRIVACY AND/OR LEGAL MAPLRACTICE

### (as to defendant Craig Donais and defendant Donais Law Offices PLLC)

588.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein.

589.    Donais had ethical and fiduciary obligations to avoid any conflicting representation with respect to the plaintiff.

590.    These obligations are defined by Mass. R. Prof. Conduct 1.7. See Maling, 473 Mass, at 339-40; RFF Family Partnership, LP v. Burns & Levinson, LLP, 465 Mass. 702, 718-19 (2013).

591.    Rule 1.7 provides that a lawyer may not simultaneously represent two clients where the representation of one is "directly adverse" to the other, or even if the representation of one "will be materially limited" by the need to avoid a conflict with the other, without informed written consent from each client. Under this rule, "a lawyer ordinarily may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated." Rule 1.7, comment 6; see also comment 7 (same with respect to unrelated transactional matters). "The purpose of rule 1.7 is twofold"—it serves both "to protect confidences that a client may have shared with his or her attorney," and also to "safeguard loyalty as a feature of the lawyer-client relationship." Maling, supra, at 340, quoting SWS Fin. Fund A v. Salomon Bros., Inc., 790 F.Sup. 1392, 1401 (N.D.Ill. 1992).

592.    "Even after termination of the attorney-client relationship, a lawyer remains bound" to preserve the former client's confidences and secrets. Bays v. Theran, 418 Mass. 685, 691 (1994), quoting Masiello v. Perini Corp., 394 Mass. 842, 847 (1985). "(W)hen an attorney has ceased to represent a client, a conflict of interest may arise in representing a new client because of the attorney's continuing duty to preserve a former client's confidences." Adoption of Erica, 426 Mass. 55, 60 (1997).

593.    In this matter, Donais violated his duty to the plaintiff in several ways.

594.    Donais discussed the client conversation with the plaintiff with several people. These include his wife, Mary Donais, his friend Dave Akridge, and his police officer friends and connections. These communications with his friends violated the rights of the plaintiff.

595.    Donais also engaged in the act of representing the opposing party in the matter that involved the plaintiff. That act in and of itself was a breach of fiduciary duty. In doing so, Donais put in motion a series of events that undercut the plaintiff's interests as a former prospective client against the opposing party. Donais should never have agreed to represent the opposing party in the first instance, given that he knew that the plaintiff was involved in the matter with the opposing party that Donais was seeking to represent.

596.    Donais also voluntarily engaged in discussion with the police about the conversation Donais had with plaintiff as a prospective client. The police interview recording of this conversation shows that Donais out of his way to violate any ounce of duty he had to the plaintiff as a former prospective client. Furthermore, much of what Donais stated in that interview with the police was untrue, misleading or twisted or embellished adding or stating things that did not occur or were not true. The fact that much of the conversation entailed untrue or misleading statements by Donais still does not avoid the conclusion that Donais violated his duty by having that conversation in the first place. There could be no untrue or misleading statements if Donais did not initiate the conversation. But even in initiating the conversation, Donais did not need to go above and beyond what was necessary. For example, this principle is also shown when a lawyer withdraws from a case and is required to state only the minimum necessary to obtain withdrawal.

597.    Donais also had a duty to inform the plaintiff, as a former client, that Donais was going to or had discussed such information with others. Instead, Donais actively hid those occurrences from the plaintiff.

598.    The act of hiding such occurrences from the plaintiff is a breach of duty the plaintiff.

599.    Rules of professional conduct creates certain duties and obligations of the lawyer to a client or former client.

600.    Mr. Donais had inside knowledge of plaintiff's self-disclosed understanding of the strategies, weaknesses and discussions about plaintiff's case from Plaintiff directly. Inside knowledge of such information creates an automatic advantage to the defendants. If the reverse was true, and plaintiff had information about the

strategies, weaknesses and discussions about the defendants' approach to defending the case, there would be no doubt that plaintiff would have had an advantage. Such advantage can play out in subtle or not so subtle ways.

601.    Similarly, Mr. Donais used his prospective client conversation with Plaintiff against Plaintiff, to directly inflict harm by defaming Plaintiff and accusing him of falsely/frivolously accusing Mr. Donais of race discrimination because he did not take his case. This false accusation against Plaintiff has sullied Plaintiff and subjected him to humiliation in the court proceedings, with the implication that Plaintiff is a frivolous liar who plays the race card without rhyme or reason and is to be discredited as an irrational, unstable, angry person who wildly hurls accusations of race discrimination when there is no valid reason to do so. This diminishes Plaintiff's character and discredits him in the eyes of the court and in the public record.

602.    If Plaintiff had never spoken to Mr. Donais on 1-9-17 about a prospective client relationship, Mr. Donais could not have had the opportunity to fabricate this lie against Plaintiff.

603.    Mr. Donais has used his position as a prospective lawyer to Plaintiff as a prospective client as a basis to injure Plaintiff by falsely accusing him of falsely accusing Mr. Donais of race discrimination in the context of a conversation wherein Plaintiff was seeking to form an attorney-client relationship with Mr. Donais, and wherein Plaintiff shared with Mr. Donais certain confidential information, thus taking Mr. Donais into his confidences and placing his trust in Mr. Donais. Mr. Donais exploited and abused the trust that Plaintiff extended to Mr. Donais in seeking to have a conversation with him about our case. Mr. Donais turned around and has used that private privileged conversation as a basis to fabricate lies on Plaintiff. This is an utter abuse and ethical travesty that has befallen Plaintiff. This is a breach of fiduciary duty. This also goes to the conflict of interest. Mr. Donais was never going to be able to be loyal to plaintiff or his spouse, and the trust and confidences plaintiff placed in him, because ultimately, he was loyal to Dave Akridge as a principal for the opposing party. His conflict of interest further created the fuel by which he found it useful to falsely accuse plaintiff, in order to harm and damage plaintiff, his spouse and their case in the interest of protecting and advancing the interests of the opposing party.

604.    Mr. Donais' acts also includes a breach of fiduciary duty by divulging information (and fabricated version of it) obtained during a confidential prospective client consultation with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client.

605.    It was malicious act and represented an attempt to harm plaintiff/his spouse as former prospective clients.

606.    Mr. Donais has inflicted significant harm upon plaintiff/his spouse in the district court and the superior court and in the public.

607.    When prospective clients meet with lawyers they are entitled to the same protections and confidentiality as any other client. The public must be assured that lawyers will treat their confidential client consultations including initial meetings as confidential, and that lawyers will not abuse such information because the lawyer ultimately declined full representation or because the lawyer joined the legal team of the opposing party. This is a logically sophisticated point that being made here. The false statement by Mr. Donais, about plaintiff accusing Mr. Donais of race discrimination, had no bearing on the issue of the disqualification motion of former co-counsel Karl Terrell (i.e. this motion was what prompted the defendants to obtain an affidavit from Mr. Donais). In fact, on January 11, 2017, Mr. Donais failed to tell Mr. Terrell or Mr. Akridge about this accusation from my husband when Mr. Donais disclosed to Mr. Terrell and Mr. Akridge what plaintiff said on the January 9, 2017 call. It clearly would not have been relevant then (even if it were true, which it is not true) which could be the only explanation that Mr. Donais could offer as to why he failed or forgot to mention it then (we know that the real reason he failed to mention it then was because it did not happen and it was thus a lie for him to state this later in March 2017, but I am using this point for illustrative purposes only) and it certainly would not be relevant in March 2017 when Mr. Donais drafted his affidavit wherein for the first time he concocted and fabricated this specious and false allegation against my husband. Mr. Donais intent was clear: to hurt, damage, harm, oppress, defame, scandalize the plaintiff.

608.    This is forbidden by the rules. So even if Mr. Donais maintains that his original 2017 affidavit is true, he still violated the rules of conduct and breached his duty and obligations to the plaintiff as a former prospective client.

609.    Hence Mr. Donais' violations are multiple, layered and intertwined with a web of layered misconduct making a very serious combination of violations of ethics that rises to the level of extreme seriousness which is further

compounded by the numerous breaches and wrongs that flowed from that to subsequent and continuing events thereafter.

610.     Again, this is an intellectually sophisticated point in showing the reasoning that would still arrive at a violation of the rules of conduct and a breach of duty and contract/good faith, by Mr. Donais even if he were telling the truth in his affidavit (which he was not).

*611.     See Rule 1.6. of the rules of professional conduct foe lawyers, which states: "Confidentiality of Information: (a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b)." See also Rule 4.4: Respect for Rights of Third Persons: "(a) In representing a client, a lawyer shall not take any action if the lawyer knows or it is obvious that the action has the primary purpose to embarrass, delay or burden a third person."*

612.     It should be noted that some lawyers have been disbarred in Massachusetts for engaging in misconduct as outlined above. Many lawyers have been disbarred for perpetrating a fraud on the court, violating several rules, including Rule 3.4. For example, in Matter of Finnerty, an attorney represented a witness called to appear before a federal grand jury. On the attorney's advice, a witness lied to the grand jury, and the attorney was disbarred for that misconduct. In Matter of Terzian, an attorney was disbarred after he was convicted on one count of attempting to procure perjury and on another count of intimidating a witness in a court proceeding. Similarly, in Matter of Jones, an attorney used false evidence in court. An attorney, representing a client in bankruptcy court, failed to present his client's claim within the permissible time. The attorney supported his motion for an extension with a forged affidavit from his client, not knowing that his client had died prior to the date of the purported affidavit. For that fraud on the court, the lawyer was convicted of mail fraud and disbarred. A lawyer has been disbarred for, among other misconduct, engaging in fraud within BBO proceedings. In Matter of Geller, an attorney falsely denied to the bar counsel that he had represented a certain client. The attorney also provided fabricated letters to the bar counsel that incorrectly documented a refund to the client on an earlier date, in addition to providing other fabricated documents. He was disbarred for this and other misconduct. It is evident that Mr. Donais' conduct outlined herein, especially as it relates to the candor to the tribunal, has violated Rule 8.4 section (a), (b), and (c), in that his perjury/lie would constitute commission of a criminal act that reflects adversely on the lawyer's honesty and trustworthiness, and it would also constitute conduct involving dishonesty, fraud, deceit and misrepresentation. Similarly, the fabrication of the race discrimination accusation would further be a violation of Rule 8.4 section (g), in that his perjury/lie was motivated by racial animus and it was intended to wrongly embarrass, harass and burden Plaintiff.

613.     Donais breached his fiduciary duty to me by breaking his obligation of confidentiality, by representing an opposing party without telling me or seeking to get a waiver from me, and acting against my interest as a former client and seeking to harm and injure my rights. In the alternative, this also constitutes legal malpractice.

614.     It should be noted that Plaintiff does allege that Donais and his law practice represented him and he was a former client, and that otherwise plaintiff was, at a minimum, a prospective client that triggered fiduciary obligations and confidentiality obligations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use client conversation to try to injure, hurt, defame or publish private facts or to seek to try to wrongly prosecute the client), as mandated and confirmed by the rules of professional conduct for lawyers, and all of which breaching conduct Donais and his law firm engaged in. There was thus an attorney-client relationship as defined by the rules of professional conduct. And Donais himself later admitted to the police that plaintiff is a potential client (i.e. stating "I have a potential client").

615.     Thus, Donais owed a duty to Plaintiff[11], and thus there was fiduciary relationship that included confidentiality. Donais' breach of duty is based on: a) the acts of Donais as outlined above, resulting in a breach of duty; as well as b) statements made by Donais that breached that duty. As explained elsewhere, these acts and statements are not time-barred and are not privileged.

616.     NB: The defendant cannot disputed facts in this complaint unless or until there is a trial or summary judgment. Any attempt to dispute these facts in a pre-trial motion to dismiss is invalid.

## COUNT 11 - BREACH OF IMPLIED CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (as to defendant Craig Donais and defendant Donais Law Offices PLLC)

617.     Plaintiff re-allege and incorporate all paragraphs above as if fully set forth herein.

618.     Plaintiff alleges that Donais and his law firm represented plaintiff and was a former client. The plaintiff was, at a minimum, a prospective client that triggered fiduciary obligations and confidentiality obligations, as mandated and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct. And Donais himself later admitted to the police that plaintiff is a potential client (i.e. stating "I have a potential client").

619.     Thus, Donais and his law firm owed a contractual duty to Plaintiff, and thus there was contractual relationship that included confidentiality. Donais' breach of contract is based on: a) the acts of Donais as outlined above, resulting in a breach of contract; as well as b) statements made by Donais that breached that contract. As explained elsewhere, these acts and statements are not time-barred and are not privileged.

620.     Donais and his law firm acted in a manner that was inconsistent with the agreed-upon common purpose and expectations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use client conversation to try to injure, hurt, defame or publish private facts or to seek to try to wrongly prosecute the client, among other things), as required by the rules of professional conduct for lawyers, and all of which Donais and his law firm did, and Plaintiff was harmed by this breach of contract conduct by Donais and his law firm.

621.     There are no statute of limitations issues with this claim as there is a 6 year time limit for this claim.

622.     NB: The defendant cannot disputed facts in this complaint unless or until there is a trial or summary judgment. Any attempt to dispute these facts in a pre-trial motion to dismiss is invalid.

623.     The law recognizes an implied covenant of good faith and fair dealing in all contracts, either expressed or implied.

624.     Defendant Donais owed to Plaintiff a duty of utmost good faith and fair dealing and thereby was obligated to consider the welfare of Plaintiff, to refrain from acting for purely selfish motives or private gain, and to desist from destroying or injuring the right of the Plaintiff to receive the fruits of the contract.

625.     Plaintiff had a prospective attorney client relationship with Donais. The rules of professional conduct and the law treats this relationship as a real attorney client relationship even where there is not an express contract.

626.     An express contract is not necessary to form an attorney-client relationship.

627.     Plaintiff and Donais had an implied contractual relationship that was implied by the confidential nature of their prospective attorney client relationship. As admitted by Donais himself in email to the police, I was a client/potential client that he had. This is an admission that there was a client relationship or a prospective client relationship, which implicates confidentiality obligations, and which creates a contractual relationship or at least an implied contractual relationship.

628.     As cited in prior paragraphs, Donais divulged information obtained during a confidential prospective client consultation, with the sole purpose of embarrassing, oppressing, burdening, scandalizing, defaming and harming the prospective client, which is the plaintiff in this case.

---

[11] Donais owed a duty to me. There was a fiduciary relationship. I was a prospective client. I was engaged as a prospective client. I was given legal advice. I shared confidential information. A prospective attorney client relationship was formed. This is what a judge found (Judge Paul Moore in Nashua district court in NH). This is why Donais withdrew as attorney in that case.

629. Donais discussed with several people the client conversation he had with the plaintiff. These include his wife, Mary Donais, his friend Dave Akridge, and his police officer friends and connections. These communications with his friends and connections violated the rights of the plaintiff.

630. Donais also engaged in the act of representing the opposing party in a matter that involved the plaintiff. That act in and of itself was a breach of implied contract and a breach of the covenant of good faith/fair dealing. Donais should never have agreed to represent the opposing party in the first instance, given that he knew that the plaintiff was involved in the matter with the opposing party that Donais was seeking to represent.

631. Similarly, every additional breach or wrongful act that flowed out of Donais' representation of the opposing party is also a breach of implied contract and a breach of the covenant of good faith/fair dealing.

632. Similarly, every wrongful act or harm resulting from the acts of Donais that flowed from the event in which the prospective client relationship was formed is also a breach of implied contract and a breach of the covenant of good faith/fair dealing.

633. By breaching the confidentiality of that prospective attorney-client relationship, and by doing so in a particularly nasty, malicious, bad faith, harmful way, Donais breached this implied contract and the attendant covenant of good faith and fair dealing.

634. Through his actions and inactions, Defendant Donais breached its duty of good faith and fair dealing to plaintiff, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Plaintiff's rights and interests.

635. By the conduct alleged herein, Defendant Donais breached the implied covenant of good faith and fair dealing and caused harm to plaintiff.

636. As a result, Plaintiff have suffered damages.

637. NB: The plaintiff does intend to seek damages for this cause of action, both either as exception to any purported 3-year statute of limitations, which in this case does not apply because breach of contract claims carry a 6 year statute of limitations, which means every act that is a breach of implied contract described in this complaint is brought timely via this complaint, or based on the Massachusetts renewal/savings statute.

## COUNT 12 - RACIAL HARASSMMENT & RETALIATION IN VIOLATION OF CIVIL RIGHTS STATUTE 42 U.S.C. § 1981
### (as to defendant Craig Donais and Donais Law PLLC)

638. Plaintiff incorporate by reference all paragraphs of this Complaint as though fully stated herein seriatim.

639. Section 1981 provides: *"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981(a). The statute also states that "[f]or purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b)."*

640. Section 1981 guarantees freedom from racial discrimination in the making, enforcement performance, modification, and termination of contracts.

641. Section 1981 also guarantees enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

642. To state a prima facie case of a violation of 42 U.S.C. § 1981, the plaintiff is to show that: (1) he belonged to a protected class; (2) he sought to make a contract for services ordinarily provided by the defendant; and (3) he was treated in such a hostile manner that a reasonable person would find it objectively discriminatory.

643. In this case, this prima facie burden has been met, as follows: a) The plaintiff is African-American and belongs to a protected class. This is undisputable. b) The plaintiff sought to make and enforce a contract for services ordinarily provided by the defendant. This is undisputable. c) The plaintiff was treated in such a hostile manner that a reasonable person would find it objectively discriminatory. By breaching the contract with the plaintiff and breaching fiduciary duty to the plaintiff, Defendants have interfered with the making and enforcement of a contract.

644.   The Defendants breached their contract with plaintiff and racially harassed plaintiff in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

645.   Defendants have also engaged in racial harassment or aided and abetted in racial harassment of the plaintiff, by treating the plaintiff in a hostile manner through activities that are tantamount to mocking, jeering, and taunting the plaintiff as he sought to resist or oppose racial harassment. The defendants have also sought to racially stereotype the plaintiff as a race-baiter, a criminal, as a violent and dangerous person, and as a troublemaker that should be punished, simply because he has to speak up and speak out against the wrongs done to him by the defendants. The defendants also sought to wrongfully use the police to further engage in racial harassment of the plaintiff in order to intimidate and retaliate against the plaintiff for opposing, resisting, and exposing and seeking to hold accountable the defendants for their racially harassing and racially stereotyping conduct towards the plaintiff.

646.   This racially harassing conduct included the false allegation that plaintiff accused Donais of racism because Donais declined to represent him, as outlined previously in this complaint. Attorney Elliott Berry (well-known and well-respected legal aid attorney in NH experienced with discrimination matters) who is plaintiff's former legal counsel, confirmed to the plaintiff that such conduct is racially harassing or discriminatory, as Donais sought to use the plaintiff's race against him as a black male in order to subject him to contempt, ridicule and diminished esteem and credibility. Donais' act of inserting race into his dealings with the plaintiff (which the plaintiff never did) was emblematic of the type of wrongful acts that Donais and the defendants engaged in towards the plaintiff.

647.   The defendants also used the fact that plaintiff originally complained of discrimination with the original hotel defendants, as evidence that plaintiff was lying in denying that plaintiff had accused Donais of racism. This is an utterly oppressive and harassing tactic by the defendants that was perpetrated against the plaintiff. This is precisely the kind of sophisticated race trap that Donais had in mind when he concocted the scheme to falsely accuse plaintiff of accusing Donais of racism because he declined to represent the plaintiff.

648.   By the above acts stated in the prior paragraphs, the defendants have violated 42 U.S.C § 1981 by racially harassing plaintiff and committing racial harassment against plaintiff because of his race as African American [black].

649.   Plaintiff presents an inference of racial harassment/discrimination for which Defendants does not and cannot offer a legitimate non-discriminatory reason for their actions. Any reasons given or to be given by Defendants were or is a mere pretext for discrimination.

650.   Defendants have intentionally engaged in racial harassment against Plaintiff with respect to and flowing out of the implied contract that plaintiff had with Donais, because of Plaintiff's race as a black male; and has classified or sought to classify plaintiff in ways that adversely affected his implied contract with Donais and adversely affected his status as a former client and customer of Donais, because of race.

651.   Defendants have engaged in a continuing practice of racial harassment, racial stereotyping and racialized character assassination against the plaintiff based on race including use of subtle dog whistles.

652.   Similarly, <u>retaliation</u> related to race is recognized as a violation of this statute.

653.   NB: Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." See Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998) 339. This type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." See Venters v. City of Delphi, 123 F.3d 956 (7th Cir. 1997) at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." See Sheehan v. Donlen Corp., 173 F.3d 1039, 1044 (7th Cir. 1999); see Venters, 123 F.3d at 973. The court in Venters explained that "the evidence need not be this obvious to qualify as direct evidence." Id. And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." See Sheehan, 173 F.3d at 1044. The direct evidence of such remarks must, however, establish that race was an important factor motivating the challenged action. 340. See also Lounds v. Lincare, Inc., 812 F.3d 1208, 1224 (10th Cir. 2015) ("[S]tray remarks can prove to be invaluable insights into biases at every level of consciousness that may be rife but invisible within the workplace.... [They] may bespeak a workplace culture in which certain language or sentiments are tolerated

and perhaps encouraged or rewarded.")). 341. Evidence, which includes conduct or statements by persons involved directly reflecting the discriminatory attitude, constitutes 'direct evidence' of discriminatory animus.

654.     Unlawful discriminatory practices also include aiding and abetting another to commit an unlawful discriminatory practice. Defendants engaged in intentional conduct in violation of these laws against discrimination and retaliation with malice and reckless indifference with respect to plaintiff's protected rights. Defendants sought to breach the agreement with plaintiff, in retaliation because the plaintiff opposed and resisted and sought to expose the racial harassment, racial stereotyping and racial ridicule and scorn, and mocking that the defendants had initiated against the plaintiff as a black man.

655.     Similarly, markedly hostile treatment is also evidence of retaliatory animus. See also Christian v. Wal-Mart Stores Inc., 252 F.3d 862, 868 (6th Cir. 2001) at 872 (Service is considered "markedly hostile" when it is (1) so contrary to the establishment's financial interests, (2) so far outside of widely accepted business norms, and (3) so arbitrary on its face, that it supports a rational inference of discrimination. Id. at 871).

656.     Plaintiff alleges that Donais and his law firm represented plaintiff and was a former client. The plaintiff was, at a minimum, a prospective client that triggered fiduciary obligations and confidentiality obligations, as mandated and confirmed by the rules of professional conduct for lawyers. There was thus an attorney-client relationship as defined by the rules of professional conduct. And Donais himself later admitted to the police that plaintiff is a potential client (i.e. stating "I have a potential client").

657.     Thus, Donais and his law firm owed a contractual duty to Plaintiff, and thus there was contractual relationship that included confidentiality. Donais' breach of contract is based on: a) the acts of Donais as outlined above, resulting in a breach of contract; as well as b) statements made by Donais that breached that contract. As explained elsewhere, these acts and statements are not time-barred and are not privileged.

658.     Donais and his law firm acted in a manner that was inconsistent with the agreed-upon common purpose and expectations (including but not limited to confidentiality and fiduciary expectations as well as the expectation that Donais would not use client conversation to try to injure, hurt, defame or publish private facts or to seek to try to wrongly prosecute the client, among other things), as required by the rules of professional conduct for lawyers, and all of which Donais and his law firm did, and Plaintiff was harmed by this breach of contract conduct by Donais and his law firm.

659.     So, there was a contract which satisfies the contract aspect of section 1981.

660.     Donais also acted to prevent or interfere with the performance and enforcement of that contract by and because of racial animus and racial bias against the plaintiff.

661.     Defendants have thus also violated 42 U.S.C. § 1981.

662.     As a direct and proximate result of Defendant's intentional, deliberate, and willful racially harassing acts, Plaintiff have suffered damages. Defendant's actions against Plaintiff have been malicious and oppressive, and conducted in a callous disregard of the rights of the Plaintiff.

## COUNT 13 – VIOLATIONS OF SECTION 176D AND VIOLATION OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A (AS BY AN INSURANCE COMPANY)
### (as to defendants John Doe Company 1 and John Doe Company 2)

663.     Plaintiff incorporates by reference each paragraph of this Complaint as if fully set forth herein.

664.     Massachusetts General Laws chapter 176D, section 3(9)(f) mandates that an insurer's "fail[ure] to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" constitutes an impermissibly unfair claim settlement practice.

665.     Massachusetts General Laws, chapter 93A, section 2(a) prohibits unfair settlement practices by insurers. Further, chapter 93A provides a private cause of action for individuals who have been aggrieved by "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Mass. Gen. Laws ch. 93A, § 2(a).

666.     Unfair or deceptive acts or practices "in the business of insurance" are specifically defined in chapter 176D, § 3, including the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Id. Mass. Gen. Laws ch. 176D, § 3(9)(f).

667.     The purpose of the statutory scheme is to "encourage the settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief." Clegg v. Butler, 424

Mass. 413, 419 (1997) (internal citation omitted); accord Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 567-68 (2001).

668.    An attorney's malpractice insurance carrier may be responsible to the client/consumer under 93A and Chapter 176D as well.  This is because, once liability is clear, the attorney's malpractice insurance company is obligated to make a reasonable offer of settlement.  Even if or when the insurance policy may not cover 93A damages (multiple damages and attorney fees), the insurance company would still be obligated to take the claim seriously and focus on resolution to prevent their insured from facing multiple damages.

669.    The Donais defendants are represented by insurance counsel for Donais' malpractice insurance (as it relates to John Doe Company 1) and the Hilliard defendants are represented by insurance counsel (as it relates to John Doe Company 2) in this case.

670.    John Doe Company 1 is an insurance company who provides Craig Donais' and Donais Law Offices PLLC's malpractice insurance coverage in Massachusetts, and who, on information and belief, does business in Massachusetts and whose true identify is presently unknown to Plaintiff.

671.    John Doe Company 2 is an insurance company who provides Russell Hilliard's and/or Upton & Hatfield's malpractice insurance coverage, and who, on information and belief, does business in Massachusetts and whose true identify is presently unknown to Plaintiff.

672.    The insurance carriers (John Doe Company 1 and John Doe Company 2) know that the liability of the defendants is clear but yet they have refused to offer prompt settlement as required under Section 176D. This fact is supported by the fact that the defendants did not challenge the complaint on the basis of failure to state a claim in their original response to the complaint. This is a tacit admission of the factual validity of my claims.

673.    I also have asked counsel for the defendants for the name of the insurance carrier several times and they refuse to tell me. I told them I intend to add insurance carriers as a defendants to this case, but they still refuse and obstruct. I offered to engage in settlement with insurance carrier and insurance counsel but they have refused to engage in any such discussion and they have even refused to tell me the name of the insurance companies. I asked defense counsel to confirm that they are insurance counsel but they refused to answer. The conduct above is a violation of Section 176D.

674.    On information and belief, the insurance carriers are citizens of MA and thus addition of them to the case would destroy diversity. NB: Even if they are not MA citizens or are headquartered or incorporated outside of MA, they evidently still conduct business in MA and the acts took place in MA.

675.    Without a name, I have been obstructed in adding them as a defendant with a proper name. Thus, I hereby seek to add them as John Doe Company 1 and John Doe Company 2, until discovery or a court order can be had.

676.    On information and belief John Doe Company 1 knew of my claims against Craig Donais since at least 2019 when an ADO complaint was filed and then a lawsuit in Massachusetts superior court was filed in 2019 or 2020, which typically triggers a requirement that malpractice carrier is notified. John Doe Company 1 had ample opportunity to be notified of my claims. In 2020, John Doe Company 1 was evidently notified when another lawsuit was filed in NH superior court naming Donais as a defendant. On information and belief, they were also notified that Donais had been purportedly engaging in settlement negotiations with me through a plaintiff's attorney along with the Hilton defendants. On information and belief, at that time, John Doe Company 1 knew that Donais was liable for the claims.  On information and belief, by the time 2022 came around and another lawsuit was filed in Bristol Superior Court, Donais' malpractice insurance company was notified again. This time the malpractice insurance company assigned litigation counsel to defend Donais in this case. Since 2022, John Doe Company 1 has had ample time to investigate the claims and on information and belief, they know that Donais is liable for the claims and that he is not telling the truth and that he made false defamatory statements about the plaintiff to others. Yet, they have dragged out the case seeking to obtain a windfall by avoiding paying out any claims on this case, in bad faith. They knew of the tape recording showing false statements by Donais, they know that Donais lied on the plaintiff because of

the testimony from witnesses such as attorney Elliott Berry and several others. Yet, they insist on playing the law game gamble on seeking a dismissal instead of offering a prompt settlement and refusing to do so when I as the plaintiff made demand for them to do so. This is exactly what section 176D seeks to prohibit and deter.

677.    A similar pattern of events also applies to John Doe Company 2 as it relates the Hilliard defendants, though there are some differences.

678.    On information and belief, in this case, both defendant insurers are engaged in business within the Commonwealth of Massachusetts.

679.    The actions giving rise to these claims under M.G.L. ch 93A occurred primarily and substantially within the Commonwealth of Massachusetts.

680.    The defendant insurers owed me a duty of care to effectuate a fair and prompt settlement offer for the underlying claims in this action.

681.    The defendant insurers breached that duty of care.

682.    Chapter 93A for violations of Chapter 176D by insurance companies is the basis of my claims against defendant insurers John Doe Company 1 and John Doe Company 2.

683.    One predicate for imposition liability under the Consumer Protection Act is any act in violation of clause (9) of section three of chapter 176D. The actions of defendant insurers John Doe Company 1 and John Doe Company 2 violated the sections of §3(9) which are quoted verbatim below: "(9) Unfair claim settlement practices: an unfair claim settlement practice shall consist of any of the following acts or omissions:... (b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;... (f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

684.    Liability against the defendants' insureds in this case was reasonably clear from the time defendant insurers formally assigned insurance counsel to this case, through and including to the present date.

685.    The actions of defendant insurers John Doe Company 1 and John Doe Company 2, as described in this complaint, constitute unfair and deceptive acts and practices in violation of M.G.L. ch. 176D sec. 3, actionable pursuant to M.G.L. ch. 93A, as follows: They failed to effectuate prompt, fair and equitable settlement of Plaintiffs claim, where liability was reasonably clear and instead compelled Plaintiff to institute or maintain vigorous litigation in multiple courts including two federal courts.

686.    The defendant insurers violated Chapter 176D, §3(9)(d) by failing to conduct a reasonable investigation; by failing to effectuate a prompt, fair and equitable settlement in which liability had become reasonably clear; and by pursuing unreasonable or unfair or oppressive litigation tactics/conduct, including but not limited to submitting false or misleading statements to the courts, including a false affidavit by its insured, in an attempt to obtain dismissal in MA federal court and to get out of paying any settlement it knew it was required to pay.

687.    See Miller v. Risk Management Foundation of Harvard Medical Institutions, Inc. 632 N.E.2d 841, 846 (Mass. App. Ct. 1994) ("Although we think the judge did well to look to the standards of c. 176D to aid her in interpreting c. 93A, we think she would have reached the same conclusion if she had disregarded c. 176D and adopted the commonplace ethical view that a claims facilitator ought not wear out the claimant by unduly delaying settlement when liability is clear.").

688.    See also Quincy Mutual Fire Insurance Company v. Atlantic Specialty Insurance Company, 2019 U.S. Dist. LEXIS 125927 (D. Mass. July 29, 2019) (Burroughs, J.) where the court observed that an insurance company is not an "ordinary defendant" and may be liable for litigation conduct. The takeaway is that an insurer may be liable for bad faith litigation conduct.

689.    The violations of M.G.L. ch. 93A and M.G.L. ch. 176D were willful or intentional.

690.    M.G.L. c. 93A §2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. c. 93A § 11 permits any person engaged in the conduct of trade or commerce and injured by a violation of M.G.L. c. 93A § 2 to bring a civil action for damages and injunctive relief.

691.     John Doe Company 1 and John Doe Company 2 willfully and knowingly committed unfair and deceptive business acts and/or practices in violation of M.G.L. c. 93A §§ 2 and 11. 122.

692.     John Doe Company 1 and John Doe Company 2 as insurance companies have engaged in unfair claims settlement practices in violation of, inter alia, M.G.L. c. 176D § 9(a), (d) and (f) by, among other things, refusing to pay claims without conducting a reasonable investigation based upon all available information, and failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.

693.     John Doe Company 1 and John Doe Company 2 acts and practices are unfair and deceptive in material respects, offend public policy, are immoral, unethical, oppressive and unscrupulous and violate M.G.L. 176D § 9 and M.G.L. c. 93A § 2. 124.

694.     Whether an insurer can be found liable for an unfair settlement practice turns in large part on whether the insurer had a duty to make an offer to settle, which in turn depends on whether liability was reasonably clear. See Clegg v. Butler, 424 Mass. 413, 421 (1997) (holding that it is an unfair settlement practice for an insurer to fail to effectuate a prompt, fair, and equitable settlement of a claim in which liability has become reasonably clear, and that a third-party claimant can bring an action against a liability insurer who fails to do so). In this instance, I allege that the defendant insurers had a duty to make an offer to settle because liability was reasonably clear or should have been reasonably clear.

695.     On information and belief, Attorney Ed Landers, who has filed an appearance in this case as counsel for Craig Donais/the Donais defendants is also insurance counsel for the malpractice insurance carrier that covers Craig Donais legal malpractice coverage in Massachusetts.  As insurance counsel, Ed Landers has a duty to do due diligence to determine if there is liability and to promptly offer settlement if liability is clear, under Section 176D. It can be inferred that Ed Landers and the insurance carrier knows that liability is clear and that is why Ed Landers has failed to allege a failure to state a claim in the motion to dismiss in MA federal court. Also, at no point has Ed Landers disputed the factual allegations in the complaint. As a result, it can be inferred that there is a violation Section 176D. Even if Ed Landers is not insurance counsel, the insurance carrier must know about this case and the allegations of breach of fiduciary duty (which is essentially a legal malpractice claim). There is no conceivable scenario where an insurance carrier for malpractice for Craig Donais has not been notified of this case and the claims therein. Because the malpractice insurance for Craig Donais is for his practice in MA, it can be inferred that the insurance carrier is based in MA or has a home office in MA or is incorporated or otherwise registered in MA[12]. Furthermore, the refusal of Ed Landers to inform me of the name of the insurance company should not bar me from adding the insurance carrier to this case, as I can do so simply as John Doe Company, until discovery occurs to reveal the correct name. The same applies to the Hilliard defendants and their counsel Dan Sonneborn.

696.     To the extent that Ed Landers and Dan Sonneborn and/or the respective insurance carriers have violated Section 176D because their client has asked them not to do so in order to protect his reputation by not offering settlement promptly though liability is clear, then both the defendants and the insurance carriers/insurance counsel have engaged in unlawful conduct, wrongdoing, and are joint tortfeasors or jointly culpable for said violations, conduct and wrongdoing. Discovery will likely reveal the extent of this issue. I therefore will seek discovery to obtain the name of the insurance company and who its insurance counsel is, as well as further information regarding its duty or refusal to offer prompt settlement as to the clear liability in this case.

697.     The defendant insurers' failure to tender a settlement offer represents an unfair or deceptive act or practice. This claim involving violation of section 176D is or should be an integral part of this case.

698.     As a direct and proximate result of John Doe Company 1 and John Doe Company 2 unfair and deceptive acts and practices, Plaintiff has suffered injury.

699.     Plaintiff would not have incurred these losses if John Doe Company 1 and John Doe Company 2 had not engaged in acts and practices that were unfair and deceptive.

700.     Based on the foregoing, Plaintiff is entitled to all remedies available pursuant to M.G.L c. 93A, including, actual damages, double or treble damages, attorneys' fees, and other reasonable costs.

---

[12] This also goes further to the grounds for remand.

701.     NB: Please allow a pro se liberal construction to the above as I am not trained in the law to articulate it with lawyerly precision. See Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972))("In general, a complaint filed pro se is "liberally construed" and held to "less stringent standards than formal pleadings drafted by lawyers."").

---

## IX. SPECIAL ISSUES – STATUTE OF LIMITATIONS

---

### Statute of limitations

702.     This case was filed in state court on Saturday June 18, 2022. The events relevant to the claims in this case (including claims that carry a 3-year statute of limitations) occurred in June 2019, 2020, in 2021 and 2022. At all times relevant to the claims and damages of this case, there were less than 3 years that elapsed between these events and the filing of the complaint in this court.

703.     NB: It should be noted that the actual statute of limitations deadline (for claims that carry a 3-year statute of limitations) would be 3 years plus 106 days, based on the tolling created by the SJC during the Covid emergency in 2020. See *Shaw's Supermarkets, Inc. v. Melendez*, 488 Mass. 338 (2021) (holding that its 2020 COVID-19 statute of limitations tolling order tolled the statute of limitations for *all* civil actions, not just those actions for which the limitations period would have expired during the tolling period).

704.     Hence, all cases that had events starting in 2017 are allowed automatically to add an additional 106 days to the statute of limitations deadline, making it in this instance, Monday, October 3, 2022, for any purported 3 year statute of limitations, although the plaintiff does not necessarily need to avail himself of this additional time period in order for his complaint to be deemed timely. NB: Otherwise, even without this tolling, the purported deadline would have been Monday, June 20, 2022 given that June 18, 2022 fell on a Saturday and thus according to the rules, the deadline would bump over to the next business day of Monday June 20, 2022, which is when my e-filed complaint was docketed by the court, after I had e-filed it on Saturday, June 18, 2022 and of which there is proof of it being electronically filed on June 18, 2022.

705.     Since the more recent core events alleged started on or about June 18, 2019, or otherwise in or around June 2019, then either way the plaintiff is covered regarding any statute of limitations issue for this complaint for claims that carry a 3-year statute of limitations, based on the above purported deadline.

706.     It should be noted however that given that the plaintiff e-filed his complaint on Saturday, June 18, 2022, then the actual time period for any purported 3-year statute of limitations, goes back 106 days to March 4, 2022.

707.     Also, for any events that took place in 2020 or after, the statute of limitations has not expired for any claims in this complaint.

708.     Similarly, for plaintiff's 93A claims and racial harassment claims under Section 1981, those have a statute of limitations of 4 years and are not expired at the time of the filing of the original complaint in state court, if counting from the events that occurred in June 2019.

709.     In addition, the plaintiff's breach of contract claims have a 6-year statute of limitations and are not expired at the time of the filing of the original complaint in state court.

710.     NB: In the first amended complaint filed in state court, that complaint stated: "*Although references may have been made to certain events that occurred in 2017 or prior to the year 2019, these are only referenced for context or background and the plaintiff does not intend, in this lawsuit, to seek recovery of damages for these events, that occurred in 2017 or prior to the year 2019, for claims that carry a 3 year statute of limitations. The plaintiff only intends to seek recovery where possible in this lawsuit for damages flowing from events, known to the plaintiff, that occurred in the year 2019 and thereafter (as it relates to claims that carry a 3-year statute of limitations). These points are stated in order to ward off any frivolous unwarranted statute of limitations challenge by the defendants.*"

711.     However, based on analysis of the applicable Massachusetts renewal/saving statute, I assert that the claims going back to 2017 are preserved. If the Massachusetts renewal statute applies, then all the claims going back to 2017 are preserved. The analysis is as follows: The statute of limitations do not apply to the claims in this case because this case was filed in Bristol Superior Court of Massachusetts in June 2022, within one year, after a similar case was dismissed without prejudice in the Middlesex Superior Court of

Massachusetts in August 2021, due to a purported issue with service of process created by an agent of the United States Post Office, and thus the Massachusetts savings statute is triggered, allowing the entire Middlesex Superior Court case, as filed in Bristol Superior Court, to relate back to the original date it was filed in January 2020. Thus, all claims from the Middlesex Superior Court case were transferred through into the Bristol Superior Court case, and thus survive any statute of limitations analysis from start to finish. Thus, the case has no statute of limitations issues. The Massachusetts renewal statute/savings statute allows for re-filing of a case dismissed within one year after dismissal, while preserving the original date of filing of the dismissed case, and thus preserving against any statute of limitations issue. In this instance, if the Massachusetts renewal statute/savings statute applies, which I believe it does, then there are no statute of limitations issues in this case.

712.     Furthermore, the plaintiff asserts that regardless of whether the Massachusetts renewal/savings statute applies or not, he does intend to seek damages for the breach of implied contract cause of action, as an exception to any purported 3-year statute of limitations, which in this case does not apply in any scenario, because breach of contract claims carry a 6 year statute of limitations, which means every act that is a breach of implied contract described in this complaint is brought timely via this complaint.

713.     **NB: It should be noted that I am not, at this juncture, seeking recovery for any statements made by the defendants to a court or to the ADO. No statement made in this complaint is to be construed as such.**

---

## X. CONCLUSION

714.     As a result of the above-described acts, the plaintiff has suffered, continue to suffer, and will in the future suffer emotional distress, embarrassment, frustration, anger, and feelings of stigmatization including racial stigmatization from the false allegations, all to his economic and noneconomic damages in an amount to be determined by a jury at trial.

715.     The plaintiff is also entitled to reasonable attorney fees pursuant to statute.

716.     The plaintiff asks the court to grant a liberal construction to these pro se/non-lawyer words in a light most favorable to the plaintiff, in accordance with the best practices of modern jurisprudence and in compliance with the US supreme court's directive to all lower courts and tribunals, in Haines v Kerner, 404 U.S. 519 (1972).

717.     The plaintiff requests that this court tries its best to understand what it is that the plaintiff is trying to articulate to the court, and to interpret it in the best way and best light possible, in order to provide appropriate justice as is necessary and required.[13]

718.     The plaintiff hereby demand a trial by jury on all issues so triable.

WHEREFORE, the plaintiff, respectfully prays that the Court grant the following relief:

(1) Enter judgment in plaintiff's favor and against Defendants for: any and all damages acceptable by law, including compensatory damages, statutory damages, punitive damages, pre-judgment interest at the legal rate, post-judgment interest at the judgment rate, attorney's fees as may be awarded by the Court, the costs of this action, equitable relief, relief pleaded in the preceding paragraphs, injunctive relief, and such other and further relief as the plaintiff may be entitled to by bringing this action.

(2) Award plaintiff damages within the jurisdictional limits of this court and enhanced damages as appropriate.

(3) Award plaintiff reasonable attorneys' fees and costs including service and filing fees.

(4) Grant a pro se liberal construction to this pleading.

(5) Order such other relief as this Court deems just and equitable.

---

[13] NB: The defendants are not allowed to dispute facts asserted in this complaint, prior to trial or the summary judgment stage. Should the defendants persist in doing so in violation of the rules and court requirements, appropriate sanctions would be proper.

Respectfully Submitted,

_____
ANDRE BISASOR
679 Washington Street, Suite # 8-206
Attleboro, MA 02703

Dated: March 12, 2024